```
 1                   IN THE UNITED STATES DISTRICT COURT

 2              FOR THE WESTERN DISTRICT OF MICHIGAN

 3                        SOUTHERN DIVISION

 4      UNITED STATES OF AMERICA,

 5            Plaintiff,              No.  1:17cr130

 6       vs.

 7      DANIEL GISSANTANER,

 8            Defendant.

 9

        Before:
10
                          THE HONORABLE JANET NEFF,
11                          U.S. District Judge
                            Grand Rapids, Michigan
12                        Thursday, March 22, 2018
                            Motion Proceedings
13
        APPEARANCES:
14
                     MR. ANDREW BIRGE, U.S. ATTORNEY
15                   By:  MR. JUSTIN PRESANT
                     The Law Building
16                   330 Ionia Avenue, NW
                     Grand Rapids, MI 49501-0208
17                   616-456-2404

18                        On behalf of the Plaintiff;

19                   FEDERAL PUBLIC DEFENDERS
                     By:  MS. JOANNA CHRISTINE KLOET
20                   MR. PEDRO CELIS
                     Federal Public Defender's Office
21                   50 Louis NW
                     Suite 300
22                   Grand Rapids, MI 49503
                     616-742-7420
23
                          On behalf of the Defendant.
24

25      REPORTED BY:  MS. KATHY J. ANDERSON, RPR, FCRR
```

1          March 22, 2018

2        PROCEEDINGS, 10:07 a.m.

3          THE LAW CLERK:  All rise, please.  Court is now in

4   session.  Please be seated.

5          THE COURT:  Good morning, everybody.

6          MS. KLOET:  Good morning.

7          THE COURT:  I have had more mouse problems today.

8   This is the date and time that is set for hearing on a couple

9   of government motions in case number 1:17cr130, the United

10  States of America versus Daniel, is it Gissantaner.

11  Gissantaner.  How is it properly pronounced?

12         MS. KLOET:  Gissantaner, Your Honor.

13         THE COURT:  Counsel, would you please put your

14  appearances on the record for me and any introductions of

15  people who are at counsel table.

16         MR. PRESANT:  Good morning, Your Honor.

17  Justin Presant for the United States.  With me at counsel table

18  this morning is ATF Special Agent Jeff Kitchen.

19         THE COURT:  Kitchen.

20         MR. PRESANT:  Kitchen, Your Honor.

21         THE COURT:  Spelled the normal way?

22         MR. PRESANT:  It is, Your Honor.

23         THE COURT:  Thank you.

24         MS. KLOET:  Good morning, Your Honor.  Joanna Kloet,

25  Assistant Public Defender, and to my left is Pedro Celis our

1　　research and writing specialist attorney, and to his left is

2　　Mr. Gissantaner.

3　　　　　　　THE COURT:  Great.  In addition to the hearing on the

4　　motions this morning, there are a couple of housekeeping things

5　　we need to talk about, but I think we will defer those until

6　　I've decided the motions after argument.

7　　　　　　　There is one I do have a question on before we get

8　　started.

9　　　　　　　There's a reference somewhere in the defendant's

10　　documents to this being a second, it sounded like it was a

11　　second trial.  But is it accurate to say that what you were

12　　referencing was an MDOC proceeding?

13　　　　　　　MS. KLOET:  That is accurate, Your Honor.

14　　　　　　　THE COURT:  Okay.

15　　　　　　　MS. KLOET:  There was a hearing, a merits hearing at

16　　the MDOC.

17　　　　　　　THE COURT:  And the result was?

18　　　　　　　MS. KLOET:  He was acquitted on the charge of felon in

19　　possession.

20　　　　　　　THE COURT:  Based on?

21　　　　　　　MS. KLOET:  Based on the evidence that was presented

22　　in that hearing which did not include the DNA evidence and

23　　likelihood ratio that is at issue in these motions.

24　　　　　　　THE COURT:  Okay.  Great.  All right.  We are first

25　　going to take up the government's motion to quash the defense

subpoenas which were served on I believe two federal employees
who are employed by the National Institute of Standards and
Technology.  So, Mr. Presant, you're up.

MR. PRESANT:  Thank you, Your Honor.  The government's
motions are or the government's arguments I should say are set
forth in the motion that it filed on the issue.  I'll briefly
summarize those arguments and then take any questions that the
Court has of course.

The basis for the motion to quash really are federal
regulations that have been approved of by the Supreme Court, or
at least the general class of regulations, if not the
regulation itself at issue in this case, has been approved by
the United States Supreme Court in United States ex rel. Touhy
versus Ragen, 340 U.S. 462, and that's a 1951 case out of the
Supreme Court.

And the rationale behind the Touhy regulations of
course is that the government has an interest in conserving its
resources.  The resources being the time of federal employees
whose job it is not to be professional expert witnesses.

THE COURT:  The government also has an interest,
Mr. Presant, in not convicting people on insufficient evidence.
And so when it comes down to balancing the government interest
in preserving resources, and the defendant's right to be tried
on proper evidence, resources loses.

MR. PRESANT:  I agree with that general concept, Your

Honor, with some caveats.  One caveat being the type of witness
at issue here.  These are witnesses who the defendant wants to
call as opinion witnesses and not fact witnesses.

THE COURT:  Well, that's not quite accurate.  As I
understand it, and as I understand what the precedent provides,
is that while they may not be properly asked for opinion
testimony, they can be properly queried with regard to
conclusions that they have reached from their research.

And it just seems to me that --  I really do think,
I'll tell you honestly, before this case I had never heard of
the Touhy regulations.  So we had to do a lot of digging.  And
it's pretty clear that the law in this particular area is not
black and white, as it were.  And what I understand, and
certainly Ms. Kloet can speak for herself, but my understanding
is not that they are looking for opinion testimony on the
particular facts of this case or the particular DNA of this
case, but their expertise which apparently is considerable on
this relatively new, and again based on our research,
relatively untested in the courts form of DNA testing.

So go from there, if you would.

MR. PRESANT:  Thank you, Your Honor.  I appreciate the
opportunity to address that.

So as an initial matter, Drs. Lund and Iyer, I believe
they are doctors though I haven't seen their C.V.s, I assume
they are given their expertise, I understand them to be experts

1    in statistics, not in DNA analysis, not in probabilistic

2    genotyping.

3        THE COURT:  But probabilistic genotyping comes up with

4    a statistical number, right?

5        MR. PRESANT:  It does.  And so what their paper says,

6    to the extent I can understand it, and it is, it's a very dense

7    paper, I have read things about that paper that say you need to

8    have a background and expertise in statistics to even

9    understand what they're saying.  So I think I have some grasp

10   of what they are trying to say in their paper.

11       And based on my understanding of that paper, what it's

12   really about is how likelihood ratios can be used in the

13   courtroom as applied to all forensic discipline.  So, yes,

14   STRmix and probabilistic genotyping end in a likelihood ratio,

15   as do other forms of forensic evidence that are presented in

16   court, including in paternity testing, paternity forensic DNA

17   analysis results in likelihood ratio, and there's been a

18   proposal to adopt likelihood ratios in other forensic

19   disciplines where they are not being used where they could be

20   used.  And there are some good arguments for doing that, and I

21   think what their paper is really about is urging caution in

22   wide spread adoption of likelihood ratios because of what are

23   really abstract statistical concerns about that.

24       However, I think Drs. Lund and Iyer also acknowledge

25   that likelihood ratios are appropriate in some applications in

1    court.  And if there's any application that likelihood ratios

2    are appropriate in, it's in DNA forensic analysis.

3            THE COURT:  Well, and that, you know, what you have

4    just described, Mr. Presant, really seems to me to argue for

5    bringing them in to explain that all to me.  It really does.

6    Because I have to tell you that I took one statistics class in

7    undergraduate school about a hundred years ago, and I hated

8    every minute of it.  But it just seems to me that this area,

9    and I've done some reading, I didn't look very closely at the

10   exhibits -- we are going to have to talk about that later --

11   but it just seems to me that where you have the kind of

12   situation that faces us here, as I said earlier, a relatively

13   new, relatively untested in the courts scientific testing

14   regimen, and lay people, a lay person, this judge, who has to

15   make a decision whether it is admissible or not admissible,

16   that as much information as is available, as much expertise

17   that we can call on argues for bringing these people forward.

18            And, again, based on our review of the legal landscape

19   with regard to the Touhy issue, I don't see any impediment to

20   me ordering them to come.  Affidavit or no affidavit.

21            MR. PRESANT:  Your Honor, I would like to address the

22   legal issue, but if I may, in preparing for today's hearing I

23   also came across just a two-page relatively short question and

24   answer type article from "IDentification News."  It's written

25   by John Paul Jones who interviews the two authors about

1    likelihood ratios.  And to me it made their opinions much more

2    accessible and I think it will shed some light on the issue for

3    the Court.  And I provided a copy to defense counsel.  So I'll

4    hand that up to the Court now.

5             THE COURT:  Sure.

6             MR. PRESANT:  And I just like to direct the Court to I

7    think what is ultimately the main issue here which is on the

8    back side of the question and answer.  And the second to last

9    question that they're asked in this article is, "Do you feel

10   that LR, likelihood ratios, should not be used in courtroom

11   testimony?"  And they say: "No, that is not our view.  While we

12   do not consider it proven that likelihood ratios are the final

13   answer and recognize their limitations, they may be the best

14   communication strategy currently available in many forensic

15   applications if one accepts the idea that the role of the

16   expert is to effectively summarize the relevant information in

17   the form of a 'weight of evidence'."  And --

18            THE COURT:  Again, that just seems to scream, let me

19   hear from these people.

20            MR. PRESANT:  Well, I understand that, Your Honor,

21   that we certainly, we certainly could bring them here, or the

22   defense could bring them here, if the Court lets the motion, or

23   the subpoena stand.  But I think the question is what's the

24   limiting principle on that?  I understand this is just one

25   case.  And they could be brought here, and maybe some other

1    judge in some other case down the line can see what the actual

2    burden is on this.  But I submit to the Court that the

3    rationale behind the Touhy regulations has to have some effect

4    in terms of weighing the government's interests and having

5    experts fly across the country here, they could fly across the

6    country in every case in which likelihood ratios are used,

7    every paternity lawsuit, every instance in which DNA evidence

8    is presented in the form of likelihood ratios.  And if all they

9    are going to come and say is, well, we should be cautious in

10   adopting likelihood ratios in other forensic disciplines but

11   likelihood ratios may be the best thing that are currently

12   available to communicate the conclusions of forensic analysis

13   in court, that is a burden on scientists whose job it is to

14   conduct research like that submitted by the defendant for a

15   relatively marginal benefit.

16        The government has no issue with the Court considering

17   their paper, has no issue with the Court considering their

18   statements in other articles.

19        THE COURT:  Well, you've already said that the paper

20   is very dense, and I take you at your word.  And I am not ready

21   to accept, what is this, maybe a hundred words in this

22   paragraph as the be all and end all.  It just seems to me, and,

23   you know, the argument that the slippery slope and all that

24   sort of stuff, that argument is made so many times.  If this

25   technology is as good as the government believes it is, it will

1    eventually, maybe after this case and another case, and a third

2    case, it will gain the kind of acceptance that other kinds of

3    forensic evidence have such as, fingerprints; I mean nobody

4    questions, although I guess now some people are beginning to,

5    but nobody has questioned fingerprint evidence for probably

6    50 years.  But early on, I'm guessing, there were some smart

7    lawyers who did.

8           And so if it does, if it is as good as you think it

9    is, sooner or later, and it may cause some inconvenience to the

10   government, and maybe will cause a little bit of expense,

11   sooner or later, it will get there.  And whenever the

12   government provides this evidence with the proper foundation,

13   there won't be any question.  The defendants will stipulate to

14   it, just as they stipulate to other kinds of scientific

15   testing.  I'm thinking of breathalyzer tests, same thing.  You

16   know, when I was early in practice they were relatively new and

17   there were challenges to them.  Some successful.  And now, you

18   know, if you can show that the operator made sure that the air

19   passage was clear, made sure that the defendant didn't have

20   anything in his mouth and all of that, the results are not

21   challenged in court.

22          And, again, you know, as I said, I think if that is

23   your strongest argument, it's not a strong argument at all.

24          MR. PRESANT:  And I just want to make sure that the

25   record is clear.  The Court understands that these experts if

they are called will not testify about STRmix or probabilistic

genotyping typing, they are strictly, my understanding is, they

are going to testify about likelihood ratios and Bayesian

decision theory and the effect of that --  the effect or how

those statistics can be presented in court.  So they aren't

going to testify about the technology.  They haven't studied

the technology.  They don't understand the technology.  Though

I haven't talked to them.  I could be wrong about that.  But

that's my understanding based on everything that's been

submitted in the case.  They're just going to talk about the

numbers, and so I don't think they will have anything to say

about STRmix or probabilistic genotyping.

THE COURT:  Well, let's hear from Ms. Kloet.  She

might be able to enlighten us.

MR. PRESANT:  Thank you, Your Honor.

THE COURT:  Thank you, Mr. Presant.

MS. KLOET:  Your Honor, I'm happy to address the Court

on the substance of what their testimony would be.  To the

extent to which the Court wants to address Touhy regulations,

Mr. Celis prepared that response and he is prepared.

THE COURT:  Okay.

MS. KLOET:  I think the Court has stated it well to

the -- I intend to have Iyer and Lund come here to explain

their findings as fact witnesses.  To do that they're going to

have to explain some really high level statistical concepts

like Bayesian decision making theory and how that applies to
its use in probabilistic genotyping systems.  I mean they are
not creators of probabilistic genotyping systems but because
that type of system generates a likelihood ratio, they may have
to testify regarding how that, how those statistical principles
apply in the context of PGS.

I think they are necessary because I mean, Your Honor,
as a non scientist, non mathematician, this article was
inscrutable.  It took me weeks, months to get through it and
just to emerge with some sort of rudimentary understanding of
what the gist of what they are saying is.

I have had an opportunity to communicate with them.
And I do believe their testimony will be very helpful to the
Court in understanding the underlying principles, how it
applies to especially complex mixtures that are at issue in
this particular case.

THE COURT:  Well, again, after listening to
Mr. Presant, I am more convinced that you're correct, and as to
the question of the necessity, whether they are necessary, I
think that is really more a judgment for defense counsel to
make than for me to make, or Mr. Presant.

If, you know, in evaluating your defense of
Mr. Gissantaner, if it is your professional judgment that this
testimony is necessary for your proper preparation and
presentation, then I think that Mr. Presant's argument to the

1    contrary really is essentially irrelevant, honestly.  You know,

2    it's not a relevance argument.  It's an argument we don't need

3    this testimony, and the defense thinks it is necessary.

4         So to that extent, I think I get your argument.  I

5    agree with it.

6         If Mr. Celis wants to put some brief argument on the

7    record with regard to the Touhy regulations, I think I can then

8    make a --

9         MR. CELIS:  Your Honor, I don't think that's necessary

10   in this case.  I will think we can stand on the arguments we

11   made in our response as they relate to the Touhy regulations.

12        THE COURT:  Okay.  Thank you.  I'm not even going to

13   cite any case law.  As I said, I think that the case law --

14   well maybe I should in deciding the motion.

15        First of all, the question of procedural compliance

16   with the agency's regulations, where the agency hasn't even

17   said that they believe their regulations have been violated,

18   the agency itself hasn't raised this issue; we don't know what

19   the agency thinks.  I assume that Mr. Presant has been in

20   contact with the NIST counsel or somebody that is related to

21   the National Institute of Standards and Technology, but we

22   don't even know if they have a position on whether the Touhy,

23   or whether the, their regulations have been offended in any way

24   by the defendant, and the defendant argues I think fairly

25   persuasively that they haven't.  Mr. Presant.

1          MR. PRESANT:  May I address that, Your Honor?

2          THE COURT:  Sure.

3          MR. PRESANT:  So the subpoenas were brought to my

4   attention because NIST counsel turned them over to me.  This is

5   my first encounter with Touhy as well.  But my understanding is

6   it's a routine matter when agency employees are subpoenaed for

7   them to turn it over to their counsel who then contacts the

8   relevant U.S. Attorney's office to file the motion to quash.

9          THE COURT:  Okay.

10         MR. PRESANT:  So the motion to quash was filed at the

11  request of agency's counsel.

12         THE COURT:  Got you.  Okay.  Thank you.  So now that

13  is cleared up.  We do have some basis to believe that the

14  agency does not --  wishes to quash these, these subpoenas.

15         But in, again, the case law, and I'm looking for the

16  full cite, the case law says, and this is not exactly a quote,

17  but, and we couldn't find anything directly on point, but the

18  case law essentially says, that a federal agency's Touhy

19  regulations do not control a federal court's evidentiary

20  decisions including the issuance of subpoenas for testimony of

21  a federal employee in cases in which the United States is a

22  party.  And that's 93 --  what is that cite, Kathie -- Federal

23  Claims at 380.  And further, where such regulations are clearly

24  in conflict with the Court's authority as set forth in the

25  Federal Rules of Evidence and the rules of court, they can have

1    no force or effect.  And for that I would cite Romero versus

2    the United States, 153 Federal Rules decision, 649, U.S. v

3    Henson, 123 F.3d 1226, disapproved on other grounds in U.S.

4    versus Foster, 165 F.3d, 689, U.S. ex rel. O'Keefe versus

5    McDonnell Douglas Corporation, 132 F.3d 1252.

6            And then the Supreme Court has said they looked at the

7    Housekeeping statute and held it does not provide statutory

8    authority for substantive regulations, Upsher-Smith Labs versus

9    Fifth Third Bank, the 16cv556, the Westlaw cite is 2017

10   WL7369881.

11           So the bottom line is that the motion to quash is

12   properly decided by this Court under the Rules of Evidence and

13   the court rules that are applicable.  And I believe that the

14   testimony which the defendant wishes to bring forward has a

15   high likelihood of being relevant, and even more significantly,

16   of doing what expert testimony is supposed to do, and that is

17   educating the Court.  I think that all of us, all of us lawyers

18   in this matter come to this issue, this DNA issue, I can't even

19   remember what, SXT --

20           THE LAW CLERK:  STR.

21           THE COURT:  -- from a decided disadvantage.  I'm sure

22   not a scientist, and I need to understand this stuff before I

23   can make an informed decision.  And so the more help I can get,

24   the better off we will all be.

25           So the government's motion to quash is denied.

1          The other thing I would say, and I don't know whether
2     it was the defense pointed this out or whether it was
3     Ms. Geiger, my law clerk, but in doing some reading on this
4     stuff, it's pretty clear that there's a lot of research still
5     going on and it may well be that these two authors will have
6     something that has come to them, or that their work has
7     discovered since they wrote the paper.  And, again, if that's
8     the case, boy, I would love to know it.  I really would.
9          So the motion to quash is respectfully denied.
10         All right.  Now, the next motion we have before us is
11    the government's motion to exclude the defense witness Nathan
12    Adams.  Or to delay the Daubert hearing.  That latter I think
13    is pretty much moot.  And I think I pretty much understand your
14    argument, Mr. Presant.  It's a fairly technical one.  I think
15    you would agree.  But if you want to put something on the
16    record, please do so now.
17         MR. PRESANT:  I'll be brief, Your Honor.  And I agree
18    that given the rescheduling of the hearing anyway, the
19    alternative form of relief may be moot.
20         The issue really is just to make sure that whatever
21    challenges the defendant is bringing in the Daubert motion are
22    joined.
23         I reviewed very carefully the motion that was filed
24    back in December, and Ms. Kloet provided contemporaneous or
25    near contemporaneous disclosure of one expert, Dr. Julie

1    Howenstine, and I think Ms. Kloet and I have had a lot of
2    conversations about the anticipated expert testimony for the
3    Daubert hearing in the time since that initial disclosure.  And
4    so I think that the government has therefore prepared its
5    experts to respond in part to some of the opinions that it
6    believes Dr. Howenstine is going to offer at the Daubert
7    hearing.

8              I think the disclosure with respect to Mr. Adams which
9    happened on March 12th of this year, some nearly three months
10   after the initial motion was filed along with the initial
11   disclosure of Dr. Howenstine, are different in kind from the
12   types of arguments raised in that motion.  I understand
13   Mr. Adams's arguments are going to be directed more towards the
14   software engineering and the computer coding behind STRmix as
15   opposed to what is probabilistic genotyping, what is STRmix,
16   how does it work, how is that evidence then presented in court,
17   what are the biological and chemical processes that lead
18   ultimately to the likelihood ratio that's presented in court.
19   Those are all the things the government was prepared to present
20   evidence on, whereas Mr. Adams is really talking about coding.
21   And from the very little time that I have had to -- well, so,
22   just to finish that thought and tie it off.  The government if
23   that's what's going to be at issue in this motion just wants to
24   be able to respond appropriately.
25             THE COURT:  Is the government also expecting or

1    contemplating hiring its own expert on the coding issue, on the

2    software issue?

3           MR. PRESANT:  Well, I want to review the issue.  I

4    mean I have taken a very cursory look so far at Mr. Adams's

5    qualifications, and the opinions he might be qualified to

6    render, and there are some things that are concerning to the

7    government about whether he really is qualified to offer the

8    opinions that he's been tendered for.  I haven't had enough

9    time to review that sufficiently where I feel confident in

10   taking a position one way or the other, but it may be that the

11   appropriate action for the government to take is to move to

12   exclude him because of his lack of qualifications or expertise

13   to render an opinion on that issue.  It may be the appropriate

14   course of action is for the government to hire its own expert

15   to respond to those issues, or it may be that even if the Court

16   is going to receive his opinion based on what qualifications he

17   has, that cross-examination would be sufficient in order for

18   the government to meet its burden under Daubert.  But the

19   government just wants additional time to review those options

20   to make sure that the issue is joined.

21          THE COURT:  How much time do you think you would need?

22          MR. PRESANT:  In our motion we ask for 45 days from

23   today's hearing.  And really I wouldn't ask for that much time

24   ordinarily but it is highly technical.

25          THE COURT:  I don't think that's a lot of time, to be

1    honest with you.  You know, I think that's a very reasonable
2    position in terms of timing.
3           Have you done a calculation of how much time is left
4    on the speedy trial clock?
5           MR. PRESANT:  I don't believe we have speedy trial
6    issues in this case, Your Honor, because the pending motions
7    tolled the Speedy Trial Act.  I would be interested to hear
8    Ms. Kloet's position on that issue.  But, no, I haven't done
9    that calculation.  But I think because of the motions for ends
10   of justice that were filed by Ms. Kloet in preparing the
11   original Daubert motion, and then the fact that that motion has
12   been pending, the two motions before the Court have been
13   pending, I think all of that time would be excluded under the
14   Speedy Trial Act.
15          THE COURT:  It might behoove you to try to figure that
16   out anyway.
17          MR. PRESANT:  I will certainly will look into it.  And
18   the only other issue I'll add on this if the Court is inclined
19   to delay the hearing, the two experts the government was
20   planning to call at today's hearing they are both with the
21   Michigan State Police, Dr. Jeffrey Nye who is a member of
22   SWGDAM is SWGDAM, which is the national governing body for --
23   which stands for the Scientific Working Group on DNA Analysis
24   Methods.  I know.  It's a world of acronyms we are living in
25   now between STRmix and SWGDAM.  And I'll stop saying them for

1  the benefit of the stenographer.  But our two experts were

2  holding this date, and they have some things on their calendar

3  that they asked me to make the Court aware of.  And I can get

4  in touch with your case manager if we are trying to find a new

5  date because I would like to do whatever we can to accommodate

6  their schedules.

7  THE COURT:  I understand.  And I agree.  And Rick will

8  work with you in finding another date.

9  MR. PRESANT:  Thank you, Your Honor, I appreciate it.

10  THE COURT:  Okay.  Ms. Kloet.  You want to respond?

11  MS. KLOET:  Sure.  Briefly, Your Honor.  I just wanted

12  to underscore the importance of Mr. Adams's testimony for the

13  Court.

14  The science or technology in front of the Court

15  really, at the risk of oversimplification can be distilled into

16  three separate areas of expertise and that is DNA forensic

17  analysis, statistics, and software.

18  Mr. Adams, his testimony would be largely about the

19  fact that there are well-established standards for testing and

20  developing software and they were not met here.  They have been

21  applied to Smart phone apps, airline navigator systems, they

22  have been established for decades, and they were not met here.

23  His testimony will supplement Dr. Howenstine's

24  testimony as to the forensic DNA forensic testing, and also the

25  testimony of Drs. Lund and Iyer with respect to the

1     statistical --

2          THE COURT:  You don't disagree, do you, that the

3     government should have an ample opportunity to do the three

4     things that Mr. Presant just talked about, review Mr. Adams's

5     qualifications, decide whether to challenge him on his

6     qualifications, decide whether cross-examination is going to be

7     sufficient, and decide whether to call their own expert.  You

8     don't disagree with any of that, do you?

9          MS. KLOET:  No, Your Honor.  I think both parties need

10    time to do that, absolutely.

11         THE COURT:  All right.  Anything further?

12         MS. KLOET:  No, Your Honor.  Just that what

13    Mr. Presant said about me keeping him apprised in real time as

14    I was searching for an expert is accurate.  Thank you.

15         THE COURT:  All right.  The, under Rule 16, as I'm

16    sure the parties know or counsel knows, I've got pretty broad

17    remedial powers in regulating discovery.  And I think that to

18    some extent we can excuse the defense's lapse, I think there

19    was a lapse here, but for --  because this case is a fairly

20    complicated one, and one involving an evidentiary issue that

21    none of us is really all that familiar with, I think we can

22    exclude the possibility of a dismissal as a result of any

23    potential violation of the court rules in naming an expert and

24    so forth.

25         In addition to that, the stakes in this case are very

1    high.  Mr. Gissantaner is facing a charge which carries a

2    mandatory 15-year minimum sentence.  And that's, that's a big

3    deal.  It's a big deal to me.  I'm quite sure it's a big deal

4    to him, and I think it's probably a big deal to the government

5    too.  And so I don't think it is at all off the mark to say

6    that Mr. Adams should be allowed to testify as an expert

7    subject to the Daubert hearing, of course, and without any

8    sanctions of any kind.  I just think that we are all grappling

9    with a situation that is not familiar to any of us, and we are

10   doing the best we can.

11        So for purposes of the ruling on the motion, the

12   motion to exclude the defense witness is, well, it's granted in

13   part and denied in part.  It's granted to the extent that we

14   are going to reschedule the Daubert hearing.  It's denied in

15   terms of the motion to exclude Adams as a witness.

16        Counsel will confer with the Court's case manager to

17   find a new date for the Daubert hearing.

18        I want to go back just one second to the ruling on the

19   motion to quash.  Not only are the Touhy regulations an area of

20   novelty for all of us, it really seems to me, and I haven't

21   obviously read all the cases, but it really seems to me that

22   for the most part the case law that has dealt with them has

23   been on the civil side of the courtroom.  And we're dealing

24   with different priorities on the criminal side.  And I think

25   that argues even more strongly for the Court to have

1   discretion.  I don't think, I don't think I need any more

2   authority for that proposition.  But to the extent that it

3   simply bolsters my conclusion, I offer that for the record for

4   whatever it's worth.

5            Now, housekeeping.  Kathie, do you have those binders

6   there?  Ms. Kloet provided the Court with a gigantic stack of

7   loose exhibits.  My JA was nice enough to hole punch them and

8   put them into binders.  I'm going to give those binders back to

9   Ms. Kloet with the instructions that she is to, number one,

10  prepare an index which not only identifies the exhibit but

11  gives at least a brief description of what it is and what it's

12  relevant to.  And secondly, that she tabs each one.  It would

13  be nice to have a divider, a tab divider between each exhibit.

14           Was there anything else, Kathie, that I needed to

15  address this morning?

16           THE LAW CLERK:  We are all set on the speedy trial.

17           THE COURT:  Yeah, they're going to deal with Rick and

18  they will figure it out.

19           THE LAW CLERK:  But we do need to hear from the

20  defense?

21           THE COURT:  Maybe we do.  That's a good idea.

22  Mr. Gissantaner, you have sat through this and I know that you

23  were not particularly interested in any further delays.  And I

24  understand that.  But my question to you is even --

25  Mr. Presant may well be correct that the speedy trial clock is

1  not running, but do you have any objection to us putting this

2  case out further into the schedule to allow everybody,

3  including me, to really get up to speed and understand the

4  nature of the evidence that the government wants to present

5  against you?  Do you have any objection to the delay that is

6  going to probably be, I'm guessing more than 45 days, partly

7  because my schedule in May and April is just jammed.

8            So can you tell me what your thinking is on the delay?

9            THE DEFENDANT:  No, ma'am, Your Honor.  In the

10  interests of fundamental fairness, I think he deserves the

11  right to prepare anything he deems necessary.  And I think the

12  Court should have the right to explore and make a decision

13  based on that.  I just want to be treated fairly.

14            THE COURT:  Well, that's my goal too.

15            THE DEFENDANT:  That's it.

16            THE COURT:  Okay.  Thank you, I appreciate your

17  comments, Mr. Gissantaner.

18            What else, Kathie, anything?

19            THE LAW CLERK:  No, I believe that's it.

20            THE COURT:  Mr. Presant, anything further?

21            MR. PRESANT:  No, thank you, Your Honor.

22            THE COURT:  Ms. Kloet.

23            MS. KLOET:  No, Your Honor.  Thank you.

24            THE COURT:  Okay.  Thank you both.  Thank you all.

25  And we are adjourned for today.

1          THE LAW CLERK:  All rise.  Court is adjourned.

2          (Proceedings concluded, 10:50 a.m.)

REPORTER'S CERTIFICATE


        I, Kathy J. Anderson, Official Court Reporter for the

United States District Court for the Western District of

Michigan, appointed pursuant to the provisions of Title 28,

United States Code, Section 753, do hereby certify that the

foregoing is a full, true and correct transcript of the

proceedings had in the within entitled and numbered cause on

the date hereinbefore set forth; and I do further certify that

the foregoing transcript has been prepared by me or under my

direction.




                        /s/ Kathy J. Anderson

                        Kathy J. Anderson, RPR, FCRR

                        U.S. District Court Reporter

                        412 Federal Building

                        Grand Rapids, Michigan  49503