hbg2jon1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,                    New York, N.Y.

4             v.                                15 Cr. 153(VSB)

5  DEAN JONES,

6       a/k/a "Korrupt,"                        Hearing

7
                  Defendant.
8
   ------------------------------x
9
                                               November 16, 2017
10                                             10:40 a.m.

11
   Before:
12
                      HON. VERNON S. BRODERICK,
13
                                               District Judge
14

15

16
                          APPEARANCES
17
   JOON H. KIM
18       Acting United States Attorney for
         the Southern District of New York
19  BY:  THOMAS A. McKAY, JR.
         JOAN M. LOUGHNANE
20       Assistant United States Attorneys

21
   ANTHONY STRAZZA
22  GIOVANNI ROSANIA
         Attorneys for Defendant
23

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

hbg2jon1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,              New York, N.Y.

 4              v.                           15 Cr. 153(VSB)

 5    DEAN JONES,

 6         a/k/a "Korrupt,"                  Hearing

 7
                        Defendant.
 8
      ------------------------------x
 9
                                            November 16, 2017
10                                          10:40 a.m.

11
      Before:
12
                        HON. VERNON S. BRODERICK,
13
                                            District Judge
14

15

16
                            APPEARANCES
17
      JOON H. KIM
18         Acting United States Attorney for
           the Southern District of New York
19    BY:  THOMAS A. McKAY, JR.
           JOAN M. LOUGHNANE
20         Assistant United States Attorneys

21
      ANTHONY STRAZZA
22    GIOVANNI ROSANIA
           Attorneys for Defendant
23

24

25
```

Hbg2jon1                      Adams – Direct

1              (Hearing resumed)

2              THE COURT:  We are ready to proceed?

3              MR. ROSANIA:  Yes, your Honor.

4              THE COURT:  Call your next witness.

5              MR. ROSANIA:  The defense calls Nathan Adams.

6    NATHANIEL D. ADAMS,

7         called as a witness by the Defendant,

8         having been duly sworn, testified as follows:

9    DIRECT EXAMINATION

10   BY MR. ROSANIA:

11   Q.  Good morning, Mr. Adams.

12   A.  Good morning.

13   Q.  Could you please describe your educational background.

14   A.  I have a bachelor's in science in computer science from

15   Wright State University, and I am currently in the process of

16   earning my master's degree in computer science from Wright.

17   State as well.

18   Q.  Let's talk about your undergraduate studies at Wright

19   State.

20            You say you have a bachelor's of science in computer

21   science, correct?

22   A.  Yes.

23   Q.  Was there a specialization that you did while conducting

24   your undergraduate studies?

25   A.  I did a specialization, which is kind of like a focus, in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Hbg2jon1                      Adams - Direct

1    the bioinformatic track.

2    Q.   Did that require additional course work at Wright State

3    University?

4    A.   There were a number of additional courses that I took that

5    are not part of a standard computer science curriculum.

6    Q.   And were they requirements for that specialization?

7    A.   Yes.

8    Q.   What were some of those courses?

9    A.   A couple of the more important ones, and what I believe are

10   relevant today, are courses in genetics and bioinformatics,

11   specifically.

12   Q.   What is bioinformatics?

13   A.   It is the marriage of computing, computer science and

14   biology, which are traditionally not very overlapping fields or

15   disciplines.  It is to acquaint biologists with competing

16   theory and capabilities of what problems can be solved with

17   different tools of computing as well as acquainting computer

18   scientists with the models, concepts, vocabulary, rules,

19   constraints of biological systems.

20   Q.   What other courses were required for the bioinformatics

21   specialization at Wright State?

22   A.   Honestly, I don't recall what was required as opposed to

23   what I took.  I have taken a number of courses in biology or

24   chemistry that -- I don't have the criteria for that

25   specialization in front of me, but I have taken courses in

Hbg2jon1                          Adams - Direct

1    biochemistry, anatomy and physiology, lab chemistry, as well,

2    microbiology, a number of different courses.

3    Q.   Did you take any courses where you had any data

4    analyzation?

5    A.   Yes.  That's a major focus of the types of electives that I

6    took for my computer science undergraduate degree, as well as

7    my graduate studies has been on kind of the analytic side of

8    computing.  That might be as opposed to other disciplines that

9    are more about the applied math computability and complexity.

10   There is a variety of disciplines, as in biology, they have

11   zoology or microbiology, genetics, things like that that

12   biologists might focus on.  Analytics is what I chose to focus

13   on in computing.  So I have courses in computability and

14   complexity, algorithm design and analysis, data mining, machine

15   learning, things like that, where we take the tools of

16   computing and actually apply them to particular data sets.

17   Q.   And in the specialization of bioinformatics, what is the

18   level of experience that you have with the cross-section

19   between computer science and forensics?

20   A.   So I have done a number of studies and projects on

21   biological data sets.  Some of those involving forensic DNA,

22   both in my studies at the university as well as my everyday

23   work experience at forensic bioinformatics.

24   Q.   We are going to get to that in a second.

25             Were you a part of any undergraduate associations?

Hbg2jon1                    Adams - Direct

1   A.  I am -- I was a member and I still am a member of the

2   Bioinformatics Research Group at the university.  It's a

3   research group run by two of the computer science professors

4   who have their students tackle biological problems.

5   Q.  What type of projects have you done with the research

6   group?

7   A.  With the research group, I spent a fair amount of time

8   working on molecular evolution projects.  That's the comparison

9   of DNA between organisms that diverged at different points in

10  their evolutionary history.

11  Q.  As part of your undergraduate experience, did you have any

12  experience with statistics?

13  A.  Yes.  I took a course specifically in statistics.  I have

14  also taken undergraduate courses in data mining, which is the

15  application of particular statistical tools to try to suss out

16  patterns in data.

17  Q.  With regards to your master's degree program, how far along

18  are you with your master's?

19  A.  I have completed the necessary course work, and the credit

20  requirement, but I have to submit and defend my thesis.

21  Q.  What's your thesis on?  What's the subject?

22  A.  The subject is -- I believe Dr. Shapiro touched on this

23  yesterday -- the maximum allele count, method of identifying

24  the number of contributors, the minimum number of contributors

25  in a mixture.  I am simulating and then evaluating the minimum

Hbg2jon1                        Adams - Direct

1    number of contributors in a variety of different mixtures.  I

2    believe the 2007 John Buckleton paper that was touched on

3    yesterday is a good description of what I am doing, except I am

4    importing that experience to a new data set.

5    Q.  What is your master's degree going to be in?

6    A.  It will be in computer science.

7    Q.  With regards to that, to your master's thesis, what type of

8    research and/or studies have you done?

9    A.  I had to source my data somewhere, and the -- my data was

10   sourced from the NIST open data set.  It is a collection of

11   about a thousand profiles, DNA profiles that have been

12   accomplished online at a variety of loci; the allele

13   frequencies that are derived from those genotypes for the

14   different populations in the United States; and I had to do the

15   research into the work that has already been done by people,

16   like my boss and several of his colleagues at the university,

17   who published one of the early papers on the subject in 2005,

18   the John Buckleton paper.  There was -- Hinda Haned was

19   mentioned yesterday, she has done some work on assessing the

20   number of contributors to a mixture.  So I have read those

21   specific papers in addition to the surrounding literature, and

22   of course had a number of conversations with my advisors and

23   group.

24   Q.  Are you employed?

25   A.  Yes.

Hbg2jon1                          Adams - Direct

1    Q.   By whom?

2    A.   Forensic Bioinformatic Services.

3    Q.   What is Forensic Bioinformatic Services in the business

4    of?

5    A.   If it's easier to say FBS, it is what we call it.

6    Q.   Okay.

7    A.   We do forensic DNA consulting and reviews of testing that's

8    already been conducted.

9    Q.   What do you do there?

10   A.   My title is systems engineer, but I have different duties

11   depending on what the particular case in question is.  I will

12   review the electronic data generated by the capillary

13   electrophoresis machine, so these are files that are exported

14   from the machine, and we use the same software that the

15   laboratory uses.  In the case of OCME, they use the GeneMapper

16   software program today.  So we will use that program to

17   reanalyze the data, to see what peaks are present, and there

18   was some conversation about that yesterday.  So we have those

19   capabilities that can be called on, if necessary.  We will

20   prepare a supplemental table of alleles that we typically find

21   easier to explain and have conversations with the lawyers who

22   hire us to have conversations over these prepared tables.  They

23   are visually more pleasing, I believe, than a lot of what the

24   laboratories produce.  We will review laboratory protocols, any

25   relevant literature in the forensic DNA field.  Depending on

Hbg2jon1                            Adams - Direct

1   what issues are at hand, from case to case, it can widely vary.

2   One case can be number of contributors, one can be touch and

3   transfer issues.  Some of them, well, increasingly, there are

4   issues about probabilistic genotyping interpretations or the

5   models and methods used to construct these probabilistic

6   genotyping systems.  So it really depends on the case, but

7   those are some major points of my duties.

8   Q.  Who else works at FBS?

9   A.  We have -- I am a full-time employee there.  We have one

10  other full-time employee.  She is a biologist, Carrie.  And

11  Dr. Krane is a -- the president of our company.  His job is

12  professor of biology at Wright State.  We have other people who

13  tend to be the big picture folks who are the shareholders of

14  our company.  So we will call them in when we have kind of

15  guiding issues that we need to address, if we go in a different

16  direction as a company or if we have particular technical

17  questions that we need to call on them.  We have a variety of

18  other part-time employees as well, both kind of managerial and

19  administrative, as well as other technical workers.

20  Q.  With regards to the non-full-time employees, the

21  consultants, what types of areas of expertise are they

22  affiliated with?

23  A.  We have a couple of our co-owners, our cofounders are

24  those -- the head of the Bioinformatics Research Group that I

25  am a member of, Dr. Raymer and Dr. Doom, they are professors of

Hbg2jon1                          Adams - Direct

1    computer science and engineering at Wright State.  There is a

2    professor, and I apologize for butchering this, in criminology

3    and social behaviors.  I'm sorry.  He is a Ph.D/J.D. at U.C.

4    Irvine.  Dr. Bill Thompson, Dr. Simon Ford, as well, who is

5    another independent expert who does reviews of forensic DNA

6    cases.  We have recently brought on, in the past six months or

7    so, we have researcher who is a Ph.D in biology, as well, who

8    works at Notre Dame for his primary job, but he has been

9    consulting and working with us as well.

10   Q.  How long have you worked at FBS?

11   A.  About five years now.

12   Q.  How did you come about working for FBS?

13   A.  I took some courses in bioinformatics as -- for my

14   specialization in bioinformatics.  The course is a year-long

15   course, two semesters, so the first course was co-taught by

16   Dr. Raymer and Dr. Krane, so a computer science professor and a

17   biology professor.

18            THE WITNESS:  May I adjust the microphone?

19            THE COURT:  Make yourself comfortable.  You can adjust

20   it as you see fit.  The only thing, obviously, is we just want

21   to make sure that the court reporter is able to hear everything

22   you say.

23            (Pause)

24   A.  So Dr. Krane and Dr. Raymer taught this course and

25   described a little bit of what they did at FBS.  I thought that

Hbg2jon1                        Adams - Direct

1    sounded interesting.  They announced that if anybody was

2    interested in an internship, they talk to them.  I ultimately

3    talked to them, I showed up, and I am here five years later.

4    Q.  I don't know if I heard you, but what is your particular

5    title as FBS?

6    A.  It's a systems engineer.

7    Q.  Now, who are your usual clients at FBS?

8    A.  We have a number of clients around the world.  They are

9    typically defense lawyers, solicitors.

10   Q.  So what would they be hiring you for?

11   A.  We don't have testing capabilities at my office.  We are

12   exclusively reviews.  So this is work that's been done by

13   either public labs or typically private labs at the behest of

14   prosecutors, police departments.  Whoever is requesting this

15   testing be done, the testing is done, the results are delivered

16   to us, we review them.

17   Q.  With regards to your work experience, we spoke about your

18   educational experience, but with regards to your work

19   experience, what level of experience do you have with

20   statistics?

21   A.  Statistics are a part of every DNA case that's brought to

22   us.  It's my understanding the case law is pretty well

23   established in the U.S. that conclusions aren't reported

24   without statistics, and of course defense lawyers who are

25   bringing us cases to review are concerned ultimately about some

Hbg2jon1                          Adams – Direct

1    conclusion reported.

2    Q.  Do you only do reviews of programs that deal with DNA?

3    A.  At FBS?

4    Q.  At FBS, yes.

5    A.  Yes we are exclusively a forensic DNA, forensic biology

6    company.

7    Q.  During your employment at FBS, what has been your

8    experience with probabilistic genotyping programs?

9    A.  In 2014, the switch flipped inside me that got me really

10   interested in where the field was heading, the field of

11   forensic DNA mixture interpretation, which has been the primary

12   focus of probabilistic genotyping.  I asked my boss to attend a

13   conference that I attended with one of our colleagues in I

14   guess it was a workshop or a seminar in -- outside of St. Louis

15   that was put on for a week where we were introduced to five

16   different probabilistic genotyping programs, one per day.

17   Q.  What were those five.  Sorry.  I cut you off.

18   A.  Oh, LabRetriever, LRmix, perhaps Forensim -- it's gone

19   through a number of names -- STRmix, TrueAllele.  I think I am

20   missing the fifth one.

21   Q.  That's okay.  It wasn't FST, though?

22   A.  That was not presented there, no.

23   Q.  And, so, what has been your experience at FBS now with your

24   reviewing of probabilistic genotyping programs?

25   A.  Well, at that time, we had seen few cases involving

Hbg2jon1                          Adams - Direct

1   probabilistic genotyping software.  TrueAllele had been out for

2   a while, and at that time we hadn't been receiving many cases

3   involving FST for review.  Since then, our -- the number of

4   cases involving FST has grown in addition to the number of

5   TrueAllele cases that we have reviewed.  So there are dozens of

6   cases across probabilistic genotyping, easily dozens, that we

7   have reviewed along with that.

8          When we attend conferences or give talks, the topic is

9   often probabilistic genotyping, especially for me personally.

10  That's one of my interests due to the computational aspect of

11  it.  So there has been an increasing amount of literature on

12  the subject as well as the general interest in probabilistic

13  genotyping has raised throughout the field and has, I believe,

14  moved from more of a theoretical kind of hypothetical interest

15  into a very practical interest due to a number of reasons and

16  changes in the field.

17  Q.  Do you work on probabilistic genotyping programs on a daily

18  basis?

19  A.  We certainly review their results.  Whether we are actually

20  running those programs on a daily basis is going to depend on

21  the week.

22  Q.  And how long have you been working on probabilistic

23  genotyping programs?

24  A.  I have been talking about them for quite a while.  That

25  workshop is, in my mind, the milestone of when in earnest I

Hbg2jon1                         Adams - Direct

1    studies.  I don't think those are publicly posted anywhere.

2    Q.  Did you review any other organizations' protocols?

3    A.  That's a standard process for me to do in any case review,

4    so I don't have a number off the top of my head, but dozens of

5    different forensic DNA labs whose testing and analysis,

6    conclusions who we have reviewed, I have reviewed their

7    protocols as well.

8    Q.  Are you familiar with SWGDAM?

9    A.  Yes, it is one of the guidance bodies for forensic DNA

10   analysis in the United States.

11   Q.  Did you review their protocols, validation protocols with

12   regards to your review of the FST program?

13   A.  Yeah, I have been familiar with those since they have come

14   out.

15   Q.  Why is Dr. Krane not here testifying?

16   A.  I believe the focus has been on me, as I was the one who

17   conducted the inspection of the source code in Johnson.  My

18   background is in computing and software development and reviews

19   of that nature, so I have certainly consulted with him but when

20   it came down to it, the questions that we were asked to address

21   are questions that I am answering.

22   Q.  And what is Dr. Krane's background again?

23   A.  He is a Ph.D in biology.  He has studied molecular biology

24   in population genetics, which is the research he has continued

25   on at Wright State.

Hbg2jon1                          Adams - Direct

1          (Counsel confer)

2          MR. ROSANIA:  Your Honor, at this time I would offer

3  Mr. Adams as an expert in computer science and bioinformatics.

4          THE COURT:  Let me ask, so the bioinformatics was not

5  a minor or was it a minor in your studies at Wright State?

6          THE WITNESS:  It's a novel field, so that's not

7  really --

8          THE COURT:  I'm sorry?  It's a what?

9          THE WITNESS:  It's a novel field.  It is one of those

10 things that we would expect it to be a major, maybe in ten or

11 20 years at, you know, first a couple institutions offer it, so

12 it is not something that is actually offered.  It is something

13 that needs to be custom crafted if you are interested in

14 studying that.  It was not an official minor.

15         THE COURT:  So it is not a degreed area at the school?

16         THE WITNESS:  Anywhere to my knowledge.

17         THE COURT:  Okay.

18         MR. ROSANIA:  Your Honor, can I just ask two more

19 questions?  I think it would help.

20         THE COURT:  All right.  Let's see.

21 BY MR. ROSANIA:

22 Q.  You mentioned that you have to take special classes to get

23 this bioinformatics specialization.  Anywhere on your degree

24 does it mention the specialization of bioinformatics?

25 A.  It's on the transcript.

Hbg2jon1                    Adams - Direct

1   Q.  So it is something that's distinctive --

2                THE COURT:  Wait.  Wait.  When you say it is on your

3   transcript, it is on your -- the transcript with your grades or

4   on your -- or -- because counsel mentioned your degree.  So in

5   other words, if you had, like, your degree that's hanging, you

6   may have hanging somewhere, or maybe not.  It is probably, like

7   mine, may be rolled up somewhere.  But is it on your

8   transcript, in other words, that you would order from the

9   university that has your grades and other things and it has

10  bioinformatics or is it on your degree?

11               THE WITNESS:  It's on my transcript.  I haven't looked

12  at my diploma since I got it.

13               THE COURT:  Is it in English or is it in Latin, your

14  diploma?

15               THE WITNESS:  I don't know.

16               THE COURT:  I'm just semi joking because many of them

17  are not, and I don't read Latin, so some of mine are in Latin.

18  Go ahead.

19  BY MR. ROSANIA:

20  Q.  How many hours have you spent on bioinformatics since your

21  specialization in undergrad?

22  A.  I don't know how to quantify that.  The company I work for

23  is has bioinformatics in its name.

24  Q.  So is that hundreds, thousands?

25  A.  Yeah.

Hbg2jon1                    Adams - Direct

1   Q.  Every day, correct?

2   A.  Yes.

3        THE COURT:  Have you ever been qualified as an expert

4   in bioinformatics?

5        THE WITNESS:  I have been qualified as an expert once.

6   It was in computer science and statistics.

7        THE COURT:  At that time were you proffered, in other

8   words, were you offered up as an expert in bioinformatics.

9        THE WITNESS:  No.

10        THE COURT:  Okay.  All right.  Go ahead.

11   BY MR. ROSANIA:

12   Q.  Have you ever been denied expert status?

13   A.  No.

14        MR. ROSANIA:  I will offer him, once again, your

15   Honor, as an expert in computer science and bioinformatics.

16        MR. McKAY:  *Voir dire*, your Honor?

17        THE COURT:  Okay.  Focused.

18        MR. McKAY:  Yes.

19        Mr. DeLuca, can you pull up his résumé again?

20   *VOIR DIRE* EXAMINATION

21   BY MR. McKAY:

22   Q.  Can you look at the first page?  It doesn't list what year

23   you graduated from college, does it?

24        THE COURT:  I'm sorry, what year?

25   Q.  What year you graduated from college.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Hbg2jon1                    Adams - Direct

1   A.  It does not.

2   Q.  You did not mention that in your direct testimony.

3   A.  No.

4   Q.  It's 2014, right?

5   A.  Correct.

6   Q.  And you do not yet have a master's degree in computer

7   science, right?

8   A.  That's correct.

9   Q.  You started that program in 2014?

10  A.  Yes.

11  Q.  And in September 2016 you testified that you were hoping to

12  get that degree by the end of that year, didn't you?

13  A.  Yeah, that sounds right.

14  Q.  You said that bioinformatics is a novel field?

15  A.  Yeah, in the scheme of the sciences it is.

16  Q.  If you Google bioinformatics, are you aware that you would

17  find 66 institutions that offer master's degrees in

18  bioinformatics?

19  A.  I was not.

20  Q.  You do not have a graduate degree in statistics, right?

21  A.  Correct.

22  Q.  You do not have a degree in forensics?

23  A.  I don't.

24  Q.  You have never worked in a forensic DNA lab.

25  A.  I have not.

Hbg2jon1                    Adams – Direct

1   Q.  You never handled a piece of evidence and conducted DNA

2   testing.

3   A.  I have not.

4   Q.  Your résumé doesn't have a section on publications, right?

5   A.  It does not.

6   Q.  You have no peer-reviewed publications?

7   A.  Not published.

8   Q.  The IEEE that you are a member of, that doesn't govern the

9   forensic DNA community, right?

10  A.  It's a professional organization.  It does not govern

11  forensics.

12  Q.  And you have testified in court twice before, is that

13  right?

14  A.  That's correct.

15  Q.  And the first time in Washington was just a pretrial

16  hearing, right?

17  A.  It was a *Frye* hearing.

18  Q.  It was a *Frye* hearing?

19  A.  Yes.

20  Q.  Are you sure that it was a *Frye* hearing?

21  A.  That's my understanding.

22  Q.  State v. Fair, in Washington?

23  A.  Yes.

24  Q.  Your testimony was not about a motion to compel testimony

25  to compel the source code?

Hbg2jon1                          Adams - Direct

1    A.  Oh, I stand corrected, that's what it was.

2    Q.  And you were not qualified as an expert in that case,

3    right?

4    A.  I don't think it came up there.

5    Q.  The second time, the time you were qualified as an expert,

6    that was in Commonwealth v. Dante Washington, right?

7    A.  Yes, sir.

8    Q.  That was a challenge to TrueAllele, right?

9    A.  The case involved TrueAllele, yes.

10   Q.  And you testified that you were qualified as an expert in

11   DNA analysis and computer science?

12           (Pause)

13   Q.  Excuse me, computer science and statistics.

14           MR. ROSANIA:  Objection.

15           THE COURT:  Yeah, I was going to say.

16   Q.  Computer science and statistics, right?

17   A.  I believe that was the terminology.

18   Q.  And you testified that you have never not been qualified as

19   an expert, right?

20   A.  Correct.

21   Q.  In fact, the defense lawyer moved for you to be qualified

22   as an expert in DNA data analysis, didn't he?

23   A.  Sounds like something along those lines.

24   Q.  And the judge sustained the objection to that, right?

25   A.  I don't recall the procedures.

Hbg2jon1                         Adams - Direct

1    was it.  There was what OCME calls performance checks and what

2    the testimony will show is how the changes in the FST program,

3    how it modified the interpretation of FST, the program itself.

4    And I think that's relevant to this hearing.

5              THE COURT:  Okay.  Well --

6              MR. STRAZZA:  May we have one moment, please?

7              THE COURT:  Sure.

8              (Counsel confer)

9              MR. ROSANIA:  Finally, your Honor, I think -- we have

10   been here for many days, you know, listening to a lot of

11   testimony, and I think that this testimony is relevant and I

12   think it is up to the court itself to determine the weight of

13   this evidence.  This is a hearing.  It's not in front of the

14   jury.  We are not --

15             MR. McKAY:  Judge, can I just briefly note --

16             THE COURT:  It probably says in SWGDAM it's not

17   retroactive.

18             MR. McKAY:  It says, "These guidelines are not

19   retroactive."  So Mr. Adams has reviewed them, but he is not

20   qualified to opine on them.

21             THE COURT:  This is what we are going to do.

22   Mr. Adams, I will qualify Mr. Adams as an expert in computer

23   science.  With regard to the other testimony, I will hear it;

24   but, quite frankly, I may reject it in the end of the day as

25   expert testimony.  I think that -- and I don't know, I haven't

Hbg2jon1                          Adams - Direct

1    gone back to look to determine.  Certainly someone who has a

2    degree in computer science and that has done work subsequently,

3    I think, you know, can be qualified as an expert.  But as I

4    understand it, with regard to bioinformatics, I am not

5    qualifying him as an expert in bioinformatics.  You know, as I

6    understand it from the testimony, although Mr. Adams does have

7    experience in that area, and perhaps could be qualified as

8    extensive, there is not a degree program or even a minor at the

9    school he was at with regard to bioinformatics.  While he does

10   have, it sounds, work experience in that area, I don't believe

11   at this stage his experience is sufficient to qualify him as an

12   expert in bioinformatics.  And, in addition, quite frankly,

13   while I understand that there may be, at least according to the

14   government's question -- it is not actually before me, and

15   questions aren't evidence -- that other -- there may be certain

16   other universities or colleges that have master's programs in

17   bioinformatics, I don't know to what extent bioinformatics as a

18   general matter being something where people have been qualified

19   as experts.

20           Let me ask, Mr. Rosania, do you know whether any

21   courts, either federal or state, have qualified individuals in

22   this area?

23           MR. ROSANIA:  I do not.  But I know, as Mr. Adams

24   testified, that in order to get this transcript distinction, he

25   was required to enroll in certain classes, which he did.  But

Hbg2jon1                          Adams - Direct

1   with regards to whether or not bioinformatics -- someone has

2   been -- opined as an expert in that, no, I do not know.

3   However, I would say I think bioinformatics is something that

4   is evolving over the past 20 years, specifically with the

5   evolution of these probabilistic genotyping programs.

6           THE COURT:  That is part of my point.  It is evolving,

7   and it may be that there is a body of law or findings by courts

8   that have set parameters with regard to when somebody can be

9   qualified as an expert or whether or not this is a particular

10  expertise or whether or not it is really a merging of two

11  different disciplines where you would have -- if someone

12  doesn't have the DNA analysis experience and the computer

13  science experience in one person, where it is something that

14  sort of goes to my questions about collaborative process.  So I

15  will maintain my ruling.  You can ask the questions.  But, as I

16  said, depending upon the nature of the questions and what

17  Mr. Adams is asked to opine about, I may, in the end of the

18  day, reject certain portions of the testimony.

19          MR. ROSANIA:  Okay.

20          THE COURT:  Okay?  You can proceed.

21  BY MR. ROSANIA:

22  Q.  I would like to first start about your procedure where you

23  are reviewing a probabilistic genotyping.  What is your first

24  step when you are contracted to review a particular program?

25  A.  We like to compile a list of materials that describe the

HBG3JON4                          Adams – Cross

1    calculation or assigns a likelihood ratio of one, whichever it

2    happens to be.  Right?

3    A.  No, it removes the locus.

4    Q.  It does that whether the likelihood ratio generated by that

5    locus was greater than, or less than, one.  Right?

6    A.  It is agnostic to the likelihood ratio value of that locus.

7    Q.  Okay.  Now, you testified a lot about the SWGDAM guidelines

8    on direct, right?

9    A.  Okay.

10   Q.  Those were 2015 guidelines?

11   A.  Some of them.

12   Q.  Well, let's pull up Defense Exhibit A.  These are 2015

13   SWGDAM guidelines that you cited in your testimony, right?

14   A.  Yes.

15   Q.  If we go to the bottom of that first page, can you read the

16   sentence that begins "these guidelines."  It may be obscured by

17   the exhibit sticker.

18   A.  "These guidelines are."

19   Q.  Let's go to the next.  You realize that the word "not" is

20   obscured by the exhibit sticker?

21   A.  I'm familiar with the document.

22   Q.  It says "not" beneath that exhibit sticker, right?

23   A.  I have no problem accepting that.

24   Q.  Okay.  So they are not intended to be applied

25   retroactively, right?

HBG3JON4                              Adams - Cross

1   A.  Not by the authors' intent, yeah.

2   Q.  Ah, I see.  But perhaps by your intent, they're intended to

3   be applied retroactively?

4   A.  I don't think science started in 2015.

5   Q.  Okay.  So you didn't help draft those guidelines, right?

6   A.  No.

7   Q.  You're not a member of SWGDAM, right?

8   A.  I am not.

9   Q.  You've never worked in a forensic lab that has to apply the

10  SWGDAM guidelines, right?

11  A.  I have not.

12          THE COURT:  Let's say you created some source code

13  five years ago and there have been guidelines that have come

14  out in 2016.  Are you saying that the source code that you

15  created, that you believe that it should be subject to the

16  guidelines that came out later?

17          THE WITNESS:  I think this is a conversation that

18  hasn't been had --

19          THE COURT:  Well, I'm asking you.

20          THE WITNESS:  -- in the field.

21          THE COURT:  But, I'm asking you whether you feel that

22  that is an appropriate thing to do and whether it's something

23  that's appropriate, an onus that is appropriate to be placed on

24  you in the work that you did.

25          THE WITNESS:  Again, I think this is a conversation

HBG3JON4                         Adams - Cross

1     that our field needs to have.  Collaboration between the

2     scientists, statistician and engineers.  If a guideline came

3     out in -- what was it -- July of 2015, then at a minimum, I

4     think those standards need to apply to any software in use at

5     that time and going forward.  And I have no idea why it would

6     not be a good idea to go back on a casework that's already been

7     done to see if those standards could be met retroactively.

8              THE COURT:  Do you understand the implications of what

9     you just said with regard to not only work that's done in this

10    area but work across a spectrum of industries that are out

11    there?

12             THE WITNESS:  I do.  And I think this comes back to

13    the conversation about what is the criticality of the system.

14    This is something that is a standard conversation in software

15    engineering, that there are software programs that are more

16    important to get right the first time than others.  Things like

17    airline navigation systems are more important than iPhone

18    games.

19             THE COURT:  Okay.  Go ahead.

20    BY MR. McKAY:

21    Q.  Just to be clear, the opinion that you just expressed, that

22    would hold true even if the governing body for the relative

23    industry in this case, SWGDAM, said these guidelines should not

24    be retroactive, you'd still have that opinion?

25    A.  That the -- good practices in 2015 are not supposed to be