1            IN THE COURT OF COMMON PLEAS OF
             LYCOMING COUNTY, PENNSYLVANIA
2

   COMMONWEALTH                  : No. CR-1075-2014
3                                :
                                 :
4        V                       :
                                 :
5                                :
   DANTE WASHINGTON              : JURY TRIAL
6

7

                     TRANSCRIPT OF PROCEEDINGS
8                 TESTIMONY OF NATHANIEL ADAMS

9             BEFORE : Nancy L. Butts, President Judge

10            DATE   : December 15, 2016; 8:54 a.m.

11            PLACE  : Courtroom No. 1
                       Lycoming County Courthouse
12                     Williamsport, PA  17701

13

14   APPEARANCES:

15       MARTIN L. WADE, ESQUIRE
         KENNETH OSOKOW, ESQUIRE
16       Lycoming County Courthouse
         Williamsport, Pennsylvania, 17701
17           FOR - COMMONWEALTH

18       WILLIAM J. MIELE, ESQUIRE
         NICOLE J. SPRING, ESQUIRE
19       Lycoming County Courthouse
         Williamsport, Pennsylvania, 17701
20           FOR - DEFENDANT

21

                         Reported and Transcribed by:
22                       Camala Jordan
                         Official Court Reporter
23

24   PHOTOCOPYING OF THIS TRANSCRIPT CONSTITUTES A VIOLATION OF
     18 Pa.C.S.A., Section 392(b), Theft of Services.
25

1   we're taking.  Currently we're using GENSCAN and

2   Genotyper.  There's a variety of versions for that.  Two

3   versions of GeneMapper.  We are looking into GeneMarker.

4   So what are we up to?  Six different versions of software.

5   We have a custom homemade version of a program called

6   Genofiler.  For statistical analysis we have sort of a

7   desktop calculator specific to forensics DNA called

8   GenoCAD.  In addition to Microsoft Office, you know, Word

9   and Excel for -- for calculations and report writing.

10  Depending on the case at hand if there was a probabilistic

11  system we might use one of those systems depending on what

12  questions have been asked of us and what we're interested

13  in doing.  So I've personally used maybe seven or eight of

14  the 12 different probabilistic genotyping software

15  programs Dr. Perlin described as on the market currently.

16      Q    Are there -- are there individuals that send you

17   DNA to be tested?

18      A    Physical samples?

19      Q    Yes.

20      A    No.

21      Q    You usually receive data?

22      A    We don't have testing capabilities at our office.

23      Q    Okay.  So you don't have the equipment on site

24   that would be used for actually extracting, amplifying

25   DNA from human samples?

        1          A      That's correct.

        2          Q      Nor do you advertise yourselves as being able to

        3      do that?

        4          A      No.  We -- anybody who calls inquiring about that,

        5      we'll refer them to a lab who does that and has that

        6      capability.

        7          Q      Have you written any publications in your area of

        8      expertise?

        9          A      In terms of journal articles I haven't had any

       10      journal articles published.  I have written some.  There's

       11      one that will hopefully be coming out in a couple months.

       12      That is not a peer reviewed journal.

       13          Q      Have you contributed to any other publications

       14      like books, anything like that?

       15          A      I haven't authored any book chapters.

       16          Q      Have you ever worked in a lab that does DNA

       17      analysis?

       18          A      Forensic DNA analysis?

       19          Q      Yes, sir.

       20          A      Not forensic DNA analysis.  I worked in a medical

       21      lab for a while.

       22          Q      What was the nature of your college curriculum as

       23      it relates to the hard sciences such as biology,

       24      chemistry, biochemistry?

       25          A      As in the courses that I took in the past during

1   college?

2       Q    Yes, sir.

3       A    So the requirements for a computer science degree

4   at Wright State required a year of what we would consider

5   hard laboratory science.  That would be general chemistry

6   or general biology.  I took general chemistry.  I took

7   advanced physics in high school, but none at the college

8   level.  I took a course in biochemistry.  I have a course

9   in genetics.  Several courses in bioinformatics, that's

10  the integration of computing and applying the principle of

11  computer science specifically to biological data.  I said

12  general chemistry, genetics.  Anatomy, physiology I took a

13  year of.  And most of my other courses have been specific

14  to computer science or other general educational

15  requirements.

16      Q    Okay.  Thank you.  Have you ever reported on

17   forensic DNA evidence in a criminal case?

18      A    What do you mean reported on?

19      Q    Reported the results of an analysis that's done

20   using a computer program instead of DNA data?

21      A    I don't believe I've authored, signed any

22  statements providing statistical weights to a Court.

23      Q    What type of statistics and mathematics classes

24   did you take in college?

25      A    I took a statistics course and then a number of my

1  computer science courses involved different types

2  statistical analysis.

3      Q    What was the statistics course that you took?

4      A    I don't recall the name of it.  It was the one

5  that's required for engineers.

6      Q    Okay.  Are you -- how familiar are you with the

7   mathematical undercarriage -- underpinnings of TrueAllele

8   software?

9      A    What do you mean how familiar?  I mean, I know

10  their equations of the difficult questions that qualify.

11      Q    Well, are you familiar with the type of

12   mathematics that is utilized by TrueAllele to do what it

13   does?

14      A    Both Bayesian Statistics and the computing

15  algorisms known as Markov Chain Monte Carlo.  Yes, I'm

16  familiar with those.

17      Q    Okay.  Have you taken classes in those areas?

18      A    I'm not aware of classes specific to Markov Chain

19  Monte Carlo.  I'm not even aware of classes that are --

20  are simply Bayesian Statistics, but I haven't taken any

21  courses exclusive to those.

22      Q    Was your -- your knowledge in those areas from

23   your own independent study?

24      A    Some of it, yes.  Some of it's from coursework as

25  well.

```
 1        Q     The -- the term probabilistic genotyping came up

 2     during your direct.  What training have you had in the

 3     area of probabilistic genotyping?

 4        A     Back in -- in 2014 -- the spring of 2014 was when

 5     my personal and professional interest really turned toward

 6     probabilistic genotyping from the more general, what we

 7     would say as traditional DNA analyst.  That summer I was

 8     able to attend a week long workshop held by the Midwest

 9     Association of Forensic Sciences.  They're a regional

10     professional organization for forensic scientists.  And

11     they exhibited one probabilistic genotyping program per

12     day for a week so I attended those, the last day being a

13     presentation of TrueAllele where I saw Dr. Perlin speak

14     via webinar or webcam, whatever you call that.  And since

15     then we've been conducting -- at work through my company

16     we've been conducting ongoing trainings on the various

17     systems and watching webinars ourself.  We're in Dayton,

18     Ohio it's not a hot bed of conferences that people come

19     from out of town so we have to attend meetings in Orlando,

20     New York, Chicago, Seattle, those places to attend ongoing

21     trainings and conferences.

22        Q     Have you been attending those conferences?

23        A     I've been attending several conferences and

24     workshops per year since I started.

25        Q     On probabilistic genotyping?
```

1      A     They include that.   Some of the conferences are

2    more specific to probabilistic genotyping.   Some are

3    included as a -- one of the bullet points that they

4    address.

5      Q     Can you tell me about the specific ones and where

6     they were?

7      A     Well, starting with the week in St. Louis in 2014.

8    There have been a number of workshops and conferences

9    where speakers have gone for anywhere in between 10

10   minutes and several hours discussing the application of

11   probabilistic genotyping to specific data in a case, the

12   development or the design of a particular system, the

13   transparency of a system, the comparison of two different

14   systems or more.   There have been a series of webinars put

15   on by the National Institute of Standards and Technology

16   including comparison studies between multiple systems.   I

17   don't recall the dates of watching those, but on my CV

18   there's the dates where I've attended these -- these

19   various workshops.   Probabilistic genotyping is -- is a

20   very interesting topic to many people in the field of

21   forensic DNA and is gaining rapid interest at the same

22   time.   It's --

23     Q     Do you have a copy of your CV?

24            MR. MIELE:   I sent a copy.   Here.

25            THE COURT:   And I have it marked as Defendant's

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

18.

2            MR. MIELE:  Yes, Your Honor.

3            THE WITNESS:  It would be fair to say that

4 at --

5 BY MR. WADE:

6      Q     Hold on a second.  I haven't asked a question yet.

7      A     I was continuing to explain where I've been

8 exposed to probabilistic genotyping.

9      Q     Oh.  Continue.  My mistake.

10      A     It would be fair to say that -- that on all of

11 those continuing education meetings at least a portion of

12 the time has been devoted to discussion of probabilistic

13 genotyping systems.  At least since 2014.

14      Q     Okay.  Have you yourself written or attempted to

15 write a computer program that can interpret DNA mixture

16 evidence?

17      A     Interpret?  In terms of reporting out a conclusion

18 that human -- as opposed to a human reporting out that

19 conclusion, I have not.  It's actually a frequent term of

20 nondisclosure agreements and Court Orders that I've been

21 signing that swear to that so I'm actually inhibited a

22 little bit as to how much development I could do if I were

23 inclined.

24      Q     And, I'm sorry, when you testified in Seattle were

25 you qualified as an expert?

16

```
 1        A    I'm not very familiar with the legal process of

 2   qualifying someone as an expert.  I don't recall anybody

 3   saying, you're now qualified as an expert.

 4        Q    So you've never been qualified as an expert?

 5        A    I don't recall -- I don't recall it.

 6              MR. WADE:  What was the offer?

 7              THE COURT:  As an expert in DNA data and

 8   analysis.

 9              MR. MIELE:  Judge, I think it was data analysis

10   without the and.

11              THE COURT:  Oh.

12              MR. MIELE:  Sorry.

13              THE COURT:  Maybe there was pause in your speak

14   and that's why I took an and.

15              MR. WADE:  I'm going to object.  I believe the

16   offer's a little bit too broad.

17              THE COURT:  Okay.  Why don't we come up to

18   sidebar and we'll talk about it.  Okay, ladies and

19   gentlemen, if you want to distract yourself from what

20   we're talking about.

21              (Whereupon, the following discussion was held

22   between the Court and counsel at sidebar:)

23              THE COURT:  Mr. Wade, you objected at this

24   point to this witness?

25              MR. WADE:  Yeah.  As far as I can tell the only
```

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

```
 1     different way?
 2              MR. WADE:  I mean, I'm opposed to a
 3     qualification in the area of statistics.  He's taken one
 4     college course, statistics for engineers.
 5              MR. MIELE:  He's been doing it for four years.
 6     He's worked on a dozen cases --
 7              THE COURT:  Well --
 8              MR. MIELE:  -- in which Perlin has been
 9     involved, dozen to two dozen cases Perlin's been involved.
10              THE COURT:  And what happened with those cases?
11              MR. MIELE:  I didn't ask the results.  I don't
12     know the results.
13              THE COURT:  Because I --
14              MR. MIELE:  A lot of them probably go toward
15     admissibility also.
16              THE COURT:  Of the doctor's results?
17              MR. MIELE:  Of the doctor's program whether
18     it's admissible.
19              THE COURT:  Then it wouldn't be in Pennsylvania
20     because it is admissible.
21              MR. MIELE:  Outside of Pennsylvania.
22              MR. WADE:  I mean, if the word genotype comes
23     out of his mouth, I'm objecting.  He doesn't know what a
24     genotype is.
25              MR. MIELE:  Yes, he does.
```

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

```
 1              MR. WADE:  He's not qualified to even talk

 2      about it.

 3              THE COURT:  But he doesn't have the

 4      background --

 5              MR. MIELE:  Yeah, he does.

 6              THE COURT:  -- to be able to talk about that

 7      and much of the information he's provided any more than I

 8      would based upon my training and my experience.  I'm not

 9      hearing from his testimony -- I mean, I'm reading

10      testimony by expert witnesses from the rules.  I'm just

11      trying to make sure it's apples and apples here.

12              MR. MIELE:  It is apples to apples in the sense

13      that we're talking about his results.  We're not talking

14      about the DNA.  We don't care what the DNA results -- that

15      the loci is seven and 11.  No one cares about how they got

16      there.  We accept all that as true.  7,11 is 2.3 percent.

17      Okay.  The next one is whatever that is.  Statistically,

18      what does that result in?  How does that result?  Does

19      that result in what Perlin's saying?  Is there another way

20      to look at that?  The probability -- what is the

21      probability of Washington's DNA is in fact there?  What is

22      it?  Perlin says it's a worthless number.  He was asked

23      that.  It's a worthless number.  We're going to say it's

24      not a worthless number.  This is how it's calculated.

25      We're not challenging DNA.  There's nothing biological
```

1    about this other than you use the terms, allele, loci,

2    locus, and those types of things.  Use the terms.

3              THE COURT:  Put it into context.

4              MR. MIELE:  Put it into context otherwise --

5              THE COURT:  Okay.

6              MR. WADE:  DNA is expressed in terms of

7    statistics and to give a statistic about DNA is to present

8    yourself -- you have to have a certain background to even

9    understand how DNA can be expressed as a statistic.  He

10   doesn't have it.  He can critique what this guy has done,

11   but ultimately he doesn't have the educational training

12   and experience to even be able to articulate to them how a

13   biological sample can result in a statistic.  I don't

14   think he gets to start off --

15             THE COURT:  But I don't think that he's been

16   asked that question.

17             MR. WADE:  It's in his report.

18             THE COURT:  Well -- and I know that.

19             MR. WADE:  So --

20             THE COURT:  But I haven't heard the questions

21   that are being asked and that's why I'm saying what I'm

22   saying is I don't think he is able to be qualified to be

23   testifying as an expert in that.

24             MR. MIELE:  To what, Judge?

25             THE COURT:  To exactly what Mr. Wade just said,

1    which is translating into DNA -- how did you say that?  I

2    don't want to misspeak.

3                MR. WADE:  Well, I mean -- explain --

4                THE COURT:  Translate --

5                MR. WADE:  Explaining how DNA data can be

6    translated is statistics.  That's the meaning of it.

7                THE COURT:  You just want the numbers?

8                MR. MIELE:  We can't explain how DNA data can

9    be translated.  We're not talking science.  We're not

10   talking DNA, biology.  We're talking about the statistics

11   of it.

12                THE COURT:  But the problem is you have to know

13   something about DNA to be able to calculate a result that

14   says this person can be excluded as a parent of this child

15   or this person can be excluded --

16                MR. MIELE:  We're not saying that.  He's saying

17   what the percentages are.  If the percentages are right.

18   What's the probability of Washington's results?  We're

19   accepting at face value what the DNA results are.

20                THE COURT:  So -- so your --

21                MR. MIELE:  We're not challenging any of that.

22                THE COURT:  You're not challenging the data

23   that was realized by the State Police --

24                MR. MIELE:  Correct.

25                THE COURT:  -- or by Sorenson?

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

1              MR. MIELE:  That is what it is.

2              THE COURT:  The raw data.

3              MR. MIELE:  He doesn't -- he doesn't care about

4    the raw data and Dr. Perlin doesn't care about the raw

5    data.  He cares about the statistical results.

6              MR. WADE:  Maybe I can give some examples of

7    where we're going to run into some serious problems almost

8    immediately.  One of the areas he talks about in his

9    report -- in his -- in the middle of his report is the

10   idea of dropout and how statistics can be altered by the

11   phenomenal dropout, which is something that happens in DNA

12   in the molecular level and results in an absent peak from

13   the data set.  He's not qualified to talk about that.  I'm

14   going to object, you know.

15             MR. MIELE:  Object.

16             THE COURT:  I would agree with that.

17             MR. WADE:  But that's -- that's -- we're

18   talking -- we're going through his report now.

19             THE COURT:  DNA data analysis.

20             MR. MIELE:  Yes.

21             MR. WADE:  And he says, due to this thing about

22   dropout -- this thing and this thing, the system's

23   unreliable and the results are unreliable.  So --

24             MR. MIELE:  We're talking about reliability.

25             THE COURT:  But that's your offer for him is

1    DNA data analysis.  And for him to be able to make that

2    statement, he doesn't -- he hasn't presented testimony

3    that I heard that would qualify him to be able to make

4    that statement.

5              MR. MIELE:  We're not going after the

6    reliability and we're not going after the DNA, it's

7    statistics.  It's the analysis of a statistical review of

8    results of the alleles, loci, and such.

9              THE COURT:  Well, I guess the first I feel

10   comfortable in giving him expertise in is computer

11   science.  I mean, that's the general description of what

12   he's describing and the use of computers and calculating

13   statistics.

14             MR. MIELE:  And applying it to the DNA results?

15             THE COURT:  And applying it to probabilities,

16   but -- see, when you say DNA results, then we run into the

17   issue that Mr. Wade --

18             MR. MIELE:  Not the scientific side of it.

19             THE COURT:  Correct.  That's -- but that's why

20   I'm reluctant to extend it to the DNA because he can't --

21             MR. WADE:  You don't know what a loci is

22   because you've never seen one because you've never done

23   DNA testing.  You're talking about things you've read

24   about and workshops.

25             MR. MIELE:  That's how people become qualified.

```
 1    You don't have to -- you don't have to test the loci to
 2    become qualified to talk about it.
 3              THE COURT:  You don't, but you have to work
 4    with --
 5              MR. WADE:  Our guy did.
 6              MR. MIELE:  Have to do what?
 7              THE COURT:  Have to work with and have a
 8    reasonable pretension of what knowledge --
 9              MR. MIELE:  He does.  He does.  Again, he has
10    been doing this for four years, he's reviewed a dozen to
11    two dozen TrueAllele reports and has testified on the
12    reports on those challenging what Dr. Perlin does.
13              THE COURT:  And that's why I'm saying the
14    number part of it -- if it's just purely a number issue,
15    then --
16              MR. MIELE:  It probably is.
17              THE COURT:  Then I would give him that leeway.
18    But if it comes to making a conclusion about why
19    certain -- like he said, the example of dropout and why
20    you get certain results.
21              MR. MIELE:  I don't think we can do that.
22              MR. WADE:  I mean, yeah.  I'm just wondering
23    what in the report are we going to cover --
24              THE COURT:  Well, then I guess --
25              MR. WADE:  -- if we're not going to cover that.
```

1          THE COURT:  That would be one area that he

2     wouldn't be able to cover.  You can't make statements like

3     that because I wouldn't certify him as an expert in that

4     and I'm not sure how to describe what it is --

5          MR. WADE:  Here's another example.  He's going

6     to talk about the difficulty in estimating the numbers of

7     contributors in the DNA mixture.  He doesn't know -- he's

8     not qualified to talk about how you estimate the number of

9     contributors.  He's never done it.  He doesn't know how it

10    works.

11         THE COURT:  And I'm believing you have to have

12    more experience than just reading about it to understand

13    how to do that.

14         MR. MIELE:  You have to actually do the testing

15    yourself?

16         THE COURT:  Or at least observe it.  At least

17    work with a lab.

18         MR. MIELE:  I disagree with the Court.  I

19    disagree.  I think an expert can inquire to the knowledge

20    by any means including study and not --

21         THE COURT:  I'm not saying had to do it.  But

22    he can at least observe it by people that know how to do

23    it.

24         MR. MIELE:  I guess I don't agree.

25         THE COURT:  Because what if he's reading

1    articles that aren't peer reviewed and he's learning

2    something that isn't approved in the -- in the scientific

3    community?  That's -- that's the issue.

4             MR. MIELE:  I disagree with the Court.

5             THE COURT:  He's talking about his writings --

6    not peer review journals.  I mean, I'm willing to give you

7    the mathematical statistical part of it, but I'm -- I'm

8    concerned about the -- how far after reading his report

9    and hearing the objection, how far he can get.  So that --

10   that's where -- so I don't know how you want me to

11   characterize that.  That's -- that's what I feel

12   comfortable doing is I'll give him as an expert in

13   computer science and statistics, but with respect to his

14   reasonable pretension of knowledge in the area of DNA, no.

15   he doesn't have that.

16            MR. MIELE:  It depends on what you're saying is

17   knowledge in DNA.

18            THE COURT:  Because I don't know where you're

19   going with it.

20            MR. MIELE:  Biological is in DNA.

21            THE COURT:  Correct.

22            MR. MIELE:  We're not going there.  We're not

23   going to talk about their DNA -- that chart that Perlin

24   put on.

25            THE COURT:  Well -- but that's not what the

```
 1    report gives me the impression so that's why I have to
 2    wait --
 3                 MR. MIELE:  It also talks about --
 4                 THE COURT:  -- and see.
 5                 MR. MIELE:  He also talks about he doesn't know
 6    where Perlin comes up with these numbers, he talks about
 7    in his report where there are numbers not reported.
 8                 THE COURT:  But then if you've got raw data and
 9    you're pointing to the raw data, he certainly can do that.
10                 MR. MIELE:  Which is --
11                 THE COURT:  Right.
12                 MR. MIELE:  Yes.
13                 THE COURT:  Right.
14                 MR. MIELE:  That's where we're going to.
15                 THE COURT:  So that's -- that's where I'm
16    coming from.  Computer science.
17                 MR. MIELE:  And statistics is what you said.
18                 THE COURT:  Statistics, but not DNA data --
19                 MR. MIELE:  Okay.
20                 THE COURT:  -- analysis.
21                 MR. MIELE:  Okay.  We object, but so be it.
22                 THE COURT:  Well --
23                 (Whereupon, the discussion held at sidebar
24    between the Court and counsel was concluded.)
25                 THE COURT:  Thank you.  Okay.  The objection is
```

1    overruled to the extent that the Court will allow him to

2    testify as an expert in the area of computer science and

3    statistics.  Mr. Miele.

4              MR. MIELE:  Yes, Your Honor.

5                       **DIRECT EXAMINATION**

6    BY MR. MIELE:

7        Q    Mr. Adams, did you become involved in this case at

8    our request?

9        A    Yes.

10       Q    And what material did you have provided to you to

11   help you review the case?

12       A    Originally, I believe it was a couple papers sent

13   in PDF and then as time went on, the crux of the material

14   that we spent time working with was the DVD provided by

15   Cybergenetics I believe to the DA first.

16       Q    And was that the disk and information that I think

17   Dr. Perlin identified earlier today?

18       A    Yes, sir.  The four gigabytes he referred to.

19       Q    You have in front of you I think what's been

20   marked as Defendant's Exhibit 17, case packet.  Was that

21   also provided to you on the disk or some other way?

22       A    Yes, it was on a disk.

23       Q    Okay.  And have you had a chance to review that?

24       A    Yes, sir.

25       Q    Have you had a chance to review Dr. Perlin's two

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

1    reports, both his preliminary report and his final report

2    dated December 1st of 2015?

3       A    Yes, sir.

4       Q    What other information, if any, did you review

5    prior to writing your report?

6       A    I read the -- the standard operating procedures

7    that were provided for the -- the TrueAllele system as

8    well as the manual for the software so that is about four

9    or 500 pages of manuals and materials that I recall

10   specifically reading in this case, though I've read many

11   of them in other cases as well.

12      Q    That's what I was going to ask you.  How many

13   times previously have you read the manuals and other

14   documents about TrueAllele provided by Cybergenetics for

15   TrueAllele?

16      A    I've been provided them several times.  I don't

17   recall how many times.  I haven't seen them in every

18   TrueAllele case involved --

19      Q    This isn't the first time that you've read those

20   manuals or seen them?

21      A    It's not the first time.

22      Q    Is this the first time you seen a case packet such

23   as the one we received here?

24      A    It's not the first time.

25      Q    And you've had a chance to review them on other

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

```
1    to do it at sidebar?

2             MR. WADE:  Sidebar please.

3             MR. MIELE:  We can do it at sidebar.

4             THE COURT:  Okay.  Ladies and gentlemen, if you

5    could distract yourselves from what we're talking about

6    please.

7             (Whereupon, the following discussion was held

8    between the Court and counsel at sidebar:)

9             THE COURT:  My concern is the fact that in his

10   expert report since his expertise has been narrowed down

11   at this point that what he does in his conclusions he has

12   referred to relevant literature, which does not speak to

13   his own personal knowledge or expertise.  And that's why

14   I'm having a problem with it.  It's not a statistical or

15   non-statistical.  His opinion he's basing it on is based

16   upon knowledge that he's getting from relevant literature

17   that speaks to this, but he doesn't have any training or

18   experience in it.  That's where I'm hung up so that's why

19   I wanted to talk to you about it at sidebar.

20            MR. MIELE:  Again, when you take a statistical

21   analysis, you know, how does the contributors change the

22   percentage, change his conclusions?

23            THE COURT:  Because it's basing his opinion

24   upon -- because he's basing his opinions on writings of

25   other people and taking what they say -- they say as
```

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

1    possible as opposed to his own.

2              MR. MIELE:  I think experts are allowed to rely

3    upon the works of others.  In other words --

4              THE COURT:  In their own field.

5              MR. MIELE:  And --

6              THE COURT:  The same thing.  These are what --

7    because I haven't read everything independent in his

8    report what I'm believing is experts in the field of

9    biology, or DNA, or genetics, making these conclusions and

10   he's accepting their conclusions of coming his own in the

11   statistical area.  Which based upon his expertise he

12   doesn't have the ability to do.  That's that was my

13   concern.

14             MR. MIELE:  Sure.  Okay.  And we object.

15             THE COURT:  Well, that's why I wanted to do it

16   at sidebar.

17             MR. WADE:  I object so you rule on the

18   objection.

19             THE COURT:  And I'm sustaining the objection.

20             MR. MIELE:  And I --

21             THE COURT:  But place your objection to my

22   ruling on the record.

23             MR. MIELE:  Yeah.  That's what -- I tried to.

24   I'm sorry.  Premature objection.  We're objecting to the

25   ruling.  We think it's an appropriate area for him to talk

1    about.

2            MR. WADE:  Judge, just one more thing.  The

3    last sidebar ruling wasn't announced to the jury so I

4    don't know if they knew the outcome.

5            THE COURT:  I thought it was.

6            MR. WADE:  The one before and before was, but I

7    could have a bad memory.  Like I said, my brain is

8    shutting down.

9            THE COURT:  I understand.  Okay.  All right.

10           (Whereupon, the discussion held at sidebar

11   between the Court and counsel was concluded.)

12           THE COURT:  Okay.  The objection's sustained.

13           MR. MIELE:  I'm sorry, Judge.  We have a

14   witness here who has to get back to work and we're trying

15   to deal with him and getting him back another day because

16   obviously we're behind schedule.  So I apologize for the

17   delay.

18           THE COURT:  No problem.

19           MR. MIELE:  Your Honor, may we approach just to

20   put something on the record?

21           THE COURT:  Okay.  Ladies and gentlemen, if you

22   don't mind distracting yourself.  I think this will be

23   relatively brief.

24           (Whereupon, the following discussion was held

25   between the Court counsel at sidebar:)