IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,          No.  1:17cr130

  vs.

DANIEL GISSANTANER,

     Defendant.


Before:

              THE HONORABLE JANET NEFF,
                U.S. District Judge
               Grand Rapids, Michigan
             Wednesday, May 23, 2018
               Motion Proceedings

APPEARANCES:

         MR. ANDREW BIRGE, U.S. ATTORNEY
         By:  MR. JUSTIN PRESANT
         The Law Building
         330 Ionia Avenue, NW
         Grand Rapids, MI 49501-0208
         616-456-2404

               On behalf of the Plaintiff;

         FEDERAL PUBLIC DEFENDERS
         By:  MS. JOANNA CHRISTINE KLOET
         MR. PEDRO CELIS
         MS. HELEN NIEUWENHUIS
         Federal Public Defender's Office
         50 Louis NW
         Suite 300
         Grand Rapids, MI 49503
         616-742-7420

               On behalf of the Defendant.

REPORTED BY:  MS. KATHY J. ANDERSON, RPR, FCRR

1          May 23, 2018

2          PROCEEDINGS, 9:09 a.m.

3          THE LAW CLERK:  All rise.  Court is now in session.

4     Please be seated.

5          THE COURT:  Good morning, everybody.

6          MS. KLOET:  Good morning, Your Honor.

7          THE COURT:  This is the date and time set for hearing

8     on two motions, the government's motion to exclude defense

9     witness Nathan Adams, and the defense motion to exclude DNA

10    evidence in case number 1:17cr130, the United States of America

11    versus Daniel Gissantaner.

12          Can we please have appearances and introductions.

13          MR. PRESANT:  Good morning, Your Honor.

14    Justin Presant for the United States.  With me at counsel table

15    is Stephanie Miller who is a paralegal in our office and will

16    be assisting with the presentation of evidence today.

17          THE COURT:  Thank you.

18          MS. KLOET:  Good morning, Your Honor.  Joanna Kloet,

19    Assistant Public Defender.  To my left is Pedro Celis, our

20    research and writing attorney who has filed an appearance on

21    this case, Helen Nieuwenhuis who has also filed an appearance,

22    Mr. Gissantaner, Emily Seale is a paralegal that will be

23    assisting with the presentation of exhibits, and investigator

24    Carlos Clay.

25          THE COURT:  Okay.  A couple of housekeeping matters

1    before we begin.  First of all, Mr. Presant, your voice is

2    soft, and Ms. Kloet your voice is soft, and secondly, we are

3    going to be dealing with some relatively technical issues, I

4    think, throughout this hearing.  So my request is, first of

5    all, that you speak directly into the microphones so that the

6    court reporter and I can hear you, and that you don't hurry

7    your speech.  And, Mr. Presant, you are particularly guilty of

8    that.  It's hard enough to, for her, for the court reporter to

9    take down your comments, but when it involves technical terms

10   and so forth, it's even more difficult.  And I would echo that

11   for any experts who are going to be testifying today.  We are

12   going to be dealing with an important issue here.  I want to

13   have as much clarity on the record as possible.  And I will say

14   this.  Be prepared for interruptions because I'm going to have

15   I think a lot of questions.

16        So let's start -- I think logically we should start

17   with the government's motion regarding Mr. Adams.  I have read

18   your memos.  I have read all of the transcripts that the

19   government has provided, and I think this:  The testimony of

20   Mr. Adams is properly offered.  The scope of it is another

21   matter altogether.  And it is, it is clear to me from the

22   response filed by Ms. Kloet last night that Mr. Adams's

23   testimony is going to be narrowly tailored to his educational

24   and experience background, at least if I understood her memo

25   correctly.  So I am going to allow him to testify today.

1          The scope of his testimony, the scope of his expertise

2     I think I am capable of understanding and properly applying.

3     The government may disagree, and of course, Mr. Presant, you're

4     more than free to put your objections on the record.  But I am

5     comfortable, again, after having, particularly having read the

6     I think there were five or maybe six transcript excerpts which

7     were offered, which were very interesting, actually, I'm

8     comfortable allowing Ms. Kloet to put him on the stand and hear

9     what he has to say.  Okay.

10          MR. PRESANT:  Your Honor, if I may.  Just to be clear,

11     the government was not seeking to exclude him from this hearing

12     today.  Just to limit his testimony to what he was properly

13     qualified on.  The government is seeking exclusion at trial,

14     but I think the Court has to hear what his testimony is before

15     it can rule on that.

16          THE COURT:  I understand.  And I think, you know, it

17     is a little bit unusual to have this kind of an issue come up

18     at this stage, but I do understand where you're coming from,

19     Mr. Presant, and it's actually I think good to have the issue

20     out in front of us early so that we have some idea what we're

21     dealing with.

22          So that being solved at this point, let's move on to

23     the defendant's motion to exclude DNA evidence.  Ms. Kloet, the

24     ball is in your court.

25          MS. KLOET:  Your Honor, as we discussed this with

1    Attorney Presant, and in light of the fact that the burden of

2    proof is on the government, we have agreed that he would

3    present his witnesses first.  And I think in light of

4    scheduling, that makes the most sense since people are coming

5    from out of town.

6            THE COURT:  Very well.  What I would like you to start

7    off with is a brief summary to put this issue in context.  I've

8    done some reading on the issues that are going to be presented,

9    probabilistic genotyping, likelihood ratios and all of that.

10   But what I know is that there is a potential, potentially broad

11   range of topics within those designated areas, and so what I

12   would like you to do, both of you, before we get to witnesses

13   is to put this case in context in terms of what do you expect

14   the issues to be surrounding the technical question of the DNA

15   results that were reported in this case.  I do think that we

16   have, we can narrow this down so that at the point where a

17   decision is necessary, it can be very focused in terms of what

18   is or is not properly submitted to the jury, which is really

19   our underlying goal here.  What can we properly offer to the

20   jury that is understandable, that is not prejudicial, and so

21   forth.  So let's start there.  Give me a short -- as soon as I

22   can find my legal pad to write on -- summary putting the case,

23   putting the situation into context.  Mr. Presant.

24           MR. PRESANT:  Thank you, Your Honor.  Of course it's

25   the defendant's motion so it's, the government agrees with

1    Ms. Kloet that the government should present witnesses first.

2    But of course it's her arguments, and I don't know if the

3    arguments have narrowed somewhat from the time of the initial

4    motion.  Maybe they have broadened a little bit in some

5    respects.  But I'll do my best to address the Court's concerns

6    and then of course we will be happy to take any questions from

7    the Court before we call our first witness.

8         The main issue in the government's view is the

9    admissibility of DNA analysis predicated on or derived from,

10   rather, STRmix which is software that was developed by the New

11   Zealand and Australian governments and is currently the market

12   leader in the United States in terms of probabilistic

13   genotyping software used by federal, state and local

14   laboratories in order to analyze DNA mixtures.

15        The defendant in his initial motion raised a number of

16   challenges to the presentation of such DNA analysis.  The

17   challenges I think begin logically in the pipeline earlier even

18   before we get to the probabilistic genotyping software.  There

19   are some passing critiques of polymerase chain reactions, the

20   process of replicating DNA in order for it to be analyzed.

21   Also the use of capillary electrophoresis which is the process

22   by which DNA fragments are separated by the genetic analyzer.

23   In the government's view those are not substantial challenges

24   because the Court will hear testimony that that technology has

25   been in use for many decades.  There's nothing new about that

1    technology in particular and perhaps Ms. Kloet doesn't
2    challenge that anymore.
3            But the next step in the pipeline we get to the use of
4    the software after the DNA has been analyzed chemically.  And
5    what the software does is it uses probabilistic genotyping,
6    which is a subspecialty of statistics; it's really advanced
7    statistics applied to biology, bioinformatics, if you will, and
8    even though STRmix is relatively new, and software programs
9    like STRmix are relatively new, probabilistic genotyping is
10   built on really established principles, statistical principles
11   that have been around some of them for more than a century, and
12   the Court will hear testimony about that too.
13           And so what the software does is it analyzes that in
14   order to produce a likelihood ratio that can be used in court
15   as evidence.
16           The government's view is that at the time of trial all
17   we will really need is the Michigan State Police forensic
18   scientist who did the work in this case to testify to what the
19   likelihood ratio was after she did the analysis.  And she will
20   testify during the proceeding too about what she did to come up
21   with that likelihood ratio.
22           Now, after the Daubert motion was filed the defendant
23   raised an additional challenge to the code, the underlying
24   code, that's used by the software.  It's different in kind from
25   the previous challenges in that the previous challenges were

1    directed more towards the use of probabilistic genotyping, the

2    use of the software, the decisions that the analysts made that

3    led to that final likelihood ratio.  The new criticism is,

4    well, the code was not, was not coded in the preferred style of

5    the defense witness.  The defense witness, Mr. Adams, does have

6    some expertise in computer science, and he conducted a code

7    review subsequent to the last time we were in court on this

8    matter and he looked at some of the code and he has some

9    criticisms of the way it was coded.  In the government's view

10   those are stylistic preferences.  He doesn't, he's never really

11   created software like this before, and at the end of the day

12   the key for this Court and that the other courts that have

13   reviewed STRmix have largely relied upon is the validation of

14   the software.  That before the software is used it is tested,

15   and much like Your Honor or, well, I'll speak about myself,

16   much like I don't understand how an internal combustion engine

17   in a car works, I can tell you when I get in my car and I drive

18   it it gets me where I need to go, I can use it properly, it

19   works safely.  And you're going to hear testimony about how

20   STRmix was coded and the coding decisions that were made that

21   respond substantively to Mr. Adams's criticism.

22          But I think at the end of the day the key is was this

23   software tested properly before it was put into use, and if it

24   was tested properly, which the Court will hear testimony that

25   it was, you can be confident that it does what it is supposed

1      to do and that it functions properly in this case.

2              THE COURT:  Do you also understand that there may be,

3      or, it is possible that there may be a challenge to the

4      protocols used by the Michigan State Police or whoever applied

5      this STRmix software to the DNA samples in this case?

6              MR. PRESANT:  Yes.  The Court will hear testimony

7      during this proceeding, and the government anticipates there

8      would be testimony at trial, that STRmix is a big step forward

9      in that it imposes uniformity on how probabilistic genotyping

10     is done, but there inevitably it is a human exercise and so

11     there is, there are human judgment calls that go into operating

12     the software.  There are things that the forensic scientists,

13     Amber Smith in this case, had to do in order to use the

14     software, and I think at trial those are properly subject to

15     cross-examination.  She will testify to those during this

16     hearing.  She will testify to those calls she made at trial.

17     There's of course been an offer to rerun the software using

18     different parameters if the defendant had different parameters

19     that he wanted to input into the software; that request has not

20     been made yet.  But there will be testimony --  I believe

21     Ms. Kloet is challenging that and there will be testimony on

22     that issue.

23              The one final issue that I haven't touched on yet is

24     the challenge to the use of likelihood ratios themselves,

25     statistical measures.  There are different types of statistics

1    that are used in DNA cases.  Likelihood ratios have been used

2    for more than a decade by the Michigan State Police or at least

3    about a decade in paternity cases.  Likelihood ratios are

4    appropriate for particular reasons that the experts will

5    testify to.  And I know Ms. Kloet raises a challenge to the use

6    of likelihood ratios at all as a statistic, and so I think that

7    will be the other issue the Court has to decide.

8            THE COURT:  My understanding with regard to that

9    challenge has more to do with the number of potential

10    contributors to the DNA sample.  And the limited reading I have

11    had an opportunity to do suggests that there is a real

12    difference in how one applies or uses likelihood ratios where

13    there is a single contributor of the DNA and where there are

14    multiple contributors, such as in this case where there are

15    three.  So, again, I think we are going to need to be very

16    specific and focused on exactly what we are talking about in

17    this case, both for my benefit and ultimately for the jury's as

18    well.

19            So is there anything else that you need to put this

20    case in context from the government's perspective?

21            MR. PRESANT:  I don't believe so, Your Honor.  I think

22    everything the Court said is absolutely correct, and the

23    government is prepared for the Court to interrupt as much as it

24    needs to because the goal of course is for you to get your

25    questions answered.  And I appreciate the opportunity to

1    present evidence to that.

2              THE COURT:  Thank you, Mr. Presant.  Ms. Kloet.

3              MS. KLOET:  Thank you, Your Honor.  I brought this

4    motion I think there are, it can be distilled into two main

5    arguments:

6              First of all, the reliability of the software is at

7    issue here.  There are two components to that:  The

8    subjectivity of the data that's entered by the analyst, and

9    that includes as the Court referenced the estimation as to the

10   number of contributors, allele calls, or whether you determine

11   is not an allele.  And as well as the parameters that are

12   entered into the program and the parameters used and set by

13   STRmix and similar systems themselves.

14             The testing and validation of these programs is also a

15   critical issue.  There has not been a broad universe of

16   testing, broad enough universe of testing done on complex

17   mixtures involving ostensibly three or more contributors to

18   that mixture, assuming there are in fact three or more in that

19   mixture.

20             The testing is also not done in accordance with

21   generally accepted software testing principles.  And it's

22   important when you're dealing with a program that concededly

23   doesn't generate the same answer every single time because

24   you'll never know the ground truth, as referred to in the

25   industry.  And that testing is not sufficiently independent as

1    required by those software standards.

2            The second part of this motion, Your Honor, is the

3    immense and disproportionate influence that this type of

4    statistic is going to have on a juror, on a non mathematician,

5    non science based, someone without a science background.

6            The obscurity surrounding the effective, this type of

7    information and the effective communication of -- the

8    difficulty in effectively communicating this type of

9    information is demonstrated and has been noted by experts even

10   within the federal government itself.

11           And the witnesses here today, Dr. Howenstine if she

12   testifies, will be testifying to the elements of these points,

13   including the subjectivity of the calls that are made by the

14   analyst and where issues can arise there, including in the

15   analytical process itself; Mr. Adams will testify to software

16   as it applied to Probabilistic Genotyping Systems in this case

17   and software standards with which he is familiar; and Dr. Lund

18   will talk about issues in the communication of this type of

19   information.

20           So that's what I anticipate covering today, Your

21   Honor.

22           THE COURT:  Thank you.  Okay.  Mr. Presant, let's hear

23   it.

24           MR. PRESANT:  Your Honor, just one evidentiary issue

25   that relates to the government's first witness.  The

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1    government's first witness is Dr. John Buckleton.  He lives in

2    New Zealand.  The government anticipates he will be unavailable

3    for trial, so if these issues do end up being relitigated at

4    trial, the government will seek to admit his testimony from

5    today's hearing under the Rules of Evidence.  And I want to

6    make sure that Ms. Kloet is on notice.  We've previously

7    discussed this, she's previously been advised of it, but I want

8    to make sure that the record is clear so that the testimony can

9    be developed appropriately from the defense perspective.

10             THE COURT:  Very well.

11             MR. PRESANT:  The government calls Dr. John Buckleton.

12             THE LAW CLERK:  Please come forward over to the podium

13   and turn toward me.  You can set your materials down if you

14   like.

15             JOHN BUCKLETON, GOVERNMENT WITNESS, WAS DULY SWORN

16             THE LAW CLERK:  Please be seated.  And state your full

17   name for the record and any unusual spellings please spell

18   those names.

19             THE WITNESS:  My full name is John Simon Buckleton.

20                      DIRECT EXAMINATION

21   BY MR. PRESANT:

22   Q    Dr. Buckleton, where do you currently work?

23   A    Largely in the United States, but the organization I work

24   for is the New Zealand government.  Mr. Presant, I have with me

25   a typed glossary for the stenographer if that's any help, and I

1      have four copies if you and the defense would like them.

2              MR. PRESANT:  I appreciate that very much.  We can

3      distribute those now or later.

4              THE COURT:  Good idea to do it now, I think.

5              THE WITNESS:  There is two pages.  You have to

6      separate them.

7      BY MR. PRESANT:

8      Q    Dr. Buckleton, you work for a particular institute within

9      the New Zealand government, is that right?

10     A    I work for ESR which is a Crown Research Institute.

11     Q    What does that mean, what's a Crown Research Institute in

12     New Zealand?

13     A    A Crown Research Institute is a New Zealand government

14     owned institute.  However, we have the expectation to operate

15     in a fiscally prudent manner.

16     Q    Ms. Miller, can we bring up Government's Exhibit 1, please?

17             MR. PRESANT:  Your Honor, would you prefer electronic

18     presentation of evidence?

19             THE COURT:  Yes.

20             MR. PRESANT:  All right.

21     BY MR. PRESANT:

22     Q    And Dr. Buckleton, you can refer to the book or the screen

23     if you like.  Do you recognize Exhibit 1?

24     A    Yes.

25     Q    What is it?

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1    A    This is my curriculum vitae.

2              MR. PRESANT:  Your Honor, the government moves to

3    admit Exhibit 1.

4              THE COURT:  Any objection?

5              MS. KLOET:  No, Your Honor.

6              THE COURT:  It's admitted.

7    BY MR. PRESANT:

8    Q    Dr. Buckleton, I want to briefly go through your CV with

9    you.  Would you start for -- start by describing for the Court

10   your academic background.

11   A    I have a Ph.D. in chemistry from the University of

12   Auckland, and DSc in forensic statistics.  DSc is not a term

13   familiar in the United States.  It's a British Commonwealth

14   term, and it's the highest academic qualification you can get

15   in the British Commonwealth.

16   Q    What about your employment record as it's listed here, what

17   have you spent your career doing?

18   A    From 1983 to the present, I have been employed in forensic

19   science largely for the New Zealand government.  However, I

20   have had four periods of employment in the United Kingdom, and

21   two periods in the United States.

22   Q    What other positions have you held besides for the New

23   Zealand government?

24   A    Specifically referring to the United States, I was a

25   researcher at North Carolina State University, then a visiting

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1    scholar at NIST, the National Institute of Science and

2    Technology, and then a researcher at University of Washington

3    at Seattle.

4    Q    Has your experience in forensic science focused exclusively

5    on DNA or have you worked in other forensic disciplines as

6    well?

7    A    I have worked across a range of disciplines, but more

8    recently my world has narrowed almost exclusively to

9    probabilistic genotyping.

10   Q    How long have you been working in forensic DNA analysis of

11   any kind?

12   A    I was involved in forensic DNA analysis from the very

13   inception of it in 1998 when it was first used in case work in

14   the United Kingdom.

15   Q    At the bottom of this first page of your CV it looks like

16   you testified before in a number of cases.

17   A    I have testified in nine Frye Daubert or Kelly Frye

18   hearings in the United States, once in the Netherlands, once in

19   Scotland, once in Australia on STRmix, and multiple times in

20   Australia and New Zealand on a range of topics.

21   Q    And regarding your prior testimony in the United States,

22   those were all in state court, correct?

23   A    No.  Some were in county court, I believe.  I have never --

24   Q    Let me ask the question this way.  Is this your first time

25   testifying in federal court?

1    A    Yes.

2    Q    Ms. Miller, can we go to page 2?  What do we have here

3    listed on page 2, Dr. Buckleton?

4    A    I have listed some of the grants and major contracts that

5    have been awarded to myself and others.  So you can see three

6    National Institute of Justice Research awards, and then I begin

7    a list of paid plenaries and speaking engagements.

8    Q    Page 4, please, Ms. Miller.  I'm sorry, page 5.  On page 5

9    you begin a list of publications, is that right?

10   A    Yes.

11   Q    And that goes on for several pages.

12   A    Yes.

13   Q    It actually goes almost to the end of the CV, correct?

14   A    Yes.

15   Q    So I want to ask you about your experience analyzing DNA

16   mixtures.  When did you first begin analyzing mixtures?

17   A    In the early 1990s.

18   Q    And how did you do it back then?

19   A    It was done with a likelihood ratio but the process was

20   manual.

21   Q    And when did you first begin to develop STRmix?

22   A    STRmix has very deep roots, but more specifically, the

23   software was begun in May 2011.

24   Q    What was the reason to begin to develop the software, what

25   was the origination of the idea?

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1    A    There was a laboratory closure in Australia, and this led

2    to a meeting of the senior managers of the Australasian

3    laboratories.  Australasia is a collective term for Australia

4    and New Zealand.  These managers were -- initiated a

5    standardization project within Australasia and myself and Dr.

6    Duncan Taylor were tasked with creating a software.

7         THE COURT:  I'm going to interrupt here a minute,

8    Mr. Presant.  Dr. Buckleton, when you say that likelihood

9    ratios were used in the early 1990s with a manual process,

10   could you explain what you mean by that?

11        THE WITNESS:  Yes, ma'am.  Likelihood ratios have been

12   used in forensic science since the 1940s, and in fact, even way

13   back to the 1910s.  Specifically answering your question, a

14   likelihood ratio would be calculated for a mixture and the

15   calculations would be done by hand, and a number of simplifying

16   assumptions had to be made to do that, and we could

17   realistically only do two-person mixtures at that stage.

18        THE COURT:  Okay.  Now, you're familiar to some extent

19   with the American criminal justice system, right?

20        THE WITNESS:  Yes, ma'am.

21        THE COURT:  Okay.  And it is not uncommon for a jury

22   to be presented with a simple statement that says, the DNA

23   analysis shows that it is a match for the defendant.  Okay.

24   What does that mean to you, and how is that different from this

25   likelihood ratio?

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1    THE WITNESS:  We have been encouraged away from that

2    type of statement by such groups as the National Forensic

3    Science Commission, now disbanded.  That is a yes/no statement,

4    and takes to the witness the task of determining certainty from

5    probability.

6         I'm taught that such judgments should really be left

7    to the factfinders, and I am trained to try and provide the

8    factual and opinion evidence to enable a factfinder to make

9    such a decision.

10    THE COURT:  Well, if we tell the jury the defendant's

11    DNA was found on the gun, just as an example, what does that

12    mean to you as a forensic scientist in terms of how that

13    communication was arrived at?  Does it mean anything at all?

14    THE WITNESS:  I think the United States Federal Bureau

15    of Investigation have done source attribution statements which

16    are what you're speaking to for a great many years and that is

17    where they say that with certainty this DNA came from that

18    person.  Such a statement can still be made from a likelihood

19    ratio if desired.  In this particular case we wouldn't meet the

20    federal limit of certainty.  However, I understand the evidence

21    is still very probative.

22    THE COURT:  What is the federal limit of certainty?

23    THE WITNESS:  I think it was a multiple of the

24    population of the United States.  I think it was something

25    like, you know, I think it was ten times the population of the

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1   United States.  But I can have that checked.  There is a person

2   who may know that in the court.  I can check that at a break.

3           THE COURT:  Okay.  Thank you.

4   BY MR. PRESANT:

5   Q   Thank you, Your Honor.  Dr. Buckleton, what have your

6   responsibilities been in rolling out STRmix to various

7   laboratories that might be interested in using it?

8   A   I'm one of the three developers of STRmix.  And I have been

9   responsible for training and support and development.  During

10  that time I have run of the order of 70, four-day training

11  sessions in the United States for different groups around the

12  United States, and I have worked with people on the setting of

13  procedures and guidelines.

14  Q   What's your and ESR's financial interest in STRmix?

15  A   I have no personal financial interest in STRmix.  I do not

16  benefit from STRmix financially at all.

17  Q   You're paid a salary?

18  A   I'm on my New Zealand government salary.  ESR takes some of

19  but not all of the proceeds of STRmix, but it is not required

20  to pay a dividend to anyone.  Their money is used for its

21  support work, development work, and, for instance, it's funding

22  my court appearance here.

23  Q   And you're appearing here today voluntarily, correct?

24  A   Yes.

25  Q   The government has covered, the United States government

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1    has covered some travel expenses but we are not paying you to

2    be here, right?

3    A    That's correct.

4    Q    You have held positions with governing bodies, bodies that

5    govern DNA analysis, correct?

6    A    Yes.

7    Q    What are those organizations?

8    A    The primary organization in the United States and Canada is

9    SWGDAM.  That is an FBI sponsored group of North American

10   scientists and invited guests, and they are the premier

11   guideline setting organization for forensic DNA.  I have also

12   been involved in some others, but that is the primary one in

13   the United States.

14   Q    Well, let's start with SWGDAM which is the scientific

15   working group for DNA analysis methods, correct?

16   A    Yes.

17   Q    What did you do for SWGDAM?

18   A    I was on SWGDAM from 2013 to 2017 where I retired from it

19   in the hope of relocating back to New Zealand.  During that

20   time I operated as a member of SWGDAM.  With specific regard to

21   probabilistic genotyping, I sat out on all those discussions to

22   avoid the appearance of undue influence.

23   Q    But otherwise you reviewed various issues with respect to

24   DNA and you voted on them or you consulted on them?

25   A    I'm not a voting member.  There are votes given, for

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1    instance, the FBI has a large block of votes.  I was not a

2    voting member but I was involved in all the discussions and

3    recommendations and drafting processes that were put to me.

4    Q    You testified that you worked at NIST for some time period?

5    A    Yes.

6    Q    What time period was that?

7    A    That was from October 2014 to December 2016.

8    Q    What did you do at NIST?

9    A    I was a visiting scholar, and my work there involved work

10   on forensic evidence interpretation and in particular,

11   footwear.

12   Q    Have you worked --

13            THE COURT:  What does that mean?

14            THE WITNESS:  Footwear, shoe print work, Ma'am.  I was

15   deliberately staying away from DNA to again avoid the

16   appearance of undue influence.

17            THE COURT:  Thank you.

18   BY MR. PRESANT:

19   Q    What about other organizations besides SWGDAM and NIST?

20   A    The other organizations that are the primary guideline

21   setting bodies that the United States tends to take cognizance

22   of are the International Society of Forensic Geneticists, and I

23   was on the DNA commission that wrote the probabilistic

24   genotyping guidelines.  OSAC, O-S-A-C, which is the

25   Organization of Science Area Committees, which I was on until

1    2017, and that has not made a work product in this field.

2    PCAST, the President's Council of Advisors On Science and

3    Technology, I'm not on that but I was invited for discussions

4    with them on that.

5    Q    What did you do for OSAC?

6    A    I was on various committees, including the proposition

7    setting document and the DNA subcommittee.

8               MR. PRESANT:  Your Honor, at this time the government

9    offers Dr. Buckleton as an expert in forensic DNA analysis,

10   probabilistic genotyping, and software development.

11              THE COURT:  Ms. Kloet, did you wish to voir dire

12   Dr. Buckleton on his qualifications as an expert in those three

13   fields?

14              MS. KLOET:  The three fields, can you repeat the three

15   fields?

16              MR. PRESANT:  Forensic DNA analysis, probabilistic

17   genotyping, software development.

18              MS. KLOET:  I would like to ask a few questions.

19              THE COURT:  Thank you.

20              MS. KLOET:  Dr. Buckleton, your background or your

21   education is not in computer science, correct?

22              THE WITNESS:  Yes, it is.

23              MS. KLOET:  Your formal education is not computer

24   science, is it?

25              THE WITNESS:  Some of it is.

24

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1      MS. KLOET:  Do you have a degree in computer science?

2      THE WITNESS:  I have undergraduate papers in it but

3   not a major in it.

4      MS. KLOET:  Okay.

5      THE COURT:  What is your undergraduate degree in,

6   Dr. Buckleton?

7      THE WITNESS:  Chemistry, Ma'am.

8      THE COURT:  That's your Ph.D. as well?

9      THE WITNESS:  Yes.

10      THE COURT:  Do you have a master's degree in something

11   different?

12      THE WITNESS:  Chemistry.  Three degrees in chemistry.

13      THE COURT:  Okay.

14      MS. KLOET:  You didn't write the code in STRmix, did

15   you?

16      THE WITNESS:  No.

17      MS. KLOET:  You don't write computer code.

18      THE WITNESS:  I have.

19      MS. KLOET:  Do you do that on a regular basis?

20      THE WITNESS:  I haven't done that regularly since the

21   mid-'90s.

22      THE COURT:  Who did write the code in STRmix?

23      THE WITNESS:  The version in question in this case was

24   written almost totally by Dr. Duncan Taylor of Adelaide,

25   Australia.

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1          THE COURT:  T-A-Y-L-O-R?

2          THE WITNESS:  Yes, ma'am.  He's top of the glossary

3     there as well.

4          MS. KLOET:  You don't currently engage in forensic

5     analysis.

6          THE WITNESS:  Excuse me, my mind was elsewhere for a

7     minute.  What did you say?

8          MS. KLOET:  That's okay.  You don't currently engage

9     in forensic analysis or wet work as it's sometimes called, do

10    you?

11         THE WITNESS:  No, I haven't been in a laboratory since

12    '02.

13         MS. KLOET:  Do you have a degree in statistics?

14         THE WITNESS:  My DSc could be argued to be in

15    statistics, and I take a position of professor of statistics on

16    first of June this year.

17         MS. KLOET:  Have you ever held a position as a

18    professor of statistics before?

19         THE WITNESS:  I have held a position as professor in

20    statistics departments before.

21         MS. KLOET:  Have you ever held -- or your degree is

22    not in mathematics, is it?

23         THE WITNESS:  I have a minor in mathematics and I'm

24    reasonably strong in mathematics.

25         MS. KLOET:  As I understand it, the government asked

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1   to qualify him in forensic DNA, Probabilistic Genotyping

2   Systems, and computer software.  I think to the extent to which

3   he needs to clarify his statements or testify as to

4   Probabilistic Genotyping Systems, I'm fine with him testifying

5   as to the underlying forensic DNA principles and software

6   principles.  But I'm not comfortable qualifying him as an

7   expert in computer science software.

8              THE COURT:  Mr. Presant.

9              MR. PRESANT:  Redirect or argument, Your Honor?

10             THE COURT:  Redirect, please.

11             MR. PRESANT:  Thank you, Your Honor.

12   BY MR. PRESANT:

13   Q   Dr. Buckleton, would you tell the Court a little bit more

14   about your role working with Dr. Taylor and the process of

15   developing STRmix?

16   A   Certainly.  I think some of the comment is fair.  My formal

17   training in computer science was in the early '80s.

18             THE COURT:  Were there computers back then?

19             THE WITNESS:  Yes, ma'am, there were.  But they were

20   much bigger than they are now.

21             I have actually in the late '80s published a chapter

22   in a book on artificial intelligence, and during my research

23   career I have been involved in quite a number of computing

24   projects.  The genesis of probabilistic genotyping dates back

25   to a mathematical solution I developed in 1999, so I'm actually

1     the father of probabilistic genotyping.  And the mathematics

2     and the majority of modern probabilistic genotyping software

3     either comes directly from me or dates back to work I've done.

4          My work with Dr. Taylor varied from side-by-side work

5     on algorithms and testing to work vicariously across the Tasman

6     Sea which separates Australia from New Zealand on the same

7     subject.  And initially we were the first two developers.  It's

8     much of the mathematics in the early version are mine, or mine

9     and Dr. Taylor's combined.

10         Subsequently, we added a third developer, Dr. Jo-Anne

11    Bright, who is very strong in quality systems, specifically in

12    ISO 17025, which is the governing standard for most of forensic

13    science.

14    BY MR. PRESANT:

15    Q    And I believe your testimony was STRmix was first began to

16    be developed in 2011, correct?

17    A    2011.

18    Q    So that was seven years ago?

19    A    Yes.

20    Q    And over the past seven years, have you been continuously

21    involved with Dr. Taylor and other individuals who have been

22    doing the line-by-line coding?

23    A    Yes.

24    Q    And you've advised them on how to code for it?

25    A    Yes.  Algorithmic work, yes, coding.

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1   Q    Is that still part of your responsibilities today to work

2   with the people who are developing the software?

3   A    Yes.

4   Q    Now, Ms. Kloet also asked you questions about your

5   experience doing work in a wet lab.  You don't do that anymore,

6   right?

7   A    No.

8   Q    What was your experience doing work in a wet lab generally,

9   getting your Ph.D. in chemistry, and doing your other academic

10  work in chemistry, and specifically, in forensic DNA analysis?

11  A    I think Ms. Kloet is fair to suggest that my experience is

12  almost ancient history now in the wet lab.  However, my

13  experience in the actual foibles of DNA analysis is completely

14  current, and for instance, I wrote with two others the textbook

15  on DNA interpretation.

16  Q    But I guess with respect to the ancient work, you actually

17  did used to work in a wet lab, right?

18  A    Yes, I did.

19  Q    So you've done --

20  A    Thousands of cases.

21  Q    -- DNA extractions?

22  A    No.  No.  That tends to be split in science and technical

23  work.  So the actual extractions and running the robots tends

24  to be done by technicians, and at that point in my career I

25  wasn't that.  So we tend to get the process, to the process

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1    post production of the e-gram, which is the electropherogram.

2    Q    That's currently or even back when you were being trained

3    academically in your early career?

4    A    In my early career it was chemistry and it wasn't DNA.

5    DNA, the advent of DNA was 1987, and my university days were in

6    the '70s.

7        MR. PRESANT:  Your Honor, at this time I would reoffer

8    Dr. Buckleton in those three categories:  Forensic DNA

9    analysis, probabilistic genotyping, and also software

10   development.  Based on the experience he's testified to, I

11   would also note that he's a fact witness here with respect to

12   the development of the software because he was actually doing

13   it.

14       THE COURT:  I do accept Dr. Buckleton, and as I said

15   earlier, I think that I can sort out areas where he's been

16   quite candid.  His expertise dates to the 1980s, but it does

17   sound to me like it's very current, and he will be recognized

18   as an expert in those areas.

19       MR. PRESANT:  Thank you, Your Honor.

20   BY MR. PRESANT:

21   Q    Dr. Buckleton, would you begin just by telling the Court --

22   well, you've testified already to the initial reasons for

23   developing STRmix.  But would you tell the Court a little bit

24   about the history of the development of the software from the

25   very first version to where we are today?

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

A    The first versions of STRmix were never intended for
release beyond Australasia.  It was to be an in-house tool for
the Australasia laboratories.  And that applies to the whole
1.0 series which goes from version 1.0 through to version 1.08.

At sometime in about 2012 various U.S. agencies,
particularly the U.S. Army and Californian Department of
Justice heard about this, and made representations to my
management that eventually led to us releasing a version for
United States use, in fact for international use.  And that was
in January 2014.

I was involved in the development of that and in
training in the United States and internationally at that time.

The first release was the 2.0 series, and we actually
skipped 2.1 and 2.2, and the next series is the 2.3 series,
which is the version we are speaking of today.

MR. PRESANT:  I'm sorry to interrupt you.  But
specifically the one at issue in this case is 2.3.07, correct?

THE WITNESS:  Yes.

BY MR. PRESANT:

Q    I'm sorry, continue.

A    I have often described 2.3 as the version I always wished
we had made if I had envisaged what it might be back in, for
instance, the year 2000.  This is what I wished we could have
made.

And I was very proud of it and it contains a number of

1    really solid features such as treatment of relatives, which I

2    believe to be a very important matter.

3           The release of 2.3.07 actually predates many of the

4    guidance documents, including SWGDAM.  So we came out in

5    October 2015, the SWGDAM guidelines came out in July 2015, so

6    it post dates SWGDAM, but it predates the others.

7           The validation of 2.3.07 is done to the SWGDAM

8    guidelines, which are the primary guidelines of which the

9    United States takes cognizance.  And I just remind you it's an

10   FBI sponsored agency.

11          Subsequently we have either met or back, back

12   engineered I guess so that we meet and exceed all the other

13   guidelines, including now the PCAST guidelines.  With the

14   possible exception of some aspects of the new Forensic

15   Regulator Guidelines.

16   BY MR. PRESANT:

17   Q    So that was 2.3, the 2.3 series which is at issue in this

18   case.

19   A    Yes.

20   Q    Where are we now, what version are you working on now?

21   A    We are currently debugging 2.6.

22   Q    What does that mean, debugging?

23   A    Debugging is an iterative process of testing and coding

24   where you run various trials, test the components for

25   compliance, and if they fail compliance, diagnose the problem

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1    and rectify.

2    Q    Well, I want to talk to you about some of that process in a

3    little bit.  But first I want to ask you is 2.6 going to be the

4    last version of STRmix?

5    A    No.

6    Q    What -- when do you stop?  When will you stop developing

7    STRmix?

8    A    The future is often opaque to me.  However, sequencing is

9    one of the next matters of great interest, so at the moment we

10   don't use DNA sequencing, we use a different method called STR

11   typing.  Sequencing is likely to be the next phase, and people

12   are also interested in the Y. chromosome.  So I imagine we will

13   be developing versions for those.

14   Q    Is it unusual for software to be operational while

15   development of new versions is still going on?

16   A    Yes.

17   Q    It is unusual?

18   A    No, not unusual.  Sorry.  It's completely usual.

19   Completely misspoke, I'm sorry.

20   Q    Well, I just want to make sure.

21   A    Absolutely normal.  I mean that's why there are all

22   different Microsoft versions.

23   Q    And what about apps on your phone?

24   A    Absolutely.  Updates come all the time.

25   Q    And that's kind of what the process is that you're in

1    currently with STRmix, correct?

2    A    Yes.

3    Q    The fact that you're developing new versions mean that

4    older versions didn't work?

5    A    No.  The engine of STRmix was in place very early, the core

6    Metropolis-Hastings algorithm and the Monte Carlo Markov Chain

7    was all in place very early, and has changed very little during

8    that time.

9    Q    Will you describe that for the Court, the way STRmix

10   actually works that engine you're talking about; what is the

11   Markov Chain Monte Carlo engine, how does probabilistic

12   genotyping work, how does it get to that final likelihood

13   ratio?

14   A    Yes.  Thank you.  Markov was a Russian mathematician

15   working on Russian poetry, and his particular interest was in

16   whether the next letter would be a vowel or a consonant, and he

17   published his work in 1906.  I mention this to demonstrate this

18   is not novel technology.

19         The Monte Carlo aspect is named for the Monte Carlo

20   casino in Monaco and was a name used by the Los Alamos

21   scientists during the development of the atomic bomb in the

22   Second World War to describe the process.  They had to conceal

23   the true nature of what they were doing so they used the code

24   Monte Carlo.

25         The Monte Carlo and Markov Chain processes were

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1    synergized in the '50s to '70s to become Monte Carlo Markov

2    Chain and you're at liberty to say that backwards.  You can say

3    Markov Chain Monte Carlo with equal accuracy.

4         It has become a dominant and mainstream methodology

5    for solving this type of complex problem from the '70s onwards,

6    and is through many fields such as physics, engineering,

7    geoscience, medicine, and a great many others.

8         It works roughly like a game of hot and cold where as

9    children you may have taken a step and your parents said

10   whether you were hotter or colder, and using that feedback you

11   would try and find your way to whatever your goal was.  And a

12   Markov Chain is quite similar to this, and, as I said, it's

13   very well established mathematics.  This process is used to

14   tease apart the mixed data and essentially make a list of

15   plausible single source genotypes that may have contributed to

16   that mixture.

17        STRmix is in two completely separate parts; the first

18   part does what I've said, which is termed deconvoluting a

19   mixture, the second part does the relatively trivial action of

20   assembling the likelihood ratio.

21   BY MR. PRESANT:

22   Q    So what are the inputs into the engine that does this work

23   in the first step?

24   A    The inputs into STRmix are a set of data that comes

25   straight out of analysis of the electropherogram, often with

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1    GeneMaker or GeneMarker, which are two commercial softwares for

2    processing e-grams.

3    Q    Can I just interrupt you there?  Ms. Miller, will you bring

4    up Government's Exhibit 6, please?  Now, Dr. Buckleton, you

5    didn't review the data that was used in this particular case,

6    correct?

7    A    No.

8    Q    I'll represent to you that this is one of the

9    electropherograms that was generated by the Michigan State

10   Police lab.  My question for you is do you recognize it as an

11   electropherogram?

12   A    Yes.

13   Q    Would it assist you in describing what electropherograms

14   are to the Court and how they are input into STRmix?

15   A    Yes, I think it would, thank you.

16   Q    If there's a portion that you would like blown up, would

17   you just, it's a touch screen, you can just highlight what you

18   would like zoomed in on, and Ms. Miller will blow it up for the

19   Court.

20   A    Gosh, all this new tangled technology.  Can I have the D3

21   locus blown up, please?  I have put a small black dot there.

22   The data for STRmix consists of the set of allele names and

23   peak heights.  So if we look at D3, you'll see a small text box

24   there with the numbers 14 then 118.84, then 2213.

25   Q    That's right there that you're looking, correct?

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1   A     Yes, it is.  So the 14 is the allele name, so that is the

2   14 allele at D3.

3   Q     What's an allele?

4   A     Technically a variant of a gene but we use it to mean a

5   variant at a in this case noncoding region.

6   Q     So D3 right here is the locus or the gene, right?

7   A     Well, it's not a gene.  That's why I'm making that somewhat

8   pedantic distinction.  Gene is a coding DNA and these aren't.

9   Q     So it doesn't produce protein, right?

10  A     It doesn't produce a protein.  In fact D3 isn't even

11  transcribed.  So D3, the 3 means on chromosome 3, so the human

12  chromosomes are numbered in decreasing size order, so

13  chromosome 1 is the largest, 2, then 3.  So this is D3.  Then

14  the number 1358 is simply a sequence number in which those loci

15  were found.  They are noncoding regions of DNA, sometimes

16  incorrectly termed junk DNA.  And because they don't code,

17  humans can be very variable at them.  We obviously cannot vary

18  much in the important elements such as arms.  It's selectively

19  disadvantageous to not have two arms.  However, here you can

20  have almost anything you want and nothing bad happens.

21          So we see at the D3 locus a number of peaks, and the

22  genotype software has detected peaks at 14, 15, 16, 17, and 18.

23  The next number, 118.4 is the molecular weight of that allele.

24  And that is used later in the mathematics.  And then the 2213

25  is the peak height of the 14 allele, and if you come down to

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1     the 15 allele, you can see it's 3848, therefore a little bit

2     higher, and if you go up and look at the picture you can see

3     that indeed the 15 is a little bit higher than the 14.

4          These are the data that are input into STRmix.  I'll

5     highlight the subjective elements of data processing at this

6     point due to the indications earlier that that was of interest.

7     BY MR. PRESANT:

8     Q   If I can just interrupt you to ask you a couple of

9     clarifying questions.  These alleles are sometimes referred to

10    as short tandem repeats, right?

11    A   Yes.

12    Q   That's the STR in STRmix?

13    A   Yes.

14    Q   Are these numbers 14, 15 or 16 significant with respect to

15    the number of repeats?

16    A   Yes, those are the number of repeats.

17         THE COURT:  Let me interrupt then again, Mr. Presant.

18    Where do these numbers originate that are put into the STRmix

19    software?

20         THE WITNESS:  These numbers originate from the

21    standard DNA typing process.

22         THE COURT:  Which is the sample?

23         THE WITNESS:  The sample is taken and extracted, it is

24    then amplified using an amplification process that has often

25    been likened to a molecular photocopier.  So you take one copy

1    of the DNA and copy it into two, then you copy those again into

2    four, and we do this plausibly with Fusion 29 rounds of copying

3    until we now have millions of copies of the DNA from which we

4    started.  That DNA has incorporated a fluorescent tag into it

5    during this copying process, and it is synced down a capillary,

6    and it's often likened to putting a platoon of soldiers through

7    a swamp.  The little light guys will get out the other side

8    first and the big heavy guys will take a bit longer to get out.

9    That's exactly what happens.  The light fragments come off the

10   column first, and then later the middle sized, and subsequently

11   the big ones.

12             THE COURT:  And this is what the technicians do that

13   you described earlier, is that right?

14             THE WITNESS:  Yes.  My part of the process would

15   usually start from the e-gram at which we are looking.

16             THE COURT:  That somebody else produced.

17             THE WITNESS:  That's correct.

18             THE COURT:  And they would produce that --  you know,

19   I really am trying to get, Dr. Buckleton, at the whole process

20   from start to finish.  The law enforcement collects something

21   that they suspect may have DNA of a defendant or a proposed

22   defendant on it.  That object, whatever it is, in this case it

23   was a gun, in other cases it may be fabric, whatever it is,

24   then goes to a technician who does what with it to get to these

25   numbers?  This is the wet lab process?

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1          THE WITNESS:  Yes.

2          THE COURT:  Okay.

3          THE WITNESS:  However it's very highly robotic now.

4     So the, you know, the human element is quite small now.  But

5     the processes are extraction, and that takes the DNA off

6     whatever it's on, so it probably was on a swab from the gun, I

7     imagine.

8          THE COURT:  Okay.

9          THE WITNESS:  So a swab is almost like those things

10    you might use to clean your ear.  You swab the gun, the DNA is

11    now on the swab, extraction is a process of taking it off that

12    into a liquid.  That liquid is then quantified to see how much

13    DNA is in there.  And from that quant, an aliquot or a small

14    portion is taken to this amplification process, which again is

15    in a machine and the machine is called a thermocycler and it is

16    the one that does these 29 cycles of amplification.  The

17    amplified product is then usually taken and placed on a robot,

18    which will take an injection from that liquid and inject it

19    into this capillary I've been speaking of which will then

20    separate the fragments by size.  As they come off, as each one

21    comes off, it will make a peak in here, and you're looking at

22    the blue line so you can see those pictures of blues so that's

23    fluorescing blue.  If we go down in the electropherogram, I'll

24    hit the green line.  So this is coming off at the same time but

25    these are fluorescing green because they have incorporated a

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1    green tag, and I believe Michigan State Police are using 5C

2    which means five colors.  So there are five colors or five

3    lanes that will be in this e-gram.

4         THE COURT:  And to go back just a little bit.

5    Quantification, that tells you how much DNA is present in what

6    measurement?

7         THE WITNESS:  It tells you how much DNA is present in

8    your extract as a concentration, how much DNA per unit volume.

9    And is disappointingly inaccurate.  It is an approximate

10   quantification and at the best it only gets human DNA and

11   doesn't account for other such things as degradation.

12        THE COURT:  And what, what is the measurement of the

13   DNA?

14        THE WITNESS:  It's usually in nanograms.

15        THE COURT:  Nanograms.  Okay.

16        THE WITNESS:  But it could be in picograms which is a

17   thousandth of a nanogram.

18        THE COURT:  And is there a minimum quantity of

19   measurable DNA that can go through this amplification process

20   and on to the further analysis that you've described?

21        THE WITNESS:  No.  There is no minimum.  If you have

22   no DNA or very little DNA, you simply get no peaks.  Nothing

23   bad happens.  You just simply get no peaks at the other end.

24        THE COURT:  Okay.

25        THE WITNESS:  Most people amp negative quants -- which

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1    is amplify, short for amplify, A-M-P -- negative quants, and

2    quant is short for quantification.

3            THE COURT:  Thank you.

4            MR. PRESANT:  Ms. Miller, if we can zoom in here where

5    we were before again.  So, Dr. Buckleton, you've explained what

6    these different numbers mean in terms of the STRs and the peak

7    heights.  When STRmix is reading this electropherogram what is

8    it doing with that information?

9            THE WITNESS:  These are the inputs for the start of

10   the Markov Chain Monte Carlo process.

11   BY MR. PRESANT:

12   Q    Now, before I interrupted earlier you were going to testify

13   about the decisions that the specific forensic scientist using

14   the software has to make in addition to inputting the

15   electropherogram information.  Would you please tell the Court

16   what those decision points are?

17   A    The decision points currently in the process for this

18   version are certain peak analysis decisions which I'll outline

19   in a minute, and the number of contributors.  The peak analysis

20   decisions are to remove spikes, pull up and forward stutter,

21   and we are on Fusion so they also have to remove one exotic

22   stutter.

23           These are standard decisions that are being made in

24   forensic DNA typing since its inception in the mid-'90s.  And

25   there is nothing novel in that at all.

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1           The other decision point is the number of contributors

2     that is an input into STRmix.  Generally speaking, changing the

3     number of contributors does not materially affect the result,

4     and if it does, it affects it in the conservative direction.

5     So I have been using the phrase you're either correct or

6     conservative with respect to the number of contributors.

7           THE COURT:  Could we go back just a second?  There

8     are, in this case there are going to be, if I understand your

9     testimony correctly, and the motion of the defense, there are

10    two discreet areas of inquiry in terms of the usefulness of

11    this information.  The first area of inquiry is in getting

12    these peaks, this electropherogram.  Okay.  What are the

13    variables that can affect the validity of the electropherogram?

14    Is deterioration of the sample, for instance, is that an issue?

15    Is there the potential for human error?  Is there potential for

16    mechanical error?  Focus if you would for me on that part of

17    the process.

18          THE WITNESS:  Thank you, Ma'am.  There is definitely

19    a, there is always an element of risk from human error.  We are

20    all human.  Sample swapping is the one that's been of greatest

21    concern over the years.  I can't speak to that particular

22    aspect for Michigan State Police and hope someone else can

23    speak to that, but in my experience enormous care is taken in

24    laboratories to minimize any risk from human error.

25          You mention degradation of the profile.  DNA is an

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1    actually very fragile molecule, and degrades and bacteria, UV

2    light, and thermal shock are all things that can damage the

3    DNA.

4         This is no longer a problem.  The evolution of

5    probabilistic genotyping tells us that if a sample is degraded

6    the software will reliably report that that is uninformative,

7    there is no information left at that particular locus.  So that

8    is no longer a risk factor, although certainly once upon a time

9    it was.

10        I don't know what else.

11        THE COURT:  With regard to the equipment, you

12   mentioned robotic, the process becomes robotic at a certain

13   point.  What equipment is used and can failures, what are the

14   typical failures in the equipment, if any?

15        THE WITNESS:  I understand Michigan State Police are

16   on a 3500 machine.  This is the most modern of the capillary

17   machines.  It's a fine tool.  No endorsement implied.  I think

18   other witnesses can probably speak to the risk, but this is a

19   very fine piece of equipment.

20        THE COURT:  And it would require a certain amount of

21   maintenance and so forth, I assume.

22        THE WITNESS:  Yes.  Yes, they do.  And the robots

23   throw little fits every now and then and throw the samples

24   everywhere.

25        THE COURT:  Okay.  And so that, that is the first

1    discreet part of this process.  The second discreet part of the

2    process is when STRmix comes in to the picture.

3         THE WITNESS:  Yes.

4         THE COURT:  And tell me what happens then.  You get

5    this electropherogram.  What happens then?

6         THE WITNESS:  The software that is drawing these

7    pictures can also output this as a file, and that file is

8    output and taken as the input for STRmix.

9         THE COURT:  And what does STRmix do with that input?

10        THE WITNESS:  STRmix takes that input and some

11   settings that have been set during the laboratory validation,

12   and one human input, which is the number of contributors, and

13   then begins the deconvolution process to try and see what

14   various combinations in the situation we are looking at of

15   three people, which combinations of three people could explain

16   this profile.  There will be many different combinations of

17   three people that could explain this profile, and it will

18   attempt to find all of those.

19        THE COURT:  Okay.  Mr. Presant.

20        MR. PRESANT:  Thank you, Your Honor.  So there are the

21   different inputs, and you mentioned just before we were

22   discussing those inputs that there are several layers of

23   conservatism built into the software.

24        THE WITNESS:  Yes.

25   BY MR. PRESANT:

1  Q    Would you tell the Court what those layers are and what you

2  mean by conservative?

3  A    In reverse order, conservative is a term used in forensic

4  judicial work to mean conceding in the interest of the

5  defendant.  So conservatism is generally viewed as a good thing

6  inasmuch as it concedes rational doubt in the interest of the

7  defendant.

8         The three layers in this version of STRmix are an

9  inherent conservatism of the population genetic model.  The

10  model itself is conservative on about the ratio of 99 to 1.  So

11  about 99 percent of the time it understates the value.

12  Q    So let's just go into a little bit more detail there.  When

13  you're talking about the population genetic model, there are

14  empirically studied known frequencies of these specific alleles

15  in different populations, correct?

16  A    Yes.

17  Q    And the software incorporates data of those known

18  frequencies in order to do its mathematical calculations?

19  A    Yes.

20  Q    All right.  And what did you mean by the 99 to 1 with

21  respect to that data?

22  A    We have to predict the occurrence of a genotype at more

23  than 20 loci.  It's almost certain this genotype is either very

24  rare or doesn't exist at all, and there is no way we can

25  measure it directly.  It is -- the estimate is generated by a

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1    population genetic model.  That model assumes a certain level

2    of population subdivision, that is, that the human population

3    is not completely homogenous and mixed; that we are genetically

4    subdivided; and it makes a concession in the interest of the

5    defendant; and in empirical measurements its concession is such

6    that about 99 percent of the time it understates the true

7    value.  That is the first level of three.

8    Q    Just to be clear, when you're talking about subdivisions,

9    those are racial subdivisions based on empirical studies and

10   frequencies?

11   A    They are usually sub racial.  So I believe Michigan State

12   Police are using the NIST data so we could talk about the

13   African American population, the Caucasian population and, for

14   instance, the Hispanic population.  If we talked about the

15   Caucasian population, even that is not homogenous inasmuch as

16   there are people of stronger Spanish origin or Italian origin

17   or anything else.  It is that level of subdivision about which

18   we are speaking.

19   Q    So that's the first manner in which STRmix is conservative,

20   right?

21   A    Yes.

22   Q    You said there were other ways it's conservative as well.

23   A    That's right.  There are two further ways in use in this

24   version.  The --

25   Q    I'm sorry to interrupt you one more time.  But when you say

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1    this version, for all your testimony thus far and going

2    forward, we are assuming it's 2.3.07.

3    A    Yes.

4    Q    Unless otherwise stated.

5    A    Should I just stop mentioning that?

6    Q    No.  I think you can just say this version.  I just want to

7    make sure the record is clear you're talking about 2.3.07, the

8    one used in this case.

9    A    Yes, I am.

10   Q    I'm sorry, continue.

11   A    I notice that MSP are using a coancestry coefficient of one

12   percent for the African American group.  That means the chance

13   that any two genes are identical by it because of relatedness

14   is taken as one percent.  That is a conservative value.  The

15   global average is about .8 of a percent.  And one percent is

16   higher than .8.

17         Then the third level is that they have applied a

18   99 percent probability interval.  A probability interval is not

19   strictly the same as a confidence interval but no harm will

20   happen if we think of that in that way.  So we could think of

21   it as the lower bound out of a 99 percent confidence level.

22         To summarize, there are two layers of conservatism

23   that can be quantified as being at 99 to 1 in favor of the

24   defendant, and one further layer that is qualitative and that

25   is they have used a conservative coancestry coefficient.

1    Q    So what you mean by that conservatism as it relates to this

2    case, if I told you that the Michigan State Police came up with

3    a likelihood ratio of 49 million to 1 in this particular case,

4    is it accurate to say that you think the true likelihood ratio

5    is actually probably higher than that, but the software has

6    made those conservative decisions to make the number at the

7    small end of the range?

8    A    That's correct.

9    Q    I want to shift to a different topic, Dr. Buckleton, which

10   is validation.  In the development of the software, what sorts

11   of --

12             THE COURT:  Before we go there, Mr. Presant, I want

13   to, I would like to clarify just a little bit.

14             MR. PRESANT:  Of course, Your Honor.

15             THE COURT:  What exactly does that ratio represent, 1

16   out of 49 million?

17             THE WITNESS:  The likelihood ratio is a very hard

18   number to get your head around, Ma'am.  And that's the

19   communication issue that has been a problem.

20             However, again nothing bad will happen if you think

21   the chance of someone else having this profile is 1 in 49

22   million.  That will give the same value to the evidence.

23             If you want it strictly, this profile is 49 million

24   times more likely if the named person is a donor than if he is

25   not.

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1    THE COURT:  Okay.

2    MR. PRESANT:  So the numerator, the top number, 49

3    million, is sometimes called the prosecution hypothesis, right?

4    THE WITNESS:  Yes.

5    BY MR. PRESANT:

6    Q    That you would expect to see this particular profile that

7    was found on the piece of evidence in this case if the

8    defendant was a contributor, right?

9    A    Yes.

10   Q    And the denominator, the bottom number, the 1 is sometimes

11   called the defense hypothesis, right?

12   A    Yes.

13   Q    And that's you would expect to see this profile if the

14   defendant were not a contributor, right?

15   A    That's correct.

16   Q    Three randomly selected people.

17   A    That's correct.

18   Q    And so the likelihood ratio is just the ratio of those two

19   hypotheses, how much more likely is the prosecution hypothesis

20   as opposed to the defense hypothesis.

21   A    Pedantically correcting the language.  How much more likely

22   the evidence is if the prosecution hypothesis is correct.

23   Q    I very much appreciate the clarification.  It's very easy

24   to get --

25   A    It is very easy.

Q    -- confused linguistically.

A    This is an area that is sometimes referred to as the prosecutor's fallacy and the most minor misstatements of the probability phrasing can lead to what's called the prosecutor's fallacy.

Q    And that's why forensic scientists are trained very carefully in terms of how they testify?

A    Yes.

Q    All right.  Well, I want to come back to likelihood ratios a little bit later on, but first would you describe for the Court the validation processes that STRmix went through during development and as it's been implemented in various laboratories.

A    Validation happens in two stages:  Developmental validation and internal validation.

Developmental validation we run a number of tests. The primary one of which I wish to speak at the moment is we repeat the calculations by a separate method, usually by hand. So we repeat a great many of the calculations by hand and check that we get the same answer as the software.

Other requirements are to run a number of samples of true donors and false donors and make sure the performance of the software is correct.

There are quite a number of tests performed, and I'll be most happy to go to them, but I'll try and summarize them.

1    We essentially follow the SWGDAM guidelines to the letter, and

2    we have published our developmental validation process in the

3    peer reviewed literature.

4    BY MR. PRESANT:

5    Q    Let's look at a few of those publications.  Can we bring up

6    Exhibit 4, please?  What is Exhibit 4, Dr. Buckleton?

7    A    Exhibit 4 is the largest ever validation work.  It's a

8    compilation of the internal validations of 31 laboratories

9    across the United States and internationally.  It was in

10   response to a PCAST request for a much larger number of samples

11   to be processed and published.

12           THE COURT:  This is a validation of the STRmix

13   software?

14           THE WITNESS:  Yes.

15           MR. PRESANT:  And some of the people you've testified

16   about here today are authors on the paper; there is you at the

17   end and Dr. Taylor, Dr. Bright.

18           THE WITNESS:  So those are the three developers, and

19   then you can see representatives of a large number of labs

20   across the United States and internationally.

21   BY MR. PRESANT:

22   Q    And this was an example of a peer reviewed published

23   compilation of internal validations, right?

24   A    That's correct.

25   Q    I'm sorry if I missed it but would you just distinguish

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1   between internal validation and developmental validation?

2   A    Developmental validation is done before we release the

3   software and it's often called a debugging process and we

4   iteratively try to repeat calculations and get the same answer

5   until eventually we get a locked down version of the software

6   in which we have repeated the number of calculations we see for

7   yourselves.  And then we begin the SWGDAM process, what we

8   begin and finish the SWGDAM process.

9   Q    Is the SWGDAM process the internal validation?

10  A    No.  It is that as well.  It's very clearly both.  And once

11  we release a version or someone such as Michigan State Police

12  uptake a version, they will then perform the internal

13  validation.  They won't tend to do the by hand calculations;

14  they take a little bit of training to be able to do.  But they

15  will certainly do a great many samples and other tests of the

16  software to see that it's fit for purpose.

17          THE COURT:  And the STRmix software remains

18  proprietary, correct?

19          THE WITNESS:  I don't know what proprietary means.

20          THE COURT:  Not available freely.

21          THE WITNESS:  No.  It's sold.  However, we do respect

22  the defendant's Fifth Amendment rights and will make the

23  software and anything else available to the defense.

24  BY MR. PRESANT:

25  Q    All right.  And how about Exhibit 5, please?

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1    A    Exhibit 5 is a publication of the internal validation of

2    STRmix done at the Federal Bureau of Investigation laboratory

3    in Quantico, Virginia.

4    Q    What about Exhibit 23?

5    A    This is not specifically relating to STRmix.  This is the

6    DNA Commission of the International Society for Forensic

7    Geneticists recommendations for validation.  I'm one of the

8    authors, and STRmix meets the requirements of this document.

9    Q    Have you published more peer review journal articles on

10   STRmix besides the three we just reviewed?

11   A    I wouldn't count this one as being on STRmix.  There are 33

12   publications in the peer reviewed literature that I count as

13   pertaining to STRmix.

14   Q    Can we bring up Exhibit 12, please?  And go to the second

15   page 2.  Is this the list that you just testified to?

16   A    Yes.

17         MR. PRESANT:  Your Honor, the government moves for the

18   admission of 4, 5, 12 and 23.

19         THE COURT:  Ms. Kloet.

20         MS. KLOET:  I have no objection, Your Honor.

21         THE COURT:  They are admitted.

22   BY MR. PRESANT:

23   Q    So I want to ask you some specific questions,

24   Dr. Buckleton, about the operation of the software.  You've

25   already described the hot and cold process by which it reaches

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1    its final number, right?

2    A    Yes.

3    Q    If you go through that hot and cold process again, the

4    Monte Carlo engine process, with everything else the same, all

5    the same inputs, the same electropherogram, the same number of

6    contributors identified by the analysts, the same population

7    genetics data, will you get the same answer the second time you

8    got the first time?

9    A    No.

10   Q    Why not?

11   A    The Monte Carlo effect.  So Monte Carlo is a gambling

12   venue, and the process is like that.  It is using random

13   numbers and the randomness of the process creates a slightly

14   different answer each time.  That answer is usually quite well

15   clustered and almost always within one order of magnitude.

16   Q    What does that mean, one order of magnitude?

17   A    A factor of ten.  So ten times higher or ten times lower.

18   Q    So if you ran this process again and again, I'm

19   representing to you that Michigan State Police's result in this

20   case was 49 million to 1, the worst you would expect the

21   software to do in terms of the lowest number it could come up

22   with the second time would be approximately 5 million to one?

23   A    Yes.

24   Q    As a result of that, do you think it's fair to say that

25   while you can have a low degree of confidence in the precise

1    answer of the likelihood ratio, you can have a high degree of

2    confidence in the approximate likelihood ratio?

3    A    Yes.

4    Q    Does STRmix have a way of measuring the precision with

5    which the likelihood ratio was attained in a particular case?

6    A    Not in this version.

7    Q    Not in 2.3.07?

8    A    But in subsequent versions it does.

9    Q    What sort of diagnostics or analysis are available for

10   2.3.07?

11   A    STRmix outputs a range of diagnostics; the one you might be

12   referring to the Gelman-Rubin diagnostics.  But there are

13   several others.

14   Q    And what's the Gelman-Rubin?

15   A    The Gelman-Rubin informs us whether the various chains of

16   the Markov Chain have converged.  So we tend to run either four

17   or eight chains.  And we check whether they have obtained the

18   same sample space.

19   Q    Is convergence of the various chains a good sign or a bad

20   sign?

21   A    It's a good sign.

22   Q    Let's talk about the number of contributors.  Is there a

23   limitation on the number of contributors that the software can

24   handle?

25   A    There is no mathematical limitation.  There are hardware

1    limitations.  And we become unable to run due to memory

2    constraints at about five.  Most laboratories in the United

3    States have stopped themselves at either four or five.

4    Q    In a mixture as displayed on an electropherogram, can you

5    determine at least approximately which contributor contributed

6    more than the others?

7    A    Yes.

8    Q    And the one who contributed the most is sometimes called

9    the major contributor?

10   A    Yes.

11   Q    And the least is the minor contributor?

12   A    In America, yes.

13   Q    In America.  It might have other names elsewhere.  Does

14   STRmix take into account the difference in the peak heights in

15   doing its mathematical analysis?

16   A    Yes.

17   Q    Is there a limitation or a lower bound in the software

18   itself on what, how low the minor contributor can be, what

19   percentage of the total DNA mixture the minor contributor can

20   be in order for the software to still do what you would expect

21   it to do?

22   A    No.  There is no lower limit.  As the minor contributor

23   becomes smaller, the answer will tend towards inconclusive, and

24   that is correct, you end up having no information about that

25   person because he or she is so small, and STRmix will reliably

1    report the answer inconclusive.

2    Q    So the likelihood ratio itself then reflects in a way the

3    uncertainty created by the smaller proportion of DNA; as the

4    DNA gets lesser and lesser in the mixture of the minor

5    contributor, the likelihood ratio is also going to tend lower

6    as well, is that what you just testified to as well?

7    A    That's correct.  That's very nicely put.

8    Q    Thank you.  So you've testified a little bit about this

9    already but I want to talk about the process for implementing

10   STRmix in a new laboratory.  How many laboratories in the world

11   have purchased a license to STRmix?

12   A    Purchased.  I don't know in the world, but in North America

13   65 percent of laboratories have purchased STRmix.

14   Q    65 percent of all forensic laboratories.

15   A    Yes.

16   Q    How many of those are actually using it?

17   A    There are 31 laboratories, all laboratories systems live

18   with STRmix in the United States.

19   Q    Can we bring up 13, please, Ms. Miller?  Do you recognize

20   13, Dr. Buckleton?

21   A    Yes.

22   Q    What is it?

23   A    It is a download from my web page showing the laboratories

24   using STRmix and the date they began case work.

25   Q    So the columns are here are the areas of the world USA,

1   Australasia, and the rest of the world, is that right?

2   A    Yes.

3   Q    Then the rows are the years and the specific laboratories

4   with their dates.

5   A    Yes.

6   Q    Michigan State Police are right here on February 22nd of

7   2016, is that right?

8   A    Yes.

9   Q    Can we go to page 2, please?  And it looks like the most

10  recent lab in the U.S. to roll it out was in Houston, Texas

11  just this year.

12  A    Yes.

13  Q    So this is work that is still going on, you're still

14  training additional laboratories and staff to use STRmix?

15  A    Yes.

16  Q    You said that there's training process for specific

17  forensic scientists?

18  A    Yes.

19  Q    You've personally delivered some of those trainings?

20  A    Yes.

21  Q    What is involved in that week-long training of the forensic

22  scientists?  What topics do you cover about how to use the

23  software?

24  A    So it's not a week, it's four days.  I'm sure it feels like

25  a week.  We cover theory and practice of use of STRmix.  So we

1    certainly go through the theoretical aspects of the Markov

2    Chain, and the calculations, and students are expected to do

3    one calculation by hand, and certainly operation of the

4    software, use of the diagnostics, and we also speak quite a bit

5    about how to phrase the LR and report it to court.

6    Q    Do you train them on the inputs that they will have to make

7    based on their interpretation of the electropherogram?

8    A    Yes.

9    Q    Are you involved in the internal validation in new

10   laboratories as they come online?

11   A    No, not typically.  We actually have 12 people working for

12   STRmix now, and many U.S. labs outsource their work to the

13   people back in New Zealand, but I'm usually only involved if

14   some issue arises.

15   Q    Have you been involved in the trainings of the Michigan

16   State Police?

17   A    Yes.

18   Q    How many have you done with MSP?

19   A    Two.

20        MR. PRESANT:  Your Honor, the government moves 13.  I

21   should have done it earlier.

22        THE COURT:  Ms. Kloet.

23        MS. KLOET:  Your Honor, I would like to know who

24   created that document.

25        MR. PRESANT:  I believe the witness testified that it

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1    was a download from his website.

2              THE COURT:  Let her voir dire on that exhibit, please.

3              MS. KLOET:  I may have missed that, Dr. Buckleton.

4    But did you create the exhibit that's displayed on your screen?

5              THE WITNESS:  Yes.

6              MS. KLOET:  And when did you create that?

7              THE WITNESS:  It's a live document.  I update it

8    regularly.  I don't know when I first created it.

9              MS. KLOET:  When did you last update it?

10             THE WITNESS:  April this year.

11             MS. KLOET:  How do you collect information for

12   inclusion on this document?

13             THE WITNESS:  Some of the laboratories write to me

14   telling me they have gone live, others I find out

15   retrospectively they have gone live and have to ask them.

16             MS. KLOET:  Do you find out firsthand or do you hear

17   through the community that they have gone live?

18             THE WITNESS:  I always check firsthand.

19             MS. KLOET:  Thank you.

20             THE COURT:  Any objection to the exhibit?

21             MS. KLOET:  No, Your Honor.

22             THE COURT:  It's admitted.

23   BY MR. PRESANT:

24   Q    On the topic of market share, Dr. Buckleton, so you said

25   65 percent of North American labs approximately have purchased

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1    licenses.

2         THE COURT:  How much do the licenses cost,

3    Dr. Buckleton, do you know?

4         THE WITNESS:  No.  I don't.  I try to ignore the

5    commercial aspects.  But I think it's about 27,000 US dollars

6    for your first license.

7         THE COURT:  And is that for unlimited use of the

8    software?

9         THE WITNESS:  Yes.

10        MR. PRESANT:  You have 30 or so labs actively using

11   the software in North America.  What about competitors?  Do you

12   know how many competitors products are used by forensic

13   laboratories in North America?

14        THE WITNESS:  I estimate or from information I have

15   had is approximately seven are using TrueAllele, and two are

16   using Lab Retriever.  That's spelled just like the dog.

17        MR. PRESANT:  Are you familiar with a recent paper

18   written by Steven Lund and Hari Iyer?

19        THE WITNESS:  Yes.

20   BY MR. PRESANT:

21   Q    Can we bring up 15, please?  Do you recognize Exhibit 15 as

22   the paper we are talking about, "Likelihood Ratio As Weight of

23   Forensic Evidence:  A Closer Look"?

24   A    Yes.

25   Q    Have you read the paper?

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1  A   Yes.

2  Q   What are the general arguments made by Drs. Lund and Iyer

3  in the paper?

4          MS. KLOET:  Your Honor, we have Dr. Lund here.  I

5  would object that he's the best person to explain his arguments

6  as expressed in that paper.

7          MR. PRESANT:  Your Honor, the witness has recently

8  published, actually just yesterday became available, a response

9  in a peer review journal of this paper.  I suppose there are

10  two ways to do it.  We could recall him on rebuttal after

11  Dr. Lund has testified, or we could let him testify now as to

12  what his understanding of what the paper is and then talk about

13  his published response to it.

14          THE COURT:  Let's get it over with now.  But, you know

15  I think you need to keep this within some fairly narrow

16  discussion.  We are going to hear apparently from Dr. Lund.  He

17  does -- I haven't read the whole article but I've also read

18  the, that little monograph that talks about it.  So let's not

19  go too far afield with the examination of the paper.

20          MR. PRESANT:  Thank you, Your Honor.  Would you

21  describe, Dr. Buckleton, concisely if you can the main

22  arguments made in this particular paper?

23          THE WITNESS:  In my view, Drs. Lund and Iyer make two

24  points:  First of all, we should not impose our view of the

25  evidence on a court, and that is certainly a point I completely

1    accept.  And second, we should take care to understand the

2    uncertainties in our process, and that's again a point I

3    accept.

4    BY MR. PRESANT:

5    Q    And you've written a couple things in response to it,

6    correct?

7    A    Yes.

8    Q    Can we look at Exhibit 18, please?  And what's Exhibit 18?

9    A    This is a statement I made for the specific case.

10   Q    And it treats both the Lund paper as well as arguments

11   raised by Mr. Adams that we will get to in a second?

12   A    Yes.

13   Q    And can we bring up Exhibit 28, please?  What's 28?

14   A    This is the accepted publication of the response to Drs.

15   Lund and Iyer.

16   Q    And you published this paper along with others just

17   recently, right?

18   A    Yes.

19          MR. PRESANT:  Your Honor, the government moves 18 and

20   28.

21          THE WITNESS:  Ms. Kloet.

22          MS. KLOET:  No objection, Your Honor.

23          THE COURT:  They are admitted.

24          MR. PRESANT:  Would you describe or summarize, rather,

25   Dr. Buckleton, the responses that you've published in the two

1    exhibits we just reviewed?  Well, I'm sorry, that you published

2    in Exhibit 28 and you've also written in Exhibit 18 that you

3    prepared for this case.  Specifically, with respect to

4    Dr. Lund.  We will talk about Mr. Adams in a second.

5            THE WITNESS:  Dr. Lund and Iyer's argument has in my

6    view correctly been likened to a straw man argument.  A straw

7    man argument is where you argue against something that people

8    aren't even doing, and in mine and my coauthors' opinion they

9    are arguing against a process that quite simply no one

10   advocates at all.  And specifically, no one that I know of

11   would impose their view of the evidence on a court.

12           I fully understand my duty is to explain both the

13   estimations I make and the uncertainties in that so that the

14   factfinders can draw a correct opinion as to the weight of

15   evidence.

16   BY MR. PRESANT:

17   Q    So that's the first argument with respect to the role of

18   the courts in understanding scientific evidence, right?

19   A    Yes.

20   Q    And what about the second critique they have about

21   incorporating uncertainty into models as they are presented in

22   court?

23   A    Well, they make the not too startling suggestion that if

24   you change the inputs you will change the outputs.  This is

25   barely news.  I wish to add that both these doctors are my

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1    personal friends, so I don't wish to be too harsh.

2    Q    You worked at NIST with them, correct?

3    A    I did.  They were several doors up the corridor from me and

4    we are friends.

5          But, yes, I'm perfectly happy to explain the

6    uncertainties in the process.  In fact, I argue not only would

7    I explain them here but I've published them.

8    Q    And you've also testified here and explained elsewhere in

9    the literature that STRmix in coming up with its final number

10   attempts as well as it can to reflect uncertainty and to make

11   decisions, you've made decisions in developing it in the

12   conservative direction, so any uncertainty is resolved in favor

13   of the defendant.

14   A    That's correct.

15   Q    Now, in reading the Lund/Iyer paper, can I ask you was it

16   specific to forensic DNA analysis or to STRmix in particular?

17   A    It's, it's neither of those.  It's a very general paper

18   speaking completely about modeling for likelihood ratios.

19   Q    General to forensic science, right?

20   A    Yes.  It could apply to firearms or footwear or any other

21   thing.

22   Q    And they advocate for testing the same evidence with a

23   number of different models and then explaining all of the

24   decisions that were made to the jury, correct?

25   A    Possibly even infinite models.

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1  Q   They say it's possible to, right, create an infinite number

2  of models, right?

3  A   Yes.

4  Q   But in a finite criminal trial, a criminal trial that has a

5  limited amount of time, it's not possible to introduce infinite

6  number of models to the jury, right?

7  A   That's true.  And one would have to really doubt or I would

8  doubt my own ability to convey all that information

9  meaningfully.

10  Q   What do you mean by that?

11  A   Well, if I sat here and gave an infinite number of possible

12  answers and possible models, we would be here for a very long

13  time, and I suspect the clarity of my presentation would fail.

14  Q   And the jurors certainly wouldn't be experts in

15  probabilistic genotyping or in the biological and chemical

16  processes that go into DNA analysis that were used by the

17  developers of STRmix or the lab in making specific decisions

18  that led to the selection of the particular model, correct?

19  A   That's correct.

20  Q   Let's turn to another topic.  Can we bring up Exhibit 17.

21  Do you recognize Exhibit 17?

22  A   Yes.

23  Q   What is it?

24  A   It's the report of Mr. Nathaniel Adams.

25  Q   The report he wrote for this case in particular, right?

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1    A    Yes.

2    Q    You understand it's subject to a protective order?

3    A    Yes.

4    Q    Did you review this report?

5    A    Yes.

6    Q    Did you write a response to it?

7    A    Yes.

8    Q    And that response is also contained in Exhibit 18?

9    A    Yes.

10   Q    What's your familiarity with Mr. Adams?

11   A    Mr. Adams and I are cordial acquaintances.  I would like to

12   say friends.  We have exchanged e-mails a number of times and I

13   spent four days with him in training in Ventura, California.

14   Q    Has he been involved in reviewing STRmix prior to this

15   case?

16   A    Yes.

17   Q    Has he reviewed the source code for STRmix prior to this

18   case?

19   A    Yes.

20   Q    Did you read the report he wrote in that case?

21   A    Yes.

22   Q    So would you summarize for the Court then your view of

23   Mr. Adams's report here in what's been marked Exhibit 17?  And

24   if you would like to refer to your written statement in

25   Exhibit 18, or any of the other supporting materials just ask

1   me, we will bring it up.

2   A    Thank you.  Mr. Adams makes a number of sensible and valid

3   points many of which we have listened to.  They tend to go to

4   the cosmetic or theoretical appearance of code style and

5   documentation, and at no point has he actually questioned the

6   or found fault in the functionality.

7        His argument is that testing or I believe his argument

8   to be that testing is inadequate for validation, and that we

9   really should pay a lot more attention to code quality.  Again,

10  I would say he has some veracity to that.  But his conclusions

11  just massively go beyond the data he's used for those.

12       Without diminishing the importance of code quality or

13  documentation, STRmix is the single most tested and trialed

14  software in use in this field.  It's been tested by multiple

15  groups in multiple situations.  And I would suggest that there

16  is a very good basis for accepting its reliability.

17  BY MR. PRESANT:

18  Q    All right.  Mr. Adams makes much of these IEEE standards,

19  correct, in this report?

20  A    Yes.

21  Q    And what is your view of the applicability of the IEEE

22  standards to probabilistic genotyping software like STRmix?

23  A    So IEEE is the most commonly used standard setting body in

24  computer science.  It's not without its faults.  For instance,

25  adherence to IEEE has actually caused a bug in Excel.  And

1    Microsoft itself complies with some but not all of IEEE.

2    However, moving to Prob Gene, none of the guidance bodies have

3    suggested adherence to IEEE.  The ISFG, International Society

4    of Forensic Geneticists, do make some suggestions for including

5    core computer science principles, and in many cases I was the

6    proponent of those.  The Forensic Science Regulator also makes

7    suggestions that it should be developed within a quality

8    system, and I would suggest that it is developed within that

9    quality system.

10           So in summary, I would say that Mr. Adams makes some

11   valid points.  But that whilst we are listening to these, they

12   do not diminish the value of the extensive testing that's been

13   done on STRmix.

14   BY MR. PRESANT:

15   Q    Do his points he makes, which are valid as you've testified

16   to, give you concern about the functionality of the operation

17   or rather the functionality of version 2.3.07?

18   A    No, they don't.  His, some of his points are completely

19   valid and I recognize them immediately.  Some he's just got the

20   wrong end of the stick or not been given the correct data.

21   Q    So let's talk about some of those.  One thing that

22   Mr. Adams says in his report is that he didn't review certain

23   documents, he didn't review something called Github.  What's

24   your reaction to those points he's making?

25   A    Some of those things we could have made available to him.

1     They do exist.  And some we did make available and he didn't

2     recognize them as the document he was seeking, and some he is

3     asking for do not exist.

4     Q    Can we go to page 6 of Exhibit 18?

5     A    Yes.

6     Q    We will bring it up on the screen.  But it's in front of

7     you as well.  This is the appendix to the statement you wrote

8     for this case, is that right?

9     A    Yes.

10    Q    And what are you trying to do in this appendix?

11    A    This is a point by point response to Mr. Adams's

12    commentary.

13    Q    So let's go through them, if you can summarize each of them

14    one by one so that the Court has the opportunity to ask you any

15    clarifying questions it might have about them.  You can start

16    with 4.1.3.

17    A    Okay.  Well, Mr. Adams I believe is just simply incorrect

18    in his assertion that this will affect the deconvolution.  If

19    we come to test script, I just need to check.  So the test

20    script is clearly not in the format he would have liked but we

21    believe contains the information that he sought.  And I think

22    there was some confusion over what expected result is.  So the

23    expected result is a defined thing.  For instance, reproducible

24    means we've been able to get the same number by a different,

25    separate and independent mechanism.

1      Issue trackers relate to the use of Github, I think,

2  and we do indeed use Github.  And we don't know as yet whether

3  we could technically give him access to just the single branch

4  for 2.3.07.  It seems likely he actually wants the entire back

5  history of STRmix which we'll have to see if we can technically

6  achieve.

7      MR. PRESANT:  Ms. Miller, we are on the bottom of page

8  7.

9      THE WITNESS:  The change log does identify the

10 changes, and we think the deficiency here is that Mr. Adams

11 would have actually liked the change logs all the way back to

12 inception.  Which we may be able to give him some but not all

13 of those because this process began at some point.

14      Dates of changes, Mr. Adams has assumed that's the end

15 date.  It's actually the beginning date of this document, and I

16 have put down the timeline for that segment.

17      The run-time checks, Mr. Adams is mathematically

18 incorrect, and it's disappointing to see him speaking on the

19 subject.

20 BY MR. PRESANT:

21 Q   Well, will you explain why he's mathematically incorrect,

22 or how do you know that?

23 A   A Markov change should be a memory less walk and a Gaussian

24 walk that proposes an illegal value should still be counted.

25      Focus on reproducibility.  Reproducibility means we

1    have been able to reproduce the result.

2    Q    Before we get too far ahead from the random walk, can we go

3    briefly to Exhibit 27?  What's 27, Dr. Buckleton?

4    A    It's a chapter from a basic text on Monte Carlo Markov

5    Chain.

6    Q    And can we go to I believe it's page 19 of the PDF?  It's

7    page 185 of the textbook chapter.  Zoom in on this gray box.

8    What's the significance of the part we have just blown up there

9    in the gray box?

10   A    That is a part that explains that you should count Gaussian

11   walk proposals that are outside the constrained limits.

12          MR. PRESANT:  G-A-U-S-S-I-A-N, did I spell that

13   correctly?

14   A    You did.

15   Q    And is this what Mr. Adams misapprehended in the criticism

16   in 4.2.2.2?

17   A    Yes.

18   Q    Let's go back to -- well before we go back.

19          MR. PRESANT:  The government moves to admit 27, Your

20   Honor.

21          THE COURT:  Ms. Kloet.

22          MS. KLOET:  If I could ask a couple questions as to

23   its genesis.

24          THE COURT:  Sure.

25          MS. KLOET:  Dr. Buckleton, was this document provided

1    to you by the government or did you provide it to the

2    government?

3              THE WITNESS:  I provided it to the government.

4              MS. KLOET:  Okay.  Is this an excerpt from a textbook

5    that you reviewed in a course that you were enrolled in?

6              THE WITNESS:  No.

7              MS. KLOET:  Where did you find this textbook?

8              THE WITNESS:  This was sent to me by Dr. Duncan Taylor

9    when I asked him for formal proof of this particular rule.

10             MS. KLOET:  And Duncan Taylor is the co-creator of the

11   STRmix program, correct?

12             THE WITNESS:  Yes.

13             MS. KLOET:  He's a geneticist?

14             THE WITNESS:  I'm not sure.  His degree, his doctorate

15   degree was studying STRs in Australian snakes.

16             MS. KLOET:  Would it be fair to say he's a forensic

17   scientist?

18             THE WITNESS:  Yes.

19             MS. KLOET:  Thank you.  I don't have any objection.

20             THE COURT:  It's admitted.

21             MR. PRESANT:  Can we go back to page 8 of Exhibit 18,

22   please?  I interrupted you, Dr. Buckleton, when you were on

23   4.2.6, Focus on reproducibility.

24             THE WITNESS:  So we use the word reproducible to mean

25   we are able to reproduce the result by a separate method which

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1      is usually by hand in Excel.

2              Recreation testing means testing against previous

3      versions and we do indeed do that, and that's outlined in the

4      R&T report.

5              Testing and verification.  So we actually set the

6      changes for each version in a thing called a change request,

7      and I think Mr. Adams would prefer this to be a vastly more

8      technical document.  And that's certainly something we could

9      do.

10             STRmix defects.  Mr. Adams is unaware of the process

11     for notifying stakeholders.  He didn't ask for it, and we would

12     have been happy to tell him that all stakeholders are notified

13     of all defects as soon as we diagnose them and measure the

14     extent of the troubles.

15             Published.  So indeed both the STRmix web page and my

16     own web page outline defects, and we openly disclose them to

17     the community.  I'm not sure what he wants further.  He calls

18     them plain language descriptions, which they are.  I'm sure we

19     could provide him if requested with some more technical data.

20             I'm not sure what he means by Unpublished but known to

21     ESR.  I don't think we have any.  We don't do that.  That's not

22     part of our philosophy.

23             The bug known to MSP.  Mr. Adams has misunderstood

24     something.

25     BY MR. PRESANT:

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1    Q    What has he misunderstood?

2    A    Well, it's not a bug.  The creation of a locus with a zero

3    when all other loci are performing well is a diagnostic usually

4    indicating an input error.

5    Q    What about 4.3.4.3?

6    A    So this is entitled Garbage collection.  Mr. Adams suggests

7    that it is improperly coded.  It's actually a completely

8    unnecessary function and has been removed.  But it had no

9    effect on 2.3.07.

10             Code style.  He wishes to know the author of the code.

11   Well, the author of nearly all the code or possibly even all

12   the code is Dr. Duncan Taylor.  But the three words, Admin,

13   Owner and Dude, refer to computers on which Dr. Taylor was

14   working.

15             Object oriented principles is the next one.  And Dr.

16   Adams argues that our use of them is limited and I think he

17   says something slightly rude.  Where is it?  Anyhow, he was

18   critical of our use of it and possibly with some justification.

19   We have certainly upped the use of this, but this goes to style

20   rather than functionality.

21   Q    Is that a way to view most or if not all of his criticisms

22   of STRmix is that they are stylistic preferences that don't

23   actually affect the way the software is operating?

24   A    That is what I am going to say.  I believe his comments are

25   stylistic and do not affect the operation.  Mr. Adams's actual

1    argument would be they are stylistic and although he can't

2    detect that they could affect the operation.

3    Q    Are you aware of any probabilistic genotyping software that

4    meets Mr. Adams's stylistic preferences?

5    A    I don't believe any of them would get close.  But we would

6    get the closest.

7    Q    Now, one of his criticisms was the identification and

8    disclosure of miscodes, right?

9    A    Yes.  Is it a criticism.  Yes, carry on, please.

10   Q    Can we bring up Exhibit 14, please?  What is 14,

11   Dr. Buckleton?

12   A    14 is a download from my web page of the miscodes detected

13   to date in STRmix.

14           MR. PRESANT:  Government moves to admit 14, Your

15   Honor.

16           THE COURT:  Ms. Kloet.

17           MS. KLOET:  I just have a couple brief questions.

18   Dr. Buckleton, when was this document created?

19           THE WITNESS:  This document is a live document and

20   I've been updating it regularly.  Updated it most recently I

21   think on the weekend just gone.

22           MS. KLOET:  This past weekend.

23           THE WITNESS:  Yes, I believe so.

24           MS. KLOET:  When was it first created?

25           THE WITNESS:  I don't know.

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1          MS. KLOET:  When was it first uploaded to the website?

2          THE WITNESS:  I don't have that information, I'm

3    sorry.

4          MS. KLOET:  Do you have an approximate idea?

5          THE WITNESS:  Well, this is my web page.  The

6    individual things are released individually.  This was a

7    compilation that I think I made about six months ago.

8          MS. KLOET:  Are you the only individual who has added

9    information to this document?

10         THE WITNESS:  The information is compiled by me from

11   information given to me by others.

12         MS. KLOET:  Okay.

13         THE WITNESS:  So you could argue that others have had

14   input into it.

15         MS. KLOET:  Just so I'm clear, this document has been

16   on the website available to the public for how long?

17         THE WITNESS:  In various forms for six months.

18         MS. KLOET:  Okay.  Thank you.

19         THE COURT:  Any objection to the Exhibit?

20         MS. KLOET:  No, Your Honor.

21         THE COURT:  It's admitted.

22   BY MR. PRESANT:

23   Q   Dr. Buckleton, on Exhibit 14, the two, I'm sorry, there are

24   more than two pages.  On the multiple pages of Exhibit 14, I

25   think you identify seven miscodes, is that right?

1   A    Yes.

2   Q    How many of those miscodes impacted the version at issue in

3   this case, 2.3.07?

4   A    One.

5   Q    Which one is that?

6   A    Number 3.

7   Q    Can we just zoom in on number 3?  Would you explain to the

8   Court how this miscode was identified and what significance if

9   any it had on the calculation of the likelihood ratio in

10  version 2.3.07?

11  A    This miscode was detected by testing, and it has an error

12  in the conservative direction, and that error is very minor and

13  occurs in very rare circumstances.

14  Q    So if that error had an impact in this case, where 2.3.07

15  was used, if anything, it would have made the likelihood ratio

16  smaller than it should have been?

17  A    Yes.

18  Q    Now you're on version 2.6 currently, right?

19  A    Debugging, yes.

20  Q    Have you identified bugs or miscodes in 2.6?

21  A    Yes.

22  Q    And is 2.6 being worked on by Dr. Taylor or have other

23  people come in and taken over the coding?

24  A    The coding is now done by professional coders, and I think

25  would meet many of Mr. Adams's requirements now.

1    Q    But you still found bugs, right?

2    A    416 to date.

3    Q    Can we bring up again Exhibit 18, page 4 this time?  This

4    table at the top.  So you found 416 bugs to date in 2.6 which

5    is being worked on by professional coders you said, right?

6    A    Yes.

7    Q    What does that tell you about the significance of bugs in

8    code to the operation of the code?

9    A    Professional coders are not, there will be bugs and they

10   have to be found by testing.

11   Q    Like the testing that's done in validation?

12   A    Yes.

13   Q    Now, Mr. Adams also makes much of the need for code to be

14   open source.  Are you familiar with that criticism?

15   A    Yes.

16   Q    What's your view of it?

17   A    When I first heard of open source, I thought it was a

18   fantastic idea, and my liberal civil service background makes

19   me think that's a really good concept, which is you make the

20   code available publicly.  Over time I have decided it's a

21   terrible idea.  And I'm going to give multiple answers but this

22   also appears on my web page.

23          First of all, it actually means anyone can download

24   and use the code without training.  And this truly horrifies

25   me.  You cannot buy STRmix without training, and in fact many

1    people have asked us that we take more care for the labs who

2    are using STRmix rather than less.  So just throwing it out

3    into the public domain and saying have a go is really akin to

4    tossing the keys to your new Ferrari to your teenage son.  And

5    I just think it's just a disaster waiting to happen.

6        The other things I've noticed is that the open source

7    are very light in documentation.  Mr. Adams comments about our

8    lack of documentation.  Well ours would be orders of magnitude

9    ahead of their's.

10       They also would not meet IEEE coding standards, and

11   seriously I start to wonder if there is even a safe activity

12   for forensic science.

13   Q    Turning to a different topic.  You're familiar with and

14   you've testified here today about the PCAST report, right?

15   A    PCAST report was released in 2016, October 2016.

16   Q    And the PCAST report touched on a number of areas of

17   forensic science, one of which was probabilistic genotyping,

18   right?

19   A    Yes.

20   Q    And would you summarize for the Court what PCAST said about

21   probabilistic genotyping?

22   A    The key finding in the PCAST report is finding 3.  Is that

23   going to appear here or shall I go from memory?

24   Q    I have not marked it as an exhibit.

25   A    Okay.  I can do it from memory, I hope.  Finding 3 has two

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1    parts.  The first part says that the community should move

2    rapidly to more objective methods such as probabilistic

3    genotyping.  And part B is that probabilistic genotyping has

4    demonstrated its validity up to three-person mixtures in which

5    the minor is at least 20 percent.

6    Q    What's your view of those findings by PCAST?

7    A    First of all, those findings were amended.  Do you want me

8    to go to the amendment or just say my view of it?

9    Q    I would appreciate it if you would summarize the amendment

10   first then go to your view.

11   A    So PCAST continued to work on this.  Subsequent to their

12   report coming out, they engaged in conversation with me and

13   others, but I think predominantly me, by e-mail and phone and

14   then eventually by meeting.  And they outlined to me at that

15   meeting, which was highly disrupted, they outlined to me what

16   they would like to be done to meet their standard of proof, and

17   that is now being done.

18          The amendment in particular came out in January 2017

19   and amended certain small aspects of that wording I have given

20   to you.

21   Q    And what's your view of the amended version of the PCAST

22   finding?

23   A    At the time of its appearance it was a massive

24   understatement of the power of the system.  And this came about

25   because of their requirement that proof be published in the

1    peer reviewed literature.  It is very hard to publish internal

2    validation work in the peer reviewed literature.  It is boring

3    and journals often have a policy against it.  However, there

4    are now two very large internal validation publications on

5    STRmix which makes in my view STRmix the most tested and most

6    published in peer reviewed software of this type available.

7    Q    We reviewed one of those publications earlier.

8    A    Looked at them both.  We looked at the FBI internal

9    validation and the 31 laboratory compilation.

10   Q    That's Exhibits 4 and 5.

11   A    Yes.

12   Q    What about these limitations, the three-person mixture and

13   the 20 percent for minor contributor, was PCAST right about

14   those?

15   A    PCAST amended the word minor to person of interest.  And

16   that was correct.  And that was at my request that they do

17   that.  And the fact that they made that fairly obvious mistake

18   of wording is problematic.  PCAST do suggest they expect the

19   range to expand as new studies are published, and I would

20   suggest that those studies have been published and therefore we

21   have met PCAST requirements.

22   Q    In terms of the number of contributors and the sensitivity

23   down to the minor contributor?

24   A    That's right.  We have gone up to five-person mixtures.

25   The study is massive, it's 28, 25 mixtures.  And massive

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1   number, 28 million non donor tests.  It's a massive study.

2   Q    When STRmix is internally validated by a particular

3   laboratory, are those things they study how the number of

4   contributors that it can analyze in its system and the

5   percentage or the limitation on the minor contributor that can

6   be used?

7   A    Yes.

8          THE COURT:  What exactly does that mean,

9   Dr. Buckleton, in your view, that "Probabilistic genotyping has

10  demonstrated its validity up to three-person mixtures in which

11  the minor is at least 20 percent."  What does that mean?

12         THE WITNESS:  So the three-person mixture is probably

13  obvious.  That suggests it hasn't demonstrated it for four or

14  five-person mixtures, as at their writing.  And the minor being

15  20 percent would mean that at least 20 percent of the DNA must

16  come from the smallest donor.

17         THE COURT:  What is the significance if that number is

18  less than 20 percent?

19         THE WITNESS:  As at writing, PCAST would say that that

20  hasn't been validated.  They would have been incorrect.

21  However, they are the President's council and I must show them

22  due respect.  And I have asked them what they would need to

23  extend that statement, and they outlined to me what they would

24  need and we have done it.

25         THE COURT:  What have you done?

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1      THE WITNESS:  We have done a compilation that goes

2  well below 20 percent, down to effectively zero percent.  And

3  four and five-person mixtures.  And we have published that.

4      THE COURT:  So if I understand you correctly, using

5  STRmix you can validly demonstrate the presence of DNA of up to

6  three people or up to five people where the minor or the person

7  of interest, as you put it, has contributed what?

8      THE WITNESS:  Well, zero, Ma'am.  But it wouldn't

9  demonstrate their presence.  If there was zero of the person,

10  it would answer inconclusive.  So STRmix will reliably report

11  when it knows and when it doesn't know.

12      THE COURT:  If it reports one percent, what does that

13  mean?

14      THE WITNESS:  It will give a very low LR and suggest

15  that it has a high uncertainty about whether that person is

16  there or not.

17      THE COURT:  Okay.  Thank you.  Mr. Presant, how long

18  how much longer do you anticipate your direct examination?

19      MR. PRESANT:  Maybe just ten minutes.

20      THE COURT:  Okay.  We will take our, well, I am going

21  to have one question after you're done and then we will take

22  our break.

23      MR. PRESANT:  Thank you, Your Honor.  Dr. Buckleton,

24  STRmix was excluded by a court in one case, is that right?

25      THE WITNESS:  Not STRmix but the evidence, yes.

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1    Sorry.  But pedantic.

2    BY MR. PRESANT:

3    Q    I think it's an important clarification so I appreciate you

4    making it.  What case was that in which it was excluded,

5    evidence was excluded?

6    A    That was People versus Hillary in New York State.

7    Q    Were you involved with that case?

8    A    Yes, I was.

9    Q    Would you describe for the Court the analysis in that case

10   and what led the Court to exclude the evidence?

11   A    The case involved the fingernail scrapings of a deceased

12   12-year-old boy.  They presented as a very imbalanced

13   two-person mixture where the minor contributor was very small,

14   and the work was done by the New York State police.  New York

15   State police did not have STRmix and do not have parameters for

16   STRmix, so I borrowed parameters for the analysis from a

17   Toronto lab who used the same kit and chemistry.  This was

18   candidly disclosed to the Court.  And His Honor deemed that to

19   be inadequate.  And I do not relitigate that.  That is his

20   decision, not mine.  He did say that STRmix was generally

21   accepted and had been validated, but that I had used it

22   improperly in that case by the act of borrowing samples,

23   borrowing parameters.

24   Q    Have you tried to approximate the number of cases in which

25   STRmix has been admitted or rather evidence derived from STRmix

1    has been admitted?

2    A    We have a lot of trouble getting this information.  But we

3    think conservatively it's, it's been admitted without an

4    admissibility hearing, so just used --

5    Q    Used in court.

6    A    In the United States, several thousands.

7    Q    And it has faced several challenges where there was an

8    admissibility hearing?

9    A    Nine by me, and some by other people.

10   Q    And have there been any other cases besides the New York

11   case that you just described in the United States where

12   evidence derived from STRmix has been excluded?

13   A    No.

14               MR. PRESANT:  Nothing further, Your Honor.

15               THE COURT:  Thank you.  I do have one, and you may

16   want to think about this over the break if you're not prepared

17   to answer it at this point.  But early in your testimony you

18   talked about communicating the results of STRmix to a

19   factfinder or to a Court and the necessity to do that

20   accurately and properly.  And in your discussion of the

21   training that you provide to a purchaser of your software, that

22   you emphasize how to phrase the likelihood ratio and report it

23   to the Court.

24               THE WITNESS:  Yes.

25               THE COURT:  If this evidence is going to be submitted

DR. JOHN BUCKLETON - DIRECT EXAMINATION - MR. PRESANT

1    to a jury in this case, how would you articulate an instruction

2    to the jury of how to use it or how to understand it or how to

3    apply it?  Because that's really --

4              THE WITNESS:  Yes.

5              THE COURT:  -- my task.

6              THE WITNESS:  No, I understand.  I'm honored by you

7    asking me my opinion.  And you're very correct to highlight

8    this as an important point.

9              Most of the discussions of statistical evidence in

10   court relate to understanding the result, and that's not just

11   likelihood ratio, that's any statistical evidence.  And there's

12   a lot of evidence that it's done poorly.

13             In this particular case, the statistic is substantial,

14   and if the statistic is deemed reliable and put to court, one

15   would have to say it's something like very strong evidence to

16   suggest the presence of the accused in this mixture.  We tend

17   to stop short of certainty, but this is very strong evidence.

18             THE COURT:  Well, that's my concern.  Because I think

19   the jury needs to be armed with the ability to understand both

20   sides of that.  By saying to the jury the ratio, the likelihood

21   ratio is 49 million to 1, without more that's really game over

22   for most lay people.

23             THE WITNESS:  49 million to 1 is very strong evidence.

24   It is.  I don't know what -- I mean game over may be an

25   American term.  I think I can obviously glimpse what it means.

1    I mean we hold open a very small chance that someone else may

2    produce evidence of this strength.  In fact, that chance is

3    roughly 1 in 49 million.  Obviously that's not quite certain.

4    It has to be zero to be certain.  But it's amazingly strong

5    evidence.

6            THE COURT:  Thank you, Dr. Buckleton.  Okay.  It's

7    11:30.  We are going to take 45 minutes and come back here at

8    12:15 and start with cross-examination of Dr. Buckleton.

9            THE LAW CLERK:  All rise.  The court is in recess.

10           (Recess taken, 11:32 a.m.; Resume Proceedings,

11   12:23 p.m.)

12           THE LAW CLERK:  All rise.  Court is back in session.

13   Please be seated.

14           THE COURT:  Dr. Buckleton, first of all, obviously

15   you're still under oath.  But I just want to follow up a little

16   bit on the last discussion that we had before we adjourned.

17           You aren't proposing, are you, that I tell the jury

18   that the results of probabilistic genotyping are powerful

19   evidence, are you?

20           THE WITNESS:  I believe the evidence in this case is

21   powerful, is that what you mean?

22           THE COURT:  No, that's not what I mean.

23           THE WITNESS:  Probabilistic genotyping is just a tool,

24   and it can only do, it can only do things if the evidence is

25   there.

DR. JOHN BUCKLETON - CROSS EXAMINATION - MS. KLOET

1    THE COURT:  Okay.  Ms. Kloet, are you ready for your

2    cross-examination?

3    MS. KLOET:  Yes, Your Honor.

4    CROSS-EXAMINATION

5    BY MS. KLOET:

6    Q   Dr. Buckleton, you didn't write the software at issue in

7    this case, did you?

8    A   No.

9    Q   I'll repeat the question.  If could you re answer it.

10   Dr. Buckleton, you didn't write the software that was at use in

11   this case, did you?

12   A   No.

13   Q   I believe it was your testimony that Duncan Taylor did,

14   correct?

15   A   I think either all or most of it.

16   Q   You also testified today that Duncan Taylor is a forensic

17   biologist, correct?

18   A   Yes.

19   Q   He's not a computer scientist.

20   A   No.  He's a scientist who programs.

21   Q   You don't need a degree to program software, do you?

22   A   No.

23   Q   Okay.  You testified in a Michigan State case a couple

24   years ago called People versus Mohammed?

25   A   Yes.

1    Q    In fact, that was the first time I believe you ever

2    testified in a Daubert hearing.

3    A    No.

4    Q    It wasn't?

5    A    No.

6    Q    When was the first testimony?

7    A    1995.

8    Q    And that was in a United States Daubert hearing?

9    A    In South Carolina.

10   Q    Did that have to do with probabilistic genotyping?

11   A    No.

12   Q    Okay.  The one in Muhammad is the first time you ever

13   testified in a Daubert hearing involving probabilistic

14   genotyping.

15   A    Yes.

16   Q    Okay.  Thank you.  And you were asked during that hearing

17   by defense counsel, "You're not a computer guy, are you?"  And

18   you responded, "No."  Is that correct?

19   A    Possibly, yes.

20   Q    Okay.  I understand based on your earlier testimony that

21   STRmix version 2.6 is now being coded by a professional coding

22   company, correct?

23   A    Yes.

24   Q    And it's still in the testing process, fair to say?

25   A    Yes.

DR. JOHN BUCKLETON - CROSS EXAMINATION - MS. KLOET

1    Q    And during that testing process 416 miscodes have been

2    identified.   Right?

3    A    I'm going to say yes.

4    Q    I think that was in the chart.

5    A    Yeah, it's at least 416.  I'm not sure miscodes is the

6    right word but certainly the tenor of your question is correct.

7    Q    Okay.  Thank you.  So there were 416 miscodes, or for lack

8    of a better description, similar problems or issues identified

9    and this was after bringing in professional software

10   developers, correct?

11   A    Yes.

12   Q    How many miscodes were identified in 2.3.07 during the

13   testing process?

14   A    I don't have that information.

15   Q    How can you assure the Court that there are no other errors

16   to version 2.3.07 that was used here?

17   A    No one can ever make such an assurance.

18   Q    You also testified regarding the assistance of peer

19   reviewed articles that relate to STRmix.

20   A    Yes.

21   Q    Almost all of those articles are in one journal, isn't that

22   right?

23   A    That's the journal I tend to submit to, yes.

24   Q    And that journal would be "Forensic Science International"?

25   A    No.

1    Q    What journal is that?

2    A    "Forensic Science International Genetics".

3    Q    Thank you, I misspoke.  Now that's not a software

4    engineering journal, is it?

5    A    If one were writing for the forensicology community why

6    would one publish in a software engineering journal?

7    Q    From that is your answer no?

8    A    I think no.

9    Q    It's not a computing journal, is it?

10   A    No.

11   Q    Okay.  You testified today that you're familiar with the

12   IEEE standards.

13   A    I know of them.

14   Q    Okay.  So you know that one of the recommendations in the

15   guidance from IEEE is that software should go through

16   independent validation and verification processes.

17   A    Yes.

18   Q    You also testified that you are a member I believe of the

19   ISFG?

20   A    Yes.

21   Q    Could you remind me again what that acronym stands for?

22   A    International Society of Forensic Geneticists, but I

23   particularly meant I was on the panel of the DNA commission.

24   Q    Okay.  One of the recommendations of the ISFG in the recent

25   article that was presented to you by the government was that to

1    incorporate the IEEE standard of independent testing, correct?

2    A    We probably meet that standard.

3    Q    Do you agree that that is what the article itself stated?

4    A    Yes, I think it did, yes.

5    Q    Okay.  And, in fact, the United Kingdom Forensic Science

6    Regulator that you previously testified about, they too

7    recommend independent testing of software.

8    A    Yes.  But I think we meet that requirement.

9    Q    Okay.  The version in 2.3.07 or version 2.3.07, pardon me,

10   that was used here, that did not follow the independent review

11   according to the IEEE standards.

12   A    Yes, I think it did.

13   Q    In what way?

14   A    Do you have IEEE and particularly the addendum on the

15   independent review?

16   Q    I can --

17   A    The full requirements for independent review.

18   Q    I can bring up the article that was previously, that

19   references the IEEE standard.

20   A    I need the actual IEEE I think.

21   Q    I don't have it.

22   A    I do on my laptop.  I'm sure Mr. Adams has it.

23   Q    I think -- let's table that for a minute and move forward.

24   I'm referencing the, I'm talking about the reference that was

25   made in the article that was previously admitted as an exhibit.

1    A    Which article would that be?

2    Q    I'm sorry?

3    A    Which article?

4    Q    The ISFG article.

5    A    Yes, I think we meet the IEEE validation or verification

6    they call it requirements.

7    Q    Okay.

8              THE COURT:  What do you understand independent

9    verification to mean?

10             THE WITNESS:  I understand it differently from IEEE.

11   So IEEE says such things such as the facilities and resources

12   should be separate, the personnel should be separate, and the

13   funding should be separate.  And I think we achieve that.

14             I would actually mean they should be separate from the

15   developers altogether.  And to some extent we have met that as

16   well.

17   BY MS. KLOET:

18   Q    Your testimony just now is to some extent.  To what extent?

19   A    So in particular, the group who do the validation or

20   verification do not do the programming.  They are a separate

21   group.  So in that regard, we maintain independence from the

22   coders.  That independence has softened slightly by the fact

23   that we find bugs and you get into an iterative process of

24   talking with the coders.  Now speaking of complete separation,

25   at least two groups have done some quite extensive by hand

1    verification of the STRmix outputs.

2    Q    So your statement just now is that they have done

3    verification of the STRmix outputs.  Does that mean they have

4    duplicated the mathematics in the program?

5    A    Yes, yes.

6    Q    How many calculations are there in a STRmix analysis?

7    A    A typical analysis would be hundreds of millions.

8    Q    So is it your testimony today that hundreds --  the

9    hundreds of millions of mathematical equations that are

10   required for STRmix to run once have been repeated in toto?

11   A    There are not hundreds of millions of equations.  There are

12   hundreds of millions of calculations, and a sample of them

13   would have been tested.

14   Q    So it was a sample that was tested, not all of the

15   calculations.

16   A    You can't even begin to do all of them.

17   Q    Okay.  Thank you.  You testified just a moment ago about

18   the independence of the review of the software for validation

19   of the software.  How many of those reviews involved a review

20   of the source code?

21   A    None.

22   Q    Has anyone reviewed the source code?

23   A    Only Mr. Adams.

24   Q    Okay.

25            MS. KLOET:  If I could confirm what he is viewing.  I

1     can confirm that's what I intended to bring up and I could use

2     my paper copy as a reference.  If that pleases the Court.

3                 THE COURT:  What are we after here?

4                 MS. KLOET:  Your Honor, I have a copy of the STRmix

5     comparison reports, the seven-page document that was generated

6     in this case and I would like to be able to refer that to him

7     for the next set of questions.

8                 THE COURT:  Was that introduced by the government?

9                 MS. KLOET:  I don't believe so.

10                MR. PRESANT:  It was not during his testimony, but we

11    do have it in our exhibit book so we could bring it up if that

12    would be helpful.

13                THE COURT:  Would you do it, please?

14                MS. KLOET:  Thank you.

15                MR. PRESANT:  Government's Exhibit 26, I believe.

16    BY MS. KLOET:

17    Q    That looks the same to me, Your Honor.  So I can continue.

18                THE COURT:  And this is the report generated by

19    Dr. Buckleton in this case.

20                MS. KLOET:  Not precisely, Your Honor, but I can have

21    him identify it for you if you wish.

22                THE COURT:  Okay.

23    BY MS. KLOET:

24    Q    Dr. Buckleton, can you identify this document?

25    A    It's STRmix output.

DR. JOHN BUCKLETON - CROSS EXAMINATION - MS. KLOET

1    Q    Did you create this personally?

2    A    No.

3    Q    Okay.  Thank you.  Do you have any reason to doubt it was

4    the STRmix report that was generated in this particular case?

5    A    No.

6    Q    Okay.

7         MS. KLOET:  I don't know if you want to stipulate to

8    that with me since it's your exhibit.  That was the report in

9    fact generated in this case.

10        Your Honor, I have asked the government if they will

11   stipulate if this was the report generated in this case, seeing

12   as it was a Government's Exhibit.

13        THE COURT:  Mr. Presant.

14        MR. PRESANT:  I mean we didn't mark it.  I think the

15   Court will hear testimony from another witness that it was

16   produced in this case.  I would rather that witness lay the

17   foundation for it.

18        MS. KLOET:  Dr. Buckleton, I would like to have you

19   look at page 3, please.  What's the title of that page or the

20   chart on that page, more specifically?

21        THE WITNESS:  Per Locus Likelihood Ratios.

22   BY MS. KLOET:

23   Q    What does that mean?

24   A    That is the likelihood ratio for each locus.

25   Q    And when you say locus, you mean each specific spot on the

1    DNA strand that is viewed for purposes of DNA analysis in this

2    case, correct?

3    A    Yes.

4    Q    Okay.  Were there any loci that were left out of analysis

5    here?

6    A    Yes.

7    Q    Which were those?

8    A    Can you just expand this and show me loci I think it's 19

9    and 20 or 18 and 19?  So it's DYS391 and D8S1179.

10   Q    Okay.  Does STRmix or can you tell from this document the

11   reasons that those two loci were left out of the analysis?

12   A    I can't tell from this document, but I otherwise know.

13   Q    Okay.  Assessing a number of contributors is a necessary

14   first step to running a STRmix analysis, right?

15   A    Yes.

16   Q    All right.  Now, the number of contributors is always an

17   estimate, is it not?

18   A    Yes.

19   Q    Okay.  I want to talk a little bit about -- I don't think

20   we have covered the concept called the analytical threshold.

21   Can you explain to the Court what an analytical threshold is?

22   A    Other than the fact that an analytical threshold has

23   absolutely nothing to do with STRmix.  It's a threshold set by

24   the laboratory below which we ignore the data.

25   Q    So it's set by the laboratory.  So the laboratory then

1      would be ignoring data under the --

2      A    Well, ignoring is a big word.  We will not use that data.

3      We will look at it sometimes for number of contributors

4      information.

5      Q    What is the implication if a number is below the analytical

6      threshold?

7      A    A peak is below?

8      Q    Correct.

9      A    We won't use it in the analysis.

10     Q    Okay.  So if the number is below that, the RFU in a

11     particular allele or peak, as you said, is below the analytical

12     threshold it could be thrown out?

13     A    It will be thrown out.

14     Q    It will be thrown out of the analysis.  Is it possible that

15     that low peak could actually be evidence of the presence of

16     true DNA?

17     A    Many of them are exactly that.

18     Q    And yet it's thrown out.  Correct?

19     A    That's correct.  And that's not a new policy.  That is a

20     policy that's been in place for well over 20 years and is a

21     very good policy.  It stops us using data that is confusing or

22     likely to cause issues.  Whilst we throw out some good data, we

23     throw out a lot of bad data.

24     Q    I think I heard you testify just now you could possibly

25     throw out what you characterized as good data.

1  A    Most of it will be.  But some of it is also confusing, bad,

2  and will derail the process.  And this is a very good policy.

3  It's sanctioned by SWGDAM and every major policy group.

4  Q    So could some of that data that is thrown out, so to speak,

5  could it lead potentially to an underestimation of the number

6  of contributors in a mixture?

7  A    Yes.

8  Q    And that in turn could potentially affect the likelihood

9  ratio generated.

10  A    Generally if you get the number of contributors wrong, you

11  get a conservative likelihood ratio.

12  Q    Generally speaking.

13  A    Yes.

14  Q    Okay.  There are competing programs to STRmix, correct?

15  A    Yes.

16  Q    And isn't it true that some of those programs choose to

17  incorporate that data below that threshold?

18  A    Yes.

19  Q    One of those, that program, an example of it would be

20  TrueAllele, correct?

21  A    There are two I know of that do that.

22  Q    What's --

23  A    TrueAllele is one of them.

24  Q    Thank you.

25          THE COURT:  What's the other one?

1          THE WITNESS:  Lab Retriever, which is spelled like the

2     dog.

3          MS. KLOET:  Thank you.  You testified on direct to a

4     case you were involved in, New York versus Hillary.

5          THE WITNESS:  Yes.

6     BY MS. KLOET:

7     Q    And that was I believe you testified that STRmix analysis

8     was not admitted or the likelihood ratio generated by the

9     STRmix analysis in that case was not admitted, correct?

10    A    That's correct.

11    Q    Now, in that case they also ran another analysis using

12    TrueAllele, correct?

13    A    Unbeknownst to me, TrueAllele had been run prior to my

14    involvement.

15    Q    You're aware of that now, however?

16    A    Yes, very much so.

17    Q    So you're aware that that program concluded that in fact

18    the defendant in that case was excluded from the mixture.

19    A    No, that's not so.

20    Q    What was the conclusion in that case?

21    A    Essentially inconclusive.

22    Q    So the conclusion for TrueAllele was inconclusive and what

23    was your, the STRmix conclusion as to a likelihood ratio?

24    A    Am I allowed to answer this?

25          THE COURT:  Why would you not be allowed to answer?

1      THE WITNESS:  I don't know.  It was precluded then.

2  I'm about to give it now.  Shall I do so?

3      THE COURT:  Yes.

4      THE WITNESS:  The likelihood ratio I think was 300,000

5  from memory.

6  BY MS. KLOET:

7  Q   Okay.  And that was excluded.  Correct?

8  A   Yes.

9  Q   Thank you.

10 A   We have subsequently diagnosed where TrueAllele went wrong

11 if you're interested.

12 Q   Not at this stage, thank you.  I would like to move on to

13 the next chapter.  I think we are getting a little bit outside

14 of the scope of this case.

15      I want to talk about drop-in.  Are you familiar with

16 the concept of drop-in?

17      THE WITNESS:  I invented the word.

18 BY MS. KLOET:

19 Q   Okay.  Can you explain it for us then, please?

20 A   Yes.  Drop-in relates to the appearance of alleles in a non

21 reproducible fashion in the electropherogram.

22 Q   So in lay person terms, what does that mean, is it a single

23 allele in the --

24 A   We have a model of alleles snowing from the ceiling.  So

25 you imagine that alleles are falling from the ceiling and

1    occasionally fall into your Eppendorf tube.  And I can not

2    spell Eppendorf.

3    Q    Is it an Eppendorf --

4    A    It's the little plastic thing that we have our extractor.

5    Q    So that's something you would find in a lab?

6    A    Yes.

7    Q    Okay.  So is drop-in a form of contamination?

8    A    Yes.

9    Q    So drop-in could take place in a lab, correct, as you just

10   described?

11   A    It would only take place in a lab.  If it happened prior to

12   the taking of the sample, we wouldn't consider it drop-in.

13   Q    And a lab will typically have filters and protocols to

14   address the risk of contamination, wouldn't it?

15   A    Yes.

16   Q    Okay.  So I just had this document, it's the same one as

17   before.  And you identified it as a report generated by STRmix

18   in this case.

19           Can you please turn your attention to page 4 of this

20   document?  What's the title of this chart present on this page?

21           THE WITNESS:  Parameters.

22   BY MS. KLOET:

23   Q    What are parameters?

24   A    Is there a hard copy?  Because mine is sideways and bleary.

25   Can I get a hard copy?

1          THE COURT:  Should be in the book.

2          THE WITNESS:  Is this number 5 or 6?

3          MS. KLOET:  It's K in defense exhibit.

4          THE WITNESS:  I think we have the equivalent.  But can

5   someone help me?

6          MR. PRESANT:  26 in the government book.

7          THE WITNESS:  I'm good, I think.

8          MS. KLOET:  You may need the other one going forward.

9          THE WITNESS:  I'm good now.  Thank you.

10  BY MS. KLOET:

11  Q    So we are looking at the same document as before, right?

12  A    Yes.

13  Q    All right.

14  A    I think.

15  Q    And you just testified that the title of this chart is

16  parameters.  Can you explain what parameters are, what that

17  means for purposes of this document, please?

18  A    These are the input parameters for STRmix.

19  Q    What do you mean by input parameters?

20  A    They're the parameters that are input into STRmix.

21  Q    Who inputs them?

22  A    They usually sit during the laboratory validation and they

23  are usually locked as a default.  If any of them change they

24  become bold and italic.

25  Q    Okay.  So are these figures that are input by the local

1    lab?

2    A    Yes.

3    Q    Okay.  Not by STRmix itself.

4    A    No.

5    Q    Do some of these parameters have an impact on the STRmix

6    analysis potentially, not in every case but potentially?

7    A    I think nearly all of them would.

8    Q    Okay.  Fair enough.  In the third column, the second row,

9    there's a parameter called drop-in cap.

10   A    Yes.

11   Q    What is the value for that?

12   A    400.

13   Q    What does that mean?

14   A    Peaks above 400 will not be considered drop-in.

15   Q    So the converse of that would be peaks below 400 would or

16   could be considered drop-in, correct?

17   A    Would be proposed potentially as drop-in.  One of the

18   proposals.

19   Q    Okay.  If you can turn to the next page titled Evidence

20   Input Files.  The very first locus listed there is D3S1358.

21   Are there any of the alleles present at this particular locus

22   that are under the drop-in cap?

23   A    Yes.

24   Q    Which one is that?

25   A    17.

1    Q    All right.  How about at the next locus, any under the

2    drop-in cap?

3    A    Yes.

4    Q    How many?

5    A    Two.

6    Q    All right.  How about at locus D10S1248?

7    A    Two.

8    Q    Two.  Okay.  If I told you there were 11 peaks on this, in

9    this document that were at or lower than 400, would you have

10   any reason to question that?

11   A    No.

12   Q    Okay.  So there are 11 peaks that are noted as present here

13   but in fact potentially could have been drop-in, right?

14   A    Yes.

15   Q    And your testimony earlier was that drop-in could, is

16   essentially contamination or could be attributed to

17   contamination, true?

18   A    Yes.

19   Q    Okay.  Thank you.  Back to the page we were just on.  Right

20   under that row we were looking at drop-in cap.  I'm looking at

21   the row entitled drop-in frequency.

22   A    Yes.

23   Q    What's the value there?

24   A    .3453.

25   Q    Okay.  You said this was a parameter that was inputted by

1    the lab following local validation, right?

2    A    Yes.

3    Q    So the frequency of drop-in as a result of their own

4    testing was .3453 or 34.5 percent, true?

5    A    Not really.

6    Q    What do you mean by not really?

7    A    Looks like they fitted the gamma distribution which is a

8    good idea or an exponential distribution which is a good idea.

9    So the 3453 may have come from a spreadsheet I made that gets

10   the tail area correct.  But am I right witness for this?  I

11   didn't do any of this work.

12   Q    I'm just asking about where you believe those figures came

13   from and what they signify.

14   A    They have come from the internal validation which a

15   subsequent witness will speak to.

16   Q    These are parameters that are used in the software that you

17   co-developed, correct?

18   A    Yes.

19   Q    Okay.  Thank you.  Speaking of contamination, I think you

20   used the analogy snowing from the ceiling --

21   A    Yes.

22   Q    -- for how the alleles might arrive in a mixture in a lab

23   or in a sample in a lab.  The DNA can arrive on an object and

24   therefore in a sample without any sort of direct physical

25   contact, isn't that true?

1    A    Yes, I think that's true.

2    Q    Okay.

3    A    This has nothing to do with STRmix.  Or prob gene or --

4    Q    Would you agree it has to do with potential contamination?

5    A    Yes.  Is that an area you would like to qualify me as an

6    expert on?

7    Q    I believe you're qualified as an expert in forensic science

8    for purposes of this hearing.  So --

9    A    I have studied contamination.

10   Q    Okay.  What I'm getting at, so the DNA that is present in

11   the sample that was analyzed here could potentially be

12   explained by, could potentially be there even without direct

13   contact, isn't that true?

14   A    Really there are better witnesses.  I don't know the quant.

15   And I mean you're getting me to say things like possible where

16   things are, you know, some things are possible but enormously

17   unlikely.

18   Q    Well, drawing upon your experience and expertise in

19   forensic science.

20   A    I haven't studied this case at all.  I don't know where the

21   sample is from.  I don't know the quant value.  There are

22   better witnesses for this evidence.

23   Q    Okay.  Do your best as a qualified expert in forensic

24   science.  My question is, could DNA arrive in a sample without

25   direct contact between an individual and that sample?

DR. JOHN BUCKLETON - CROSS EXAMINATION - MS. KLOET

1    A    Yes, you could drop blood on something or you could

2    ejaculate on something or you could spit on something.

3    Q    Okay.  Thank you.  That's as far as I'll take it on that

4    point.

5         I believe this document was previously displayed to

6    you but for purposes of the record could you identify it again

7    please?

8    A    It's an e-gram.

9    Q    If I told you it was the e-gram or the electropherogram for

10   this particular case, for the sample taken in this case, would

11   you have any reason to doubt that?

12   A    No.

13   Q    Okay.  Did you have a chance to review other materials in

14   this particular case including Mr. Gissantaner's own EPG?

15   A    I have seen it.  I haven't reviewed it.  It was present at

16   a preparation meeting yesterday.  So I've seen it.

17   Q    Okay.  Did you have -- do you agree that his -- at every

18   loci that was analyzed here there are some loci where both of

19   his alleles are not present?

20   A    I haven't done that work.  But I could it for you, but I

21   haven't done it.

22   Q    Okay.  I'm just going to take you from one locus and we

23   will go from there.  So have a look at CSF which is in the

24   bottom half of this first page, just to the left of the --  I'm

25   looking at this one right here.  So what alleles are present at

1    this locus?

2    A    7, 9, 10 and 11.

3    Q    Okay.  I'm going to pull up another document quickly.  Was

4    this one of the documents that you had a chance to look at

5    yesterday?

6    A    It was present and I have looked at the blue lane only.

7    Q    So if I were to -- would you have any reason to doubt that

8    this is the EPG for Mr. Gissantaner's reference sample?

9    A    No.

10   Q    Okay.  So let's look at, have a look at this locus right

11   there.  I'm trying to look at CSF.  Second circle.  Okay.  So

12   this one right here.  So what two alleles are present there?

13   A    9 and 12.

14   Q    Okay.  So that would represent ostensibly the alleles that

15   Mr. Gissantaner carries at that particular locus, true?

16   A    Yes.

17   Q    So 9 and 12.  Can we go back to the previous exhibit,

18   please?  So if you could look back again at that same locus, I

19   believe you just agreed that the alleles that are present on

20   Mr. Gissantaner's EPG were 9 and 12.  And you testified earlier

21   too that the alleles that are present at the same locus are 7,

22   9, 10 and 11.  So there's no 12 present in this sample, is

23   there, at least as displayed by the EPG?

24   A    There is no 12 peak above the analytical threshold.

25            MS. KLOET:  Okay.  Thank you.

1      THE COURT:  What does that mean?

2      THE WITNESS:  There is no peak on which we would

3    choose to rely for the 12 allele that is concordant with

4    Mr. Gissantaner's 12 allele.  So there are two possible

5    explanations.  The 12 of Mr. Gissantaner has dropped out, or

6    Mr. Gissantaner is not a donor.

7      MS. KLOET:  Are you ready for me to change the

8    display, Your Honor?

9      THE COURT:  Yes, yes.

10   BY MS. KLOET:

11   Q    So this is Defense Exhibit K, the comparison report that

12   you've already identified.  Page 3.  I would like you to have a

13   look at page 3, please, which she is about to display.  Just a

14   minute while she orients the page.  So I have some highlights

15   here, but what I would like you to look at is the highlights

16   under CSF, that locus we were just looking at.

17   A    Yes.

18   Q    Okay.  So at loci CSF, the third column we have there, what

19   does that represent?

20   A    The likelihood ratio for that locus.

21   Q    For that particular locus, okay.  What's that number?

22   A    4.2.

23   Q    Thank you.  Now, a likelihood ratio greater than one, what

24   does that signify?

25   A    Support for the prosecution proposition.

1    Q    Okay.  So to put it another way, it's an inclusive piece of

2    information or inclusive likelihood ratio?

3    A    That's correct.

4    Q    So here you have a likelihood ratio greater than one, and

5    therefore inclusive at a location where you don't see, as we

6    just established, all of Mr. Gissantaner's alleles, correct?

7    A    Yes.

8    Q    If this number, 4.2 was the likelihood ratio at each locus

9    on the 21 reporting loci, do you have, can you give us an

10   estimate of what the likelihood ratio would be generated from?

11   A    I can give you the exact answer.

12   Q    What is that?

13   A    It's 4.2 to the pair of 21.

14   Q    Okay.  That's a 4.2 with 21 zeros after it?

15   A    No, not quite.  It's about --

16   Q    Can you tell us what that is?

17   A    Do you want me to do this in my head?  I think I can.

18   Q    Would it be fair to say that you take the number 4.2 and

19   you move the decimal 21 places?

20   A    About 150 billion.

21   Q    150 billion.  Okay.  So 4.2, although it seems small has a

22   pretty large impact on the overall likelihood ratio if it were

23   carried across all the reporting loci?

24   A    Yes.

25   Q    150 billion, is that what your testimony was?

1    A    I'm doing math in my head which isn't a good plan.

2    Q    I have a different number but I'll go, they are both quite

3    large.

4    A    Somewhat might have Excel open.  They can put it in

5    quickly.

6    Q    But you would agree that's a fairly large likelihood ratio.

7    A    Yes.

8    Q    And that's generated from a number that's only a couple of

9    integers above 1, right, at each locus?  I'll rephrase.  Might

10   be a confusing question.  So what does a likelihood ratio of 1

11   indicate, is it informative?

12   A    No.

13   Q    Okay.  And here we have a likelihood ratio of 4.2.  That's

14   only 3.2 above an uninformative likelihood ratio number, right?

15   A    Well, the answer is yes.

16   Q    Okay.

17   A    It's a poor, it's a poor thought process.

18   Q    But if you were to have that particular, although it's only

19   a difference of 3.2, at least on a likelihood ratio scale, if

20   you were to use that 4.2 and input the per locus likelihood

21   ratio for each one of these rows in this particular column, you

22   would generate a likelihood ratio statistic at least in the

23   billions.

24   A    Yes.

25   Q    Okay.  Thank you.  You talked about stutter in your direct

1    exam.  I would like to discuss that just a little bit.  What is

2    stutter exactly to refresh, to the extent we didn't already

3    cover it to refresh the Court's recollection?

4    A    Stutter is an artifact of the amplification process.

5    Q    What kind of artifact do you mean?  How does it manifest?

6    A    In Fusion 5C there are three predominant stutters.  The

7    most common is the minus 1 repeat stutter which creates a peak,

8    one repeat smaller than the allele.

9    Q    So I'm sorry to interrupt you.  I just want to make sure we

10   don't get too much at once.  So when you say one repeat

11   shorter, would that mean then if a peak was 12 in order for it

12   to be, if backward stutter took place as you just described,

13   there may be evidence of an 11 present?

14   A    Yes.

15   Q    Thank you.  Okay.  Go ahead.  And you were talking about

16   three different types of stutter.

17   A    The other is forward stutter which is one repeat larger.

18   Q    Okay.

19   A    And we have a minus 2 base repeat stutter happening at D1

20   in Fusion.

21   Q    Okay.  So to summarize, forward stutter is one repeat

22   longer, backward stutter is one repeat shorter, true?

23   A    Yes.

24   Q    Okay.  And that manifests as an increase in the allele

25   number that's present in the EPG, if -- potentially if that

1    took place?

2    A    No, it shouldn't.  We have got mechanisms in place to avoid

3    that.

4    Q    That's how it could appear, potentially, without those

5    mechanisms?

6    A    If someone were to do forensic science without those

7    mechanisms, yes, they would get the answer wrong.

8    Q    Okay.  Thank you.  What is forward stutter modeling?

9    A    Modeling the forward stutter I spoke of.

10   Q    Okay.  When you say modeling, what does that mean?

11   A    We essentially predict a peak height for forward stutter

12   and compare it with the observed peak height and do our

13   standard calculation for the probability of that occurrence.

14   Q    Okay.  Thank you.  Did the version of STRmix that was used

15   in this case, 2.3.07, take into account the possibility of

16   forward stutter?

17   A    No.

18   Q    Do the later versions of STRmix including the one you're

19   currently developing take into account that possibility?

20   A    Yes.

21   Q    Thank you.  So I'm going back to the electropherogram for

22   the sample in this case.  If you could turn to page 2.  I would

23   like you to look at this second column of boxes here.  So the

24   second column of boxes, I'm referencing to the left of that

25   line there, those are the alleles present at locus D12S391,

1    correct, as they appear on the electropherogram?

2    A    Yes.

3    Q    Okay.  The 19 peak here, the 19 allele is, the RFUs, or the

4    peak height as you described it earlier, are 4649, true?

5    A    Yes.

6    Q    The 20 peak just below it or just next to it, would be, I'm

7    not saying this specifically, but a 20 peak could be in forward

8    stutter position to the 19 peak.

9    A    It is in the forward stutter position.

10   Q    Okay.  Thank you.  But by comparison to 19 the amount of

11   RFUs at 19 which we just established was 4649, the RFU at 20

12   are quite low at 648 in height.

13   A    Yes.

14   Q    So potentially the 20 that's present there could be forward

15   stutter to the 19 that's present in larger amounts.

16   A    No.

17   Q    Your testimony --

18   A    You would never get a forward stutter that big.

19   Q    Why do you say that?

20   A    It's almost always less than two percent of the parent.

21   But it is also in the back stutter position of the 21.

22   Q    The 20 you mean?

23   A    Yeah, it's between the 19 and the 21.

24   Q    So is it your testimony today it's absolutely impossible?

25   A    It's absolutely impossible for that 20 peak to be all

1    forward stutter.

2    Q    Okay.  How about we look at peak 21.  Now, that particular,

3    the RFU at that particular peak are 1970, correct?

4    A    Yes.

5    Q    And the 21 peak is or the 20 peak is in backward stutter

6    position to that 21 peak, right?

7    A    Yes.

8    Q    Is it possible that that 20 peak is a sum of the forward

9    stutter from 19 and the back stutter of 20?

10   A    I have to go and do some math.  I would say -- see I don't

11   have the stutter ratios for D12 in my head but I'll just try

12   and do it.  Really why are you making me do mental arithmetic

13   in court?  Why haven't we done prepared work on this?

14            MR. PRESANT:  Your Honor, I'm going to lodge an

15   objection now on that basis which is he has already testified

16   that he has not reviewed the specific work done in this case.

17   The government is going to call a witness later on who has done

18   the work in this case and can testify about these particular

19   electropherograms.  I think Ms. Kloet has had a lot of leeway

20   to question Dr. Buckleton about these issues, but I think her

21   examination would be better focused on how the software

22   functions as opposed to what was done in this particular case

23   because he hasn't reviewed it.  It's not fair to make him do

24   that on the stand.

25            THE COURT:  Ms. Kloet.

DR. JOHN BUCKLETON - CROSS EXAMINATION - MS. KLOET

1    MS. KLOET:  Well, Your Honor, this is information

2    that's incorporated into the software program that

3    Dr. Buckleton created himself.  This is -- he's familiar with

4    the parameters.  I'm asking him to simply read the numbers that

5    everyone in the courtroom can review.  And he's familiar as a

6    forensic science expert about what, of concepts of forward and

7    backward stutter.  The question I just asked didn't require him

8    to do mathematics.  I just asked him if it was possible under

9    the theories and principles of forensic, of forward and

10   backward stutter that this particular allele in the amount

11   that's there could potentially be a combination of forward and

12   backward stutter.  Not conclusively yes or no, just

13   potentially.  I don't think that requires math.

14   MR. PRESANT:  Well, I think the testimony is he would

15   have to refer back to other materials in order to say

16   conclusively.  So I don't think there is a lot of probative

17   value in the question.  Is it something possible hypothetically

18   or conceivably.  I think she should ask the witness what he

19   knows about and what he is prepared to testify about here

20   today.

21   THE COURT:  I think you need to move on, Ms. Kloet.  I

22   really do.  I think you are getting a little bit deep in the

23   woods here with regard to Dr. Buckleton's expertise and the

24   meaning of these documents which he did not produce.

25   MS. KLOET:  I'll move on, Your Honor.  And I can ask

1    another witness to hopefully answer some of those questions

2    that he's not in a position to do today.

3           Based on your -- so is it your testimony for purposes

4    of clarification that you have not reviewed the EPGs in this

5    case or you just did briefly yesterday?

6           THE WITNESS:  I saw them.  I don't think I could say I

7    reviewed them.

8    BY MS. KLOET:

9    Q    Okay.  Can you pull up J, please?  You are familiar with

10   what a STRmix report looks like, correct?

11   A    Yes.

12   Q    General format.  Okay.  I hope so.  And you're aware to the

13   extent you have some familiarity and from the cover page of the

14   document I'm displaying here that the determination of the

15   number of contributors here was three, right?

16   A    Yes.

17   Q    Okay.  No reason to dispute that.

18   A    No.

19   Q    Okay.  Or at least that determination.

20          So what is this document that I'm looking at here?

21   A    That's the opening page of a STRmix output.

22   Q    Okay.  And if you see towards the top under the STRmix

23   brand stamp there is a comments.  It says deconvolute.  What

24   does that mean?

25   A    Mine is different from yours.

1    THE COURT:  Are you on Exhibit J in the defense book?

2    THE WITNESS:  I must not be.  I think I'm sorted now,

3    thank you.  In any case, deconvolute is, tends to mean exactly

4    what it says, it's asking STRmix to deconvolute the mixture.

5    BY MS. KLOET:

6    Q    And by deconvolute, could you just break it down for us?

7    A    It's the process I spoke of earlier which is essentially to

8    run the Markov Chain and ascertain those sets of genotypes that

9    could plausibly explain the mixture.

10   Q    Okay.  And on this front page there is a chart entitled

11   Summary of Contributors, correct?

12   A    Yes.

13   Q    And in that chart there is a row entitled mixture

14   proportions.

15   A    Yes.

16   Q    What does it say as to the proportion of the mixture

17   contributed by 1, what is the figure there?

18   A    68.

19   MR. PRESANT:  Same objection, Your Honor.  The witness

20   didn't prepare this document.  If Ms. Kloet has questions about

21   how the software works or why it generates a document like

22   this, I think those are fair for Dr. Buckleton.  The document

23   speaks for itself and there will be other witnesses who did

24   prepare the document who will testify about what it means.

25   THE COURT:  I think she is heading in that direction,

1    Mr. Presant.  And he can obviously relate what is on the page.

2            MS. KLOET:  I am, Your Honor.  I don't expect very

3    many more questions on these particular documents.  With

4    respect to contributor 2, what's the proportion of the mix?

5            THE WITNESS:  25.

6    BY MS. KLOET:

7    Q    And contributor 3?

8    A    7.

9    Q    Okay.  Dr. Buckleton, do you recognize this document?

10   A    Yes.

11   Q    What is it?

12   A    This is the raw output from STRmix.

13   Q    The raw output you said?

14   A    Yes.

15   Q    If I could call your attention to the first page, the

16   section entitled contributor order giving highest likelihood

17   ratio.

18   A    Yes.

19   Q    Do you agree that this report generated by STRmix tends to

20   indicate the strongest support for the sample labeled

21   LS15-3777-2AX as contributor 3?

22   A    Yes.

23   Q    So if I were to tell you that 2AX represented

24   Mr. Gissantaner, would you agree that the strongest likelihood

25   ratio for him would be at contributor 3 according to this

1    report?

2    A    Yes.

3    Q    Okay.  Thank you.  Earlier in your testimony you referenced

4    diagnostics, is that true?

5    A    Yes.

6    Q    And STRmix generates several diagnostics.  What was their

7    purpose?

8    A    To help diagnose the performance of the software in this

9    particular run.

10   Q    So it can help tell the analyst whether or not the run was

11   good, I guess, for lack --

12   A    Yes.

13   Q    And the one you testified to earlier was the Gelman-Rubin

14   diagnostic?

15   A    Yes.

16   Q    Can you just roughly describe what that means?

17   A    Have all the different chains gone to the same places.

18   Q    Okay.  I guess I lied.  I had one more reference to this.

19   So back to J.  So this is the document I was just showing you

20   that the STRmix report that we went over with the contributors

21   listed.  Under the section entitled Run Information, is there

22   any information about the Gelman-Rubin diagnostic you just

23   explained?

24   A    Yes.

25   Q    What's the figure for that?

1   A    1.41.

2   Q    1.41.  Is that a potential warning indicator that this may

3   have not been a good run?

4   A    It's above 1.2 which is a limit many people would use.

5   Q    So if it's above 1.2, then potentially this could indicate

6   there was an issue or concern with the run?

7   A    With running it for longer.

8   Q    A lab can run STRmix more than once, right?

9   A    Yes.

10  Q    Okay.  Thank you.  I want to talk about the validation

11  studies that you covered pretty extensively.  I'm not going to

12  cover them as extensively.  You mentioned SWGDAM.  SWGDAM has

13  published guidelines, right?

14  A    Yes.

15  Q    But guidelines aren't the same as standards, are they?

16  A    There are no standards.

17  Q    What is the difference?

18  A    To some extent standards are mandatory.  Whereas guidelines

19  are not.

20  Q    Okay.

21  A    But for all intents and purposes, SWGDAM guidelines are

22  mandatory in the United States.

23         THE COURT:  Would it be fair to say that a guideline

24  is more like a range of behavior or --

25         THE WITNESS:  Yeah.

DR. JOHN BUCKLETON - CROSS EXAMINATION - MS. KLOET

1          THE COURT:  -- values as opposed to a standard which

2     is a single --

3          THE WITNESS:  Yes.

4          THE COURT:  -- statement.

5          THE WITNESS:  Yes, that's well put.

6     BY MS. KLOET:

7     Q    When was the STRmix software first commercially available

8     in the United States?

9     A    January 2014.

10    Q    And when were the SWGDAM guidelines published?

11    A    Can you check for me?  I think it's July 2015.

12    Q    That sounds about right.  I have June.

13    A    It could be June.

14    Q    So you completed the developmental validation or engaged in

15    a significant amount of it and sold the product in the United

16    States but in the absence of formal standards under SWGDAM.

17    A    Yes.

18    Q    Okay.  Thank you.  And when SWGDAM eventually did issue

19    those guidelines, didn't they specifically instruct not to

20    apply those guidelines retroactively?

21    A    They may have.  I think they usually do that.  But it has

22    no, it has no traction.  A Court can deem that it should be

23    taken cognizance of whether SWGDAM thinks so or not.

24    Q    Okay.  Talking about the peer reviewed publications in this

25    case.  The peer reviews of these validation studies of yours

1   did not involve a duplication of the exact tests that you

2   completed on the STRmix program, correct?

3   A    No.

4   Q    So they were an evaluation of the studies or tests that you

5   completed, true?

6   A    They usually about paper exercise.  So they actually get

7   the paper electronically and read it.  Very few people actually

8   repeat the calculations, but I do tend to do that, but most

9   referees do not.

10  Q    Okay.  Thank you.  The internal validations that you

11  referenced, you indicated that Nathan Adams is the only

12  individual who has reviewed the source code.

13  A    Yes.

14  Q    So impliedly then the Michigan State Police didn't review

15  the source code during their validation.

16  A    No, they did not.

17  Q    Okay.  Someone who has to review the source code would have

18  to get permission from ESR, is that true?

19  A    Permission is automatic on signing of the NDA, so they

20  don't need to get specific permission.

21  Q    Okay.  I mean you don't make it publicly available.

22  A    No, we don't.

23  Q    Do you recognize this document, Dr. Buckleton?

24  A    Just give me a minute, please.  Yes.  This is our access to

25  STRmix that appears on the STRmix web page.

1          THE COURT:  We are at C?

2          MS. KLOET:  CC, two Cs.  All right.  So this is a

3     3-page document, right?

4          THE WITNESS:  Yes.

5     BY MS. KLOET:

6     Q    On the first page I would like to call your attention to

7     the fourth full paragraph.  It begins, "Where STRmix has been

8     used."

9     A    Yes.

10    Q    Okay.  So this paragraph delineates what's available for

11    inspection, true, for defense review?

12    A    This delineates what we would automatically hand over.

13    Q    Okay.

14    A    We would also hand over extraneous material if requested

15    and if our lawyers allowed us to.

16    Q    Okay.  Do you agree that there are four items listed in

17    this bulleted list in that paragraph?

18    A    Yes.

19    Q    And that's the source code, a limited trial version,

20    developmental validation records, and the user's manual,

21    correct?

22    A    Yes.

23    Q    Github repository is not on that list, is it?

24    A    No.

25    Q    You charge defense to do this review, don't you?

 1    A    No.

 2    Q    ESR charges defense to do this review.

 3    A    No.

 4    Q    So is it your testimony today that if defense counsel

 5    requested this information that that would be free?

 6    A    I think you have to pay the costs of the supervision and it

 7    doesn't go to ESR at all.  And an installation fee by the

 8    installer of the software and that doesn't go to ESR at all.

 9    Q    What if I told you it was $100 an hour to access the source

10    code.

11              MR. PRESANT:  I'm going to object on relevance

12    grounds, Your Honor.  I think this is a Daubert hearing about

13    the reliability of the software.  Dr. Buckleton developed the

14    software.  I think he's testified already today that he doesn't

15    handle the business end of it.  He's certainly not the lawyer

16    for ESR.  I'm not sure there has even been a foundation that he

17    developed this document.  And I don't understand the relevance

18    of it considering the code review has already taken place and

19    the Court is going to hear testimony about that in order to

20    determine the issue here which is whether or not the software

21    is reliable.

22              THE COURT:  I don't understand the relevance either,

23    Ms. Kloet.

24              MS. KLOET:  Your Honor, whether the software has been

25    reviewed and validated and the extent of those reviews and

DR. JOHN BUCKLETON - CROSS EXAMINATION - MS. KLOET

1    validation goes directly to how accessible this program is.

2    And I believe Dr. Buckleton has already testified that there

3    are some open source and previous software versions for

4    probabilistic genotyping software, and his position previously

5    was that this be allowed open source.  So I think it goes

6    directly to access, which goes directly to whether or not it's

7    been sufficiently validated and tested.  And as he --  I'll

8    stop there.

9        THE COURT:  Well, it strikes me that whether it is

10   free for purposes of validation is irrelevant.  The question is

11   has it been validated independently of Dr. Buckleton and the

12   company for which he works, or the agency for which he works.

13   Right?

14       MS. KLOET:  The question is the breadth of the

15   validation, the depth and the breadth, as it applies to

16   different mixtures from independent review, and his testimony

17   tended to suggest today that the review was in fact done

18   internally.  So access to the source code would enable

19   independent reviewers to identify issues or problems in the

20   coding that might manifest themselves during the operation of

21   the program itself.

22       THE COURT:  Well, is it your position then that

23   charging a hundred dollars an hour is somehow limiting

24   independent review?  Why don't you just ask him, has, have

25   there been independent reviews of this software including the

1    source code.  Isn't that really the question?

2              MS. KLOET:  I think he's testified to that today, Your

3    Honor, that Mr. Adams has done that and he's the only one.  So

4    I can move on to the next set of questions.

5              THE COURT:  Okay.

6              MS. KLOET:  My point was to emphasize the lack of

7    access.

8              G.  Dr. Buckleton, in 2008 you coauthored an article

9    about the likelihood ratio and the random man not excluded as

10   means of presenting evidence.  Isn't that true?

11             THE WITNESS:  Yes.

12   BY MS. KLOET:

13   Q    Is this the article that you authored?

14   A    Yes.

15   Q    Now, in the article fair to say that you weighed these two

16   approaches of presenting evidence against each other, right?

17   A    Yes.

18   Q    And in fact you came to two conclusions:  One of those was

19   that likelihood ratios are different -- difficult to present in

20   court.

21   A    Yes.

22   Q    Specifically, if you would like to follow along, on page

23   344, in the second column, second paragraph, can you read the

24   last paragraph or last sentence, pardon me, for me starting

25   with there is.

1   A    I stand no chance of reading this at the moment.  Can this

2   be made bigger?

3           THE COURT:  Can you look at it in the book?

4           THE WITNESS:  Maybe I could.  What is it?

5           THE COURT:  It's G.

6           MS. KLOET:  Here we go.  Exhibit G.  The final

7   paragraph, final sentence in that paragraph, could you read

8   that for me, please?

9           THE WITNESS:  Yes.  "There is considerable evidence

10  that likelihood ratios are harder to understand and that they

11  may be slightly more prone to the prosecutor's fallacy."

12  BY MS. KLOET:

13  Q    Okay.  Thank you.  The paragraph right below that, if you

14  could pull that up, please.  Can you in the middle of the

15  paragraph you see the word furthermore.  Could you read that

16  sentence?

17  A    "Furthermore, if likelihood ratios lead to better

18  scientific decision making then they should be used."

19  Q    What's the next sentence?

20  A    "Whether they are then presented to court is a secondary

21  decision."

22  Q    Thank you.  This was an article that you coauthored,

23  correct?

24  A    Yes.

25  Q    I'm just going to ask this final question and I think it's

1   done.  It's not related to this document necessarily so you can

2   pull it down.

3             What is a conditioning profile?

4             THE WITNESS:  A conditioning profile is a profile that

5   can reasonably be assumed to be present under both the

6   prosecution and defense scenario.

7   BY MS. KLOET:

8   Q    Okay.  Could there be more than one conditioning profile?

9   A    Yes.

10  Q    So does that mean if there's an additional reference sample

11  added in the analysis that it would impact the outcome, the

12  outcome of an analysis potentially?

13  A    Yes.

14  Q    Would it tend to increase its reliability if you knew for

15  certain who else was in a mixture?

16  A    They are all reliable.  It would increase its ability to

17  discriminate true from false contributors.

18  Q    Okay.

19            MS. KLOET:  Thank you.  That's all I have, Your Honor.

20            THE COURT:  Any redirect, Mr. Presant?

21            MR. PRESANT:  Thank you, Your Honor.

22                          REDIRECT EXAMINATION

23  BY MR. PRESANT:

24  Q    Dr. Buckleton, Ms. Kloet asked you some questions about the

25  IEEE and you said it would be helpful if you could refer to the

1    manual.

2    A    Yes.

3    Q    Do you recall that?

4    A    Yes.

5    Q    I wanted to offer you the opportunity if you want to see

6    anything in the manual.

7    A    Only if you can get me directly to the independence clause

8    which I think we may meet.  I may have brought it to your

9    attention yesterday.  I can't remember.  I don't think it's

10   page 17, and I think you only printed to there.

11   Q    May I approach, Your Honor?

12            THE COURT:  Yes.

13            MR. PRESANT:  I don't think I can get you there but

14   I'll give you the opportunity to do it.  If it's not important

15   we will move on.

16            THE WITNESS:  All right.  Perhaps I can try and answer

17   your next question while I look.

18   BY MR. PRESANT:

19   Q    Ms. Kloet also asked you some questions about the

20   analytical threshold and then some subsequent questions about

21   drop-in and drop-out.  You recall those?

22   A    Yes.

23   Q    She asked you a number of questions about drop-in/drop-out

24   stutter.  Is it fair to say those are all biological phenomena?

25   A    They are all biological phenomena.  They are not peculiar

1  to STRmix and they have been in existence since the inception

2  of DNA analysis.

3  Q    Do you think when you're building a model that reflects the

4  existence of those phenomena it's necessary to have training in

5  forensic analysis or forensic biology in order to be able to

6  understand how they should properly be modeled?

7  A    I think it's advantageous, yes.

8  Q    Now, you also testified I believe that the analytical

9  threshold is not an issue for STRmix.

10 A    It's not an issue peculiar to STRmix.  We have had

11 analytical thresholds in the United States again since the

12 inception.  And they are highly accepted by courts all over

13 America, and it's just standard usage.

14 Q    And STRmix uses analytical thresholds.

15 A    Yes.

16 Q    Ms. Kloet asked you a series of questions about

17 contamination being source of drop-in.  Are there other causes

18 of drop-in besides contamination?

19 A    Drop-in we think are fragments of cells present in the

20 laboratory often after the cleanup process.  It's a very rare

21 phenomenon, and it is a form of contamination.

22 Q    But it's not necessarily mishandling of evidence

23 contamination.

24 A    No.  It's good sensitivity.  It's almost impossible to

25 completely get rid of.  And it's reasonably innocuous.  It's

1    single alleles, and it would be almost inconceivable they could

2    ever build to form any form of false inclusion.

3    Q    Ms. Kloet asked you about the drop-in threshold of 400 I

4    believe it was.

5    A    Yes.

6    Q    How did you come up with that number, 400, or did you come

7    up with that number?

8    A    I think MSP would have come up with it.  And it tends to be

9    a number higher than the highest drop-in they have seen.

10   Q    That's because it's specific to the laboratory where the

11   work is being conducted.

12   A    Yes, yes.

13   Q    Just to be clear, STRmix in fact models for the different

14   biological phenomenon we just covered, drop-in, drop-out and

15   stutter, those are all things that are incorporated into the

16   mathematical model?

17   A    Yes.  This version models only back stutter, not forward

18   stutter.

19   Q    Ms. Kloet also asked you about the particular data in this

20   case of an example of drop-out or that 12 allele I believe that

21   dropped out, right?

22   A    Well, it dropped out if it's from Mr. Gissantaner, and we

23   shouldn't make the assumption it is from Mr. Gissantaner.

24   That's the question, not the conclusion.

25   Q    But the likelihood ratio models both of those

1    possibilities, that it is from him and that it is not, correct?

2    A    Absolutely.  That's exactly what it does.  It's weighed

3    those against each other, and in their particular locus, the

4    colony specific factor locus which we were speaking of, it's

5    the rarity of the 9 allele that's driving that locus specific

6    allele of 4.20.

7    Q    She also asked you a series of questions about 4.2 being

8    close to 1, and the product rule getting you to a number in the

9    billions.  And I believe you started an answer saying that

10   wasn't a logical way to think about it.  I just wanted to give

11   you an opportunity to explain why that is.

12   A    Sure.  So 4.2 could be viewed as 3.2 bigger than 1, or over

13   4 times 1.  And it's the multiplier I ask you to think of.  So

14   if I could lower your chance of developing cancer by a factor

15   of 4, would you call that immaterial?

16   Q    I wouldn't, no.

17   A    Well, I would suggest you shouldn't.  It's a massive

18   factor.

19   Q    And if you could do that 21 times that compounded on one

20   another.

21   A    If you could get a factor of 4 in 21 major diseases, I

22   would take it.

23   Q    Now, she also asked you about this diagnostic being 1.41.

24   A    Yes.

25   Q    You said a commonly used threshold is 1.2.

1    A    Yes.

2    Q    Is that a mandatory threshold?

3    A    No, it is not.  It's a soft threshold.  Recall this is a

4    convergence diagnostic, not a has it run properly diagnostic.

5    So you can get the right answer from something with 1.41, and

6    often more complex mixtures do have higher GRs.

7    Q    And I think you started to say something along the lines of

8    well it could have run for longer.

9    A    Yeah.

10   Q    What did you mean by that?

11   A    You can set STRmix to run for longer.

12   Q    So if someone were unhappy with that particular number,

13   they could choose to run it again, run for longer and that

14   diagnostic might get lower?

15   A    It would get lower.

16   Q    But that's a judgment call that whoever is running it has

17   to make.

18   A    We have done a fairly massive trial so we have picked on

19   GRs that were of the sort of 1.4 and then run them for longer,

20   and the GR does come down and the likelihood ratio seldom moves

21   at all.  So I would predict if you ran this for longer the GR

22   would come down but the likelihood ratio would be similar.

23   Q    Finally, Ms. Kloet showed you sentences out of context from

24   that 2008 paper regarding likelihood ratios.  I wanted to give

25   you a chance to elaborate on that.  Has your thinking on

1    likelihood ratios changed since 2008?

2    A    No.  They are not so out of context, to be fair to

3    Ms. Kloet.  I think I just accept that presenting likelihood

4    ratios is difficult.  The wording is very awkward.  Her Honor

5    has very correctly picked up on this.  It is awkward.  And it

6    is an area which were we to go to trial we could give some

7    proper attention to.  I spend a lot of my time thinking about

8    how to present this evidence.

9    Q    But the bottom line opinion you have is that it is useful

10   evidence that can be presented to a jury in court?

11   A    Likelihood ratios are so much more powerful than other

12   methods.  We spoke earlier about this particular case and what

13   represented certainty.  If we had done this in the olden days

14   with CPI, it would have been completely impossible to interpret

15   this profile.  This profile, the CPI is such a blunt tool it

16   would have not been able to interpret this profile.  We now

17   have a powerful tool that can produce a reliable statistic for

18   this type of profile.  So we are obligated both in the

19   interests of victims and falsely accused people to try and

20   present this powerful evidence properly.

21   Q    In the best way you can.

22   A    In the best way we can in conjunction with the legal

23   participants to do the best job we can.

24            MR. PRESANT:  Thank you, Your Honor.

25            THE COURT:  Ms. Kloet.  Any recross?

1          MS. KLOET:  Your Honor, I don't believe I have any

2     recross.  But I did want to address the issue of exhibits.  The

3     witness identified the six exhibits that I offered in the

4     course of my cross-examination of him.  Three of them have

5     already been part of the record through the motions and

6     responses filed.  That's Exhibit J, H, K.  The other three

7     which is CC, G and F are not part of the record and I would

8     move to admit those now seeing as they have been identified and

9     discussed on the record.

10          THE COURT:  Mr. Presant.

11          MR. PRESANT:  What were those again?

12          MS. KLOET:  CC, G and F.  Those are the three that are

13     not in the record and the other three are the EPGs and the

14     STRmix reports.

15          MR. PRESANT:  CC and G the government is fine with.  I

16     think F the foundation hasn't been laid yet.  But I think the

17     foundation, I think it will come in through another witness.

18     But he didn't create it so I don't think he can testify that it

19     was the one used in this case.  If she wants to admit it

20     simply --

21          THE COURT:  Did you say F?

22          MR. PRESANT:  F I believe, yes.  I mean he can I think

23     if it's just being admitted right now for the purpose of saying

24     this was, this looks like something that would be output by

25     STRmix, that's fine.  But another witness is going to have to

1    testify to what it is.  And it's marked in the Government's

2    Exhibit book too.  So for all intents and purposes it can come

3    in.  I just want to be clear that he hasn't testified this is

4    what was done in this case.

5              THE COURT:  CC and G then are admitted without

6    objection.  And F I don't think it is properly offered at this

7    time.  So let's wait until we get the proper witness in front

8    of us.  Okay?

9              MS. KLOET:  Okay.  Thank you.

10             THE COURT:  Before I excuse you, Dr. Buckleton, I want

11   to, first of all, take a quick look at my notes.

12             In terms of, well, first of all, under Daubert it's

13   the duty of the Court to determine the reliability of the

14   evidence.  And if I understand, again what limited reading I've

15   been able to do in this area, there are for purposes of

16   addressing the jury, we have to talk about how was the sample

17   collected, how was it handled after it was collected, and then

18   how was it analyzed in the lab and using the software that's in

19   question here, STRmix.  Do you agree with all of that?

20             THE WITNESS:  I'm not certainly not going to debate

21   with Your Honor the legal interpretation of Daubert.

22             THE COURT:  Okay.  Well but in interpreting the

23   results that are going -- assuming the evidence is deemed to be

24   admissible and relevant, and not unduly prejudicial, in

25   interpreting the results that are going to be presented, those

1    areas have to be independently addressed by the testimony and

2    the evidence.

3              THE WITNESS:  Yes.

4              THE COURT:  Okay.  And they should lead to a question

5    or an answer to the question of are these results reliable

6    based on existing scientific principles.

7              THE WITNESS:  Yes.

8              THE COURT:  And your testimony is that they are.  That

9    these, that when we look at, at least from your perspective,

10   when we look at what was done in this case, you don't have any

11   opinion with regard to the collection, you have no opinion with

12   regard to the handling, but you do have an opinion as to the

13   analysis that was done leading to the probabilistic figure of

14   49 million to 1.

15             THE WITNESS:  Yes.

16             THE COURT:  That is exclusively where your areas of

17   expertise come into play in this case.

18             THE WITNESS:  Yes.

19             THE COURT:  And you are satisfied to the best of your

20   scientific knowledge that these results are reliable.

21             THE WITNESS:  Yes.

22             THE COURT:  Okay.  Now, the one thing that I am still

23   not entirely clear on based on what I've read is this idea of

24   the interpretation of the results.  Could you please speak to

25   that?

1        THE WITNESS:  Yes.  So I have in the break been able

2    to clarify that the FBI have stopped doing source attribution,

3    so they do not say this DNA came from him anymore.  When they

4    did do it, their number was 700 billion.  That was the number I

5    said I would try and find for you.  And even then they produced

6    the number first and then, so they have always tried to produce

7    a statistic.  I won't go into any depths but this case would

8    have been very hard to interpret without the modern software.

9        But if we come to the concept of what does 49 million

10   mean.  49 million should be combined with the other evidence,

11   and that is not my job to do.  I do not know whether there is

12   any other evidence or whether there's evidence that points

13   either towards or away from Mr. Gissantaner.  I have no idea.

14       If the other evidence were neutral, then you multiply

15   that by 49 million and the odds are now 49 million to 1 that

16   this DNA came from Mr. Gissantaner.

17       But if the odds are not neutral, if there is massive

18   evidence in his favor, or if he's plucked randomly from the

19   street as being one in a million people, then you should start

20   from a position of 1 in a million and multiply that by 49

21   million, and that comes to simply 49 to 1.

22       I'm certainly not going to tell you how to interpret

23   the other evidence.  I don't even know what that is.  But you

24   must form that view of what the other evidence is, combine it

25   with the 49 million, and then you get the overall value.

JEFFREY NYE - DIRECT EXAMINATION - MR. PRESANT

1   THE COURT:  But my question is this.  Again, based on

2   the reading that I've done suggests that there is a certain

3   amount of interpretation of the data that is done when these

4   results are produced; not, not interpretation for the jury to

5   make or for me to make, but the people who produce these

6   results do some individual interpretation that may be

7   subjective.

8   THE WITNESS:  Yes.  So that it is subjective.  So it's

9   utterly routine.  It's been happening for years.  And it's not

10  to do with STRmix.  The subjective elements are some artifact

11  management, so that is removal of spikes, and pull up, and

12  forward stutter.  These are artifacts of the PCR in imaging

13  process, and this is standard stuff.  It's been happening for

14  years.  And we all follow the SWGDAM guidelines on how to do

15  it.

16  Then the other one is assigning a number of

17  contributors.  When you assign a number of contributors you are

18  either correct or incorrect.  If you're correct, then you are

19  correct.  If you are incorrect, you produce a conservative

20  number.  So there is nothing bad that can happen by getting the

21  number of contributors wrong.  You simply get additional

22  conservativeness.

23  THE COURT:  Okay.  I think I understand.  And that's

24  all the questions I have.  Thank you, Doctor.  You may step

25  down.

JEFFREY NYE - DIRECT EXAMINATION - MR. PRESANT

1      THE WITNESS:  Thank you, Ma'am.

2      THE COURT:  Mr. Presant.

3      MR. PRESANT:  The government calls Jeffrey Nye.

4      JEFFREY NYE, GOVERNMENT WITNESS, WAS DULY SWORN

5      THE LAW CLERK:  Please be seated.  And state your full

6  name for the record, spell your last name.

7      THE WITNESS:  Full name is Jeffrey Burn Nye.  Last

8  name is spelled N-Y-E.

9                       DIRECT EXAMINATION

10  BY MR. PRESANT:

11  Q    Mr. Nye, where do you work?

12  A    I work for the Michigan State Police Forensic Science

13  Division.

14  Q    What's your current position with the Michigan State

15  Police?

16  A    My current position is the assistant director of the

17  Forensic Science Division.

18  Q    Let me bring up Exhibit 2, please, Ms. Miller.  Do you

19  recognize 2?

20  A    Yes, I do.

21  Q    What is it?

22  A    My curriculum vitae.

23      MR. PRESANT:  Government moves to admit 2, Your Honor.

24      THE COURT:  Ms. Kloet, any objection to Mr. Nye's CV?

25      MS. KLOET:  No, Your Honor.  I have seen it.

1              THE COURT:  It's admitted.

2    BY MR. PRESANT:

3    Q    As we follow along here, Mr. Nye, would you please describe

4    for the Court your educational background?

5    A    Certainly.  I have a Bachelor of Science Degree in

6    Biochemistry from Michigan State University.  I have a Master's

7    Degree in Crop and Soil Sciences from Michigan State

8    University.  And then I also have a specialization, another

9    Master's in Environmental Toxicology, and then I have an

10   additional course in molecular biology from Lansing Community

11   College.

12   Q    What did you do after you finished your graduate work in

13   1995?

14   A    After I finished my graduate work I worked for a company

15   called Michigan Biotechnology Institute.  Essentially that

16   organization would take laboratory research from universities

17   and scale them up and if we could prove that they were viable

18   corporations or companies around that, then we would spin them

19   out as private companies.  So research.

20   Q    And then here at the bottom we pick up in 1996.

21   A    Yes.

22   Q    And that's when you moved to the laboratory at the state

23   police?

24   A    That's correct.

25   Q    And have you been there ever since in various capacities?

JEFFREY NYE - DIRECT EXAMINATION - MR. PRESANT

1    A    I have.

2    Q    What are the various positions you've held with the

3    Michigan State Police?

4    A    I started out as a forensic scientist conducting DNA

5    testing at the Lansing laboratory.  I did that for a number of

6    years, then I promoted to a unit supervisor where I oversaw

7    other forensic DNA examiners.  Did that for a number of years,

8    then I promoted to a DNA technical leader position which is

9    sort of a quality assurance manager for that discipline with

10   respect to training and validations and things of that nature.

11   I did that for approximately nine to nine and a half years.

12   And then about two years ago I promoted to the assistant

13   director for the Forensic Science Division.

14   Q    What are your responsibilities as the assistant director

15   for forensic science?

16   A    So as I described my position before that, it was as a

17   technical leader for the DNA discipline.  Forensics within the

18   Michigan State Police there is a number of different

19   disciplines:  Firearms, controlled substances, all the

20   different forensic disciplines.  Each discipline has a

21   technical leader.  And all those technical leaders report to me

22   as the assistant division director and quality assurance

23   manager.

24   Q    What's involved in being the quality assurance manager?

25   A    Quite a bit.  So we as a laboratory system are accredited

1    to certain standards and guidelines.  And it's to ensure that

2    our operation, which is eight laboratories and approximately

3    260 scientists and technicians, comply with standards and we

4    meet those accreditation standards, and then also to establish

5    policies and procedures as far as how our operation operates

6    and complies with those standards.

7    Q    The Court has heard testimony today about a forensic

8    governing body called SWGDAM.  Are you familiar with SWGDAM?

9    A    I am.

10   Q    How are you familiar with it?

11   A    I am a member of SWGDAM.

12   Q    Would you describe for the Court what the structure is of

13   SWGDAM and what its role in the forensic science community is.

14   A    So by congressional act, SWGDAM is sponsored by the Federal

15   Bureau of Investigation.  And they convene twice per year for

16   about a week at a time, January and July of each year, a

17   variety of experts from around North America and then some

18   international guests as well.  The spectrum basically runs the

19   gamut of practitioners like myself, researchers, a whole host

20   of individuals basically to get together to address current

21   concerns within forensic DNA and biology testing to help

22   develop guidelines and standards specific to that discipline.

23   Q    How many people sit on SWGDAM?

24   A    Roughly I would say between 40 and 50 individuals.

25   Q    And that's primarily in the United States but also from the

JEFFREY NYE - DIRECT EXAMINATION - MR. PRESANT

1    whole world?

2    A    Correct.  There are also other invited guests.  There is a

3    distinction between being an invited guest and being a member.

4    Invited guests are able to contribute to the work product, but

5    the members actually vote on accepting the final work product.

6    Q    So if there are only 50 total then every state laboratory

7    doesn't have someone who is a member of SWGDAM, correct?

8    A    That's correct.  They work very hard to make sure they

9    represent the full range of laboratories within the United

10   States.  So there are federal laboratories such as the FBI or

11   the Army crime lab or ATF, there is state laboratories that are

12   represented, then there is also local laboratories

13   geographically distributed as well as size distribution as far

14   as how big of an operation that they have.

15   Q    How does SWGDAM decide who should be invited as a member?

16   A    Probably by recommendation.  And I believe that they have a

17   separate committee that votes on those recommendations as to

18   extend an offer of an invitation for an invited guest or to

19   offer somebody as being a member.

20   Q    How long have you been a member?

21   A    Goodness.  Eight or nine years, I'm going to guess.

22   Q    And you're a voting member so you vote on standards?

23   A    I am.

24   Q    Bring up Exhibit 19, please.  Do you recognize 19?

25   A    I do.

JEFFREY NYE - DIRECT EXAMINATION - MR. PRESANT

1   Q    What is it?

2   A    It's the "Guidelines for Validating Probabilistic

3   Genotyping Systems" that was developed by SWGDAM.

4   Q    Were you on SWGDAM when these were developed?

5   A    Yes.

6   Q    Were you involved in the subcommittee that developed them?

7   A    I was not.

8   Q    Did you vote on whether to adopt these guidelines?

9   A    I did.

10  Q    Did you vote in favor of them?

11  A    I did.

12          MR. PRESANT:  Your Honor, the government moves to

13  admit 19.

14          THE COURT:  Ms. Kloet.

15          MS. KLOET:  No objection, Your Honor.

16          THE COURT:  It's admitted.

17  BY MR. PRESANT:

18  Q    Now, there's been some testimony, though we haven't pinned

19  down an exact date of when these were adopted.  Can you zoom in

20  on the portion I just highlighted?  Reviewing the part that

21  I've just blown up, do you recognize a date that these were

22  adopted?

23  A    I do.

24  Q    And when does it say they were approved for posting on the

25  SWGDAM website?

JEFFREY NYE - DIRECT EXAMINATION - MR. PRESANT

1    A    June 15th of 2015.

2    Q    And so would you just summarize for the Court the

3    significance of these guidelines as they relate to the use of

4    probabilistic genotyping in the United States?

5    A    Yes.  So there was some discussion on the previous witness

6    about what guidelines actually represent, and I would indicate

7    the guidelines are basically recommendations.  They are

8    recommendations that if you for this particular guideline, if

9    you want to validate a probabilistic genotyping software

10   application, that you should follow these guidelines to

11   properly validate the system.  Dr. Buckleton had mentioned that

12   there's a strong incentive to follow these guidelines as more

13   of like standards, but there's not really a standard associated

14   with these, it's just a strong recommendation that you follow

15   these.

16            THE COURT:  What is the incentive?

17            THE WITNESS:  Just consensus in the community that

18   these are --  there's not an incentive like you're going to get

19   an audit finding when we undergo audits.  There's not a

20   monetary incentive.  There's not an incentive to a particular

21   government resources or anything like that.  It's just a, it's

22   driven in everyone that we do quality work.  If you want to

23   subscribe to doing that quality work, then it's highly

24   recommended that you follow these guidelines.

25            THE COURT:  And if you say that you follow them, does

1    anybody determine whether you do follow them or have followed

2    them?

3            THE WITNESS:  So throughout accreditation, the

4    accreditation process, there is a number of different standards

5    that we follow.  So when I mean standards, they are shalls.

6    You shall do these things.  So one organization that we are

7    accredited to is an acronym called ANAB, it's the National

8    Accrediting Board, and there's a host of standards associated

9    with that particular organization and one is related to

10   validation.  There is another set of standards that SWGDAM also

11   produces called the Quality Assurance Standards for Forensic

12   DNA Testing Laboratories.  So it's exactly how it's described,

13   these are quality assurance standards.  If you're a forensic

14   DNA testing laboratory in the United States, you need to follow

15   these.  And that, there's a, there's an expectation that you

16   follow those because it gives you access to other government

17   resources such as data bases and other resources that the

18   government maintains.  So if you don't follow those standards,

19   there's actually ramifications for it.  And those standards

20   also have directions specifically on how you conduct a

21   validation.

22            In a very general sense, the validation needs to cover

23   certain criteria.  A little bit was discussed this morning

24   about precision, and reliability; they have to cover the range

25   of samples that you would normally cover in the laboratory

1       during testing, you know, there's a whole host of standards.

2               And so your question is how does somebody check to

3       make sure you follow those standards.  We go through extensive

4       audits every single year.  For the ANAB standards, we are

5       audited once every four years for what they call a full

6       assessment.  And that assessment for our system, for the

7       Michigan State Police, can be as many as 75 independent

8       assessors coming in from around the country and around the

9       world and evaluating our practices and policies and procedures

10      against these standards.

11              That occurs every four years.  And then every year, so

12      year 2, year 3, in between those there is also what they call

13      surveillance visits where smaller contingency of assessors will

14      come in to evaluate to make sure you're continuing your

15      accreditation activities to make sure it's a part of your

16      culture of your organization.

17              Aside from that accreditation process is also the

18      quality assurance standards for forensic DNA testing and that's

19      an every other year assessment.

20              So every other year we bring in, again, external

21      assessors to evaluate specifically the DNA program to ensure

22      that we are complying with the standards that are in place, and

23      then on the opposite years, we are required to do our own

24      internal review of our guidelines with those standards.

25              So continually there's some sort of an assessment

1    going on with the laboratory.

2         THE COURT:  Thank you.

3    BY MR. PRESANT:

4    Q    With all those qualifications is it fair to say that to the

5    extent that there is a document governing forensic DNA

6    analysis, specifically probabilistic genotyping, and the

7    validation of those systems in the United States, that this

8    Exhibit 19 is that governing document?

9    A    Yes.

10   Q    Let's go back to Exhibit 2, please.  Let's go to page 2.  I

11   have highlighted, Mr. Nye, just a portion of the trainings

12   portion of your CV.  Right?

13   A    Correct.

14   Q    And there are a couple on here that say STRmix training,

15   right?

16   A    Yes.

17   Q    And so I want to ask you before you talk specifically about

18   those, what training in general and these in particular you

19   have had on STRmix.

20   A    So before I get into STRmix, just probabilistic genotyping

21   in general, there's what I would probably call less formal

22   training that occurs.  So when I go to a general conference

23   related to forensic DNA testing, there is often presentations

24   by experts in the field about probabilistic genotyping, you

25   know, could have been somebody related to STRmix, or it could

JEFFREY NYE - DIRECT EXAMINATION - MR. PRESANT

1    be related to a competitor to just kind of get a general

2    understanding of the system.  And then more formally, after we

3    purchased STRmix it included formal training.  Dr. Buckleton

4    had mentioned it was four days.  And, yes, it felt like more

5    than a week.  And that occurred in the spring of 2015 was our

6    initial training event that included I think it was roughly, I

7    forget if it was 10 or 20 people, it was in that class, and

8    then we conducted a second class for an additional number of

9    examiners in the summer of 2016.

10   Q    Let's go to page 4.  You have been published in several

11   peer review journals on topics including DNA analysis, is that

12   right?

13   A    Yes.

14   Q    Now, Mr. Nye, was there ever a time where you were cited

15   for approving a report without proper technical review?

16   A    Yes, there was.

17   Q    Would you describe for the Court what happened in that

18   instance and approximately when that occurred?

19   A    I'm sorry, the last part.

20   Q    When it occurred approximately.

21   A    So we talked a little bit about accreditation, and one of

22   the requirements as well as our own internal policies and

23   procedures is that before a laboratory result is published that

24   it undergo a review by a peer.  They call them technical and

25   administrative reviews.  And approximately six years ago I

JEFFREY NYE - DIRECT EXAMINATION - MR. PRESANT

1    inadvertently published three to four reports without the

2    proper reviews being done.  And this was the result -- I used

3    the word inadvertently because it was a result of a software

4    application that we use and under my specific profile with that

5    software application, there were some additional privileges in

6    that software application to issue reports that I didn't fully

7    understand.

8    Q    And you received some sort of citation for it?

9    A    I did, yes.

10   Q    Has the Michigan State Police promoted you since then?

11   A    Yes.  I have, so at that particular time I was the DNA

12   technical leader and I have since been promoted to the

13   assistant division director responsible for quality assurance.

14   And then I've also received a number of different awards from

15   the department as well.

16   Q    Does that incident have any bearing on the adoption of

17   STRmix by the Michigan State Police that you're here to testify

18   about today?

19   A    Not whatsoever.

20          MR. PRESANT:  Your Honor, the government offers

21   Mr. Nye as an expert in forensic science and DNA analysis.

22          THE COURT:  Ms. Kloet.

23          MS. KLOET:  Just a moment, Your Honor.  No objection,

24   Your Honor.

25          THE COURT:  Thank you.

BY MR. PRESANT:

Q   Mr. Nye, the Court had some questions this morning just about the overall process kind of soup to nuts from the time the sample comes into the laboratory until the time that the laboratory issues its reports about how forensic DNA analysis is conducted, specifically in a DNA mixture case like this one. I thought it would be helpful --

THE COURT:  You're talking awfully fast.

MR. PRESANT:  I appreciate you pointing that out.  I often don't even notice, Your Honor.

It would be helpful I think if you started out by summarizing for the Court the process that the Michigan State Police use for that pipeline.

THE WITNESS:  Yes.

THE COURT:  Before you do that, and sort of in conjunction with that, could you pretend that I'm a jury of one, could you tell me, go through the process of DNA genotyping, if that's what it's called, before this probabilistic method was developed, and after it was developed. Can you lay those two things side by side so that I can understand the difference?

THE WITNESS:  It's going to be a long explanation.

THE COURT:  That's okay.

THE WITNESS:  Please refrain me if I go into too much detail.

1          THE COURT:  Okay.

2          THE WITNESS:  So previous to probabilistic genotyping

3     and now in probabilistic genotyping, everything in the

4     laboratory is the same.  Everything is.  So when I say

5     everything, I'm talking about the DNA extraction method, the

6     purification process, the DNA quantitation method to determine

7     how much DNA we have, the DNA amplification, the actual

8     separation and visualization of the different DNA fragments are

9     all exactly the same.

10         The difference from let's say three years ago to today

11    is just the tools that are used to assist the examiners in

12    interpreting mixed DNA results.  And I'm, I like Mr. Presant

13    tend to speak relatively quickly and I'm choosing my words very

14    carefully because I want to stress that the tools that are used

15    may be different, but the approach and the modeling and the

16    interpretation itself is very, very much the same.

17         I want to point out that STRmix is really just a tool

18    applying methods and modeling that was previously used

19    manually.

20         The significant difference with STRmix or any

21    probabilistic genotyping system is that because it's computer

22    based it allows the user to incorporate more data because the

23    amount of data that was available exceeded what the average

24    human could actually efficiently use and analyze.

25         THE COURT:  So is it true that before the development

1    of this probabilistic genotyping with software like STRmix, the

2    determination of DNA matches and so forth was essentially

3    manual, is that correct?

4              THE WITNESS:  Yes.

5              THE COURT:  There was no machine intervention that

6    either produced results or interpreted results, is that fair?

7              THE WITNESS:  There may be some tools just simply like

8    Excel spreadsheets and some different things of that nature to

9    just help with the math.  The math is very simple to do.  It's

10   just more than what I would care to do and sit down and do it

11   with a pen and a piece of paper and a calculator.

12             But the approach is very, very much the same.

13   Dr. Buckleton had talked about certain artifacts.  Stutter, we

14   heard this morning about forward stutter and back stutter, and

15   pull up, and all these different things.  Those are still

16   things that have always been there, and they have always been

17   used in the interpretation, it's just now that there's actually

18   a method that can, there is a tool that can be used to assist

19   the DNA examiner to do it.

20             I might try and offer an example that might illustrate

21   it a little bit better.  So three years ago and prior for many

22   years when you had a DNA mixture, the statistical approach that

23   was very common in the United States was something called a

24   CPI.  Combined probability of inclusion.  And the approach in

25   that method is to only look at the DNA types that are present.

1    So Dr. Buckleton had testified that there are DNA types.  There

2    is a DNA size, and then the height of the peak which

3    corresponds to the relative amount of DNA that's in that

4    mixture.

5         And so the CPI only looks at the presence or absence

6    of a particular DNA type.  It does not use the size of the

7    fragment or the height or relative amount of each fragment.

8         THE COURT:  So that the conclusion that would be

9    reached pre three years ago would be the defendant's DNA was

10   found on this gun, period.  Or it was not found on this gun,

11   period.  Right?

12        THE WITNESS:  It entirely depends on the data that's

13   available and present to interpret.  And I think that that was

14   one thing I wanted to clear up from this morning.

15        I think there was some comment that we used 21 genetic

16   markers.  That number has varied over the years.  The more data

17   that you have, the more significant the statistic is.

18   Regardless of which type of statistic you're generating,

19   whether it's a likelihood ratio or whether it's a CPI or any

20   other type of statistic, the more data that you can use, the

21   more significant that interpretation, the statistical

22   interpretation becomes.

23        And so your question is entirely based upon how much

24   DNA data that you have to work with.  So if you're targeting 21

25   genetic markers, let's say, and you have a very limited amount

1    of DNA that you're working with and you get data, useable

2    interpretable data at let's say 3 or 4 genetic markers of the

3    21 that you attempted, then your conclusion is going to be

4    quite different in that and the significance of it.  You may

5    not be able to say his DNA is on the item or not on the item.

6    It's more of the significance is going to be quite a bit

7    different.  Versus if you have a full range of genetic data at

8    the 21 markers that you look at, then the significance of that

9    statistic and the strength that you can apply to your

10   statements related to that are quite a bit different.

11        So there's quite a bit of discussion around the 40 or

12   50 million to 1 number that we have on this particular case.  I

13   have testified as low as 10 or 1 as far as a likelihood ratio.

14   And that does not have the same significance.  In your words, I

15   would not be able to go in and say with any certainty that an

16   individual's DNA was on a particular item with a likelihood

17   ratio of that level.

18        Versus I have also testified to a likelihood ratio of

19   a duodecillion to one ratio.  My comments to the jury would be

20   significantly different between those two situations.  So here

21   we have a likelihood ratio in the 40 to 50 million to 1, and I

22   agree with Dr. Buckleton that's very strong evidence.  And I

23   also want to add because I think many of your questions this

24   morning were how this is going to relate to the jury.  And I

25   know Mr. Presant's questioning, a lot of questioning will get

1          into this later.

2                    MR. PRESANT:  We can do it now.  That's fine with me.

3                    THE WITNESS:  So a likelihood ratio is just a

4     different way to relate to the jury the strength of the

5     evidence.  And although Dr. Buckleton is an excellent

6     instructor and an excellent researcher, myself as a

7     practitioner I have to hone my craft, so to speak, about how I

8     communicate to the jury.  Because that's the end result of my

9     work.  I'm as much a communicator as I am a scientist.  And we

10    hire people and we work with them to develop how they interact

11    and how they communicate to the jury.  So a likelihood ratio is

12    just a different way to relay that information to the jury and

13    that is something that we develop over a period of time.  So we

14    are essentially two years into this process of moving from a

15    frequency based statistic to a likelihood ratio based

16    statistic, and we have been very cautious in how many of our

17    scientists that we are training in this method so that we can

18    sort of craft and mold how we present this information to the

19    jury.

20                    And your question about likelihood ratios, one way

21    that you could present what a likelihood ratio is to a jury is

22    to try and present it on a topic that they can actually grasp.

23    DNA is hard for a lot of people, and so I like to bring in the

24    idea of weather.  Everybody pays attention to the weather.

25    When I get up in the morning I look outside and it dictates

1    what kind of day I'm going to have.  And so one of the things

2    that's actually in the training program that Dr. Buckleton runs

3    through with new STRmix users is an example where if you look

4    at the weather report and there was an 80 percent chance that

5    it was going to rain today.  The opposite of that is going to

6    be there is 20 percent chance that it's not going to rain

7    today.  So that's basically your two competing hypotheses.

8    Your prosecution hypothesis is going to rain, your defense

9    hypothesis, it's not going to rain.  So the ratio of 80 to 20

10   is four.  And the way that it would be worded, and hopefully in

11   front of Dr. Buckleton I can somewhat closely get it right, is

12   that given the evidence, it is four times more likely to rain

13   than not rain.  And that's a very easy understandable way for a

14   jury to understand a likelihood ratio.

15          And when you apply that to forensic DNA, it becomes a

16   bit more information to digest, but basically you give what

17   your hypothesis is for the prosecution, which might be worded

18   something like I have a mixture of three people, the

19   prosecution hypothesis is Mr. Gissantaner, plus 2 unknown

20   individuals, and then the defense hypothesis would be it's

21   three unknown individuals, not Mr. Gissantaner.  And it's the

22   ratio between those two which turns out to be approximately 40

23   or 50 million to 1 in favor of the prosecution.

24          So that's --  you kind of have to build up to it

25   without just putting out a number and saying it's a likelihood

1    ratio.  You need to build into it a little bit.

2           THE COURT:  Thank you.

3    BY MR. PRESANT:

4    Q    We need to follow up on what you were just talking about.

5           How long has Michigan State Police been using

6    likelihood ratios in one form or another in its testimony?

7    A    So there are a number of different statistical methods to

8    use and it really depends on which situation you're dealing

9    with.  And what I mean by situation, that means the type of

10   evidence or the type of crime that you're working with.  So if

11   you have in its simplest terms a single source DNA profile, the

12   very common method is the random match probability.  That's a

13   frequency.  How often would you expect to see a DNA profile in

14   a population.  Then you get into a mixture where you have more

15   than one person in a mixture.  We currently use probabilistic

16   genotyping, STRmix as that.  And then another situation would

17   be is if you're dealing with a criminal paternity case.  So if

18   there is a sexual assault that results in a child or a fetus,

19   there's a criminal paternity case and that child or that fetus

20   becomes the evidence which is essentially the joining of the

21   victim and the potential assailant.  And it's very common for

22   probably I would say the last ten plus years that we use a

23   likelihood ratio for criminal paternity cases, and then for --

24   we don't do them -- but for noncriminal paternity cases, just

25   parenthood, likelihood ratios are very common in the United

1    States, in Michigan specifically.

2    Q    Are there any other statistics that are frequently used in

3    DNA cases besides likelihood ratio or the random match

4    probability?

5    A    CPI would be one.  I referenced that previously.

6    Q    That's the combined probability of inclusion?

7    A    Yes.  And then the antithesis of that it would be the

8    combined probability of exclusion.  Pretty much the same

9    statistic.  And then there are some laboratories in the United

10   States that used likelihood ratios for even non paternity type

11   of cases, and it's certainly much more prevalent in Europe and

12   other areas of the world.  It's just been delayed in getting

13   into the United States.

14   Q    Would you agree that one advantage of a likelihood ratio is

15   that it incorporates uncertainty by using two competing

16   hypotheses?

17   A    It does.

18   Q    All right.  So you testified that everything really up to

19   and including the generation of the electropherogram by the

20   genetic analyzer is pretty much the same whether it's a

21   probabilistic genotyping case or not, right?

22   A    Correct, yes.

23   Q    Does that process change at all whether the source of the

24   genetic sample is from blood or from skin cells or from another

25   type of cell?

1    A    The process?

2    Q    Yeah, the extraction process, the whole laboratory process,

3    does it change based on the source of the DNA?

4    A    It does in one particular instance.  If it's an item of

5    evidence that results from a sexual assault, whether it's semen

6    present, the extraction process is slightly different.  But

7    otherwise, everything is done the same.

8    Q    Now two steps of the process are PCR, or, and then second,

9    capillary electrophoresis, right?

10   A    Yes.

11   Q    PCR is the multiplication of the DNA that's present so it

12   can be viewed, right?

13   A    Yes.

14   Q    And capillary electrophoresis is the sorting of the

15   different fragments of DNA, right?

16   A    It is.

17   Q    Then those are imaged by the fluorescent tag we heard

18   testimony about, right?

19   A    That's correct.  So during the amplification process each

20   DNA fragment is tagged with a fluorescent label, and then as

21   they are sorted in the capillary, they pass a detector, a

22   camera, from which they could detect the fluorescence of each

23   fragment as it goes by, then that detection is represented

24   visually with an electropherogram or an e-gram as was described

25   earlier today.

1    Q    Now, in the defendant's Daubert motion, he makes some

2    passing arguments that there should be some question about the

3    reliability of those two steps, PCR, and capillary

4    electrophoresis because before those things existed DNA

5    analysis could be done, right?

6    A    It could be done, yes.

7    Q    What's your view on how established PCR and capillary

8    electrophoresis are both in forensic DNA analysis specifically,

9    and all DNA lab work generally?

10   A    So I have worked for the state police for 22 years and when

11   I first came into the department PCR was not used.  It was a

12   different technology at that particular time called RFLP,

13   restriction fragment length polymorphism.

14   P-O-L-Y-M-O-R-P-H-I-S-M.  And it was approximately 1998 when we

15   switched from the RFLP technology to a PCR based analysis

16   method.  So we are at this point in time 20 years into using

17   PCR as a method.  Really the only thing that's changed in

18   20 years with respect to PCR is the number of genetic markers

19   that we look at, and then there's been some increases in

20   sensitivity of the systems that we use.

21        Approximately in 1998 when we first started using PCR

22   we used a gel based system to separate out the DNA fragments,

23   and then approximately in 2000 I believe it was we switched

24   from a gel based system to a capillary electrophoresis.  Which

25   for all intents and purposes is the same as a gel based system

1    only it's carried out in a small capillary.  The system is

2    really the same.  And then it's been ever since 1998 to 2000

3    it's been all capillary electrophoresis since then.

4         That's our system in forensic DNA analysis.  The use

5    of PCR and the use of capillary electrophoresis is throughout

6    vast portions of research, medical applications, parentage,

7    ancestry, a whole host of other applications all use the same

8    technology that we are using today.

9    BY MR. PRESANT:

10   Q    And how does PCR compare to its predecessor, RFLP?

11   A    So RFLP technology I think at the time we were looking at

12   five genetic markers.  And those genetic markers had more

13   statistical power per marker.  They were more discriminating

14   per genetic marker than what the STRs are.  But it also

15   required a very large sample size.  There was some discussion

16   about DNA quantitation this morning.  And we can get DNA

17   results from a very, very, very small sample in a nanogram or

18   picogram range, but in RFLP technology we would require as much

19   as 500 nanograms of DNA to get a result at that particular

20   time.

21        So the sample size was orders of magnitude higher.  We

22   needed more in order to get a result.  But then the other

23   significant portion is that the RFLP technology required DNA

24   that was in very good condition, had not been degraded,

25   inhibitors, different things like that.  It really required a

1    very good sample.  And the PCR technology with capillary

2    electrophoresis allows us smaller sample sizes; it allows us to

3    deal with samples that have been degraded or insulted in some

4    way.  And there is also sort of an efficiency standpoint, it's

5    less hands on, it's more automated.  Because of the increase in

6    sensitivity there's more samples coming to the laboratory and

7    we can get more work done when automation is going on.

8    BY MR. PRESANT:

9    Q   Do I take from your answer then that capillary

10   electrophoresis is also an improvement upon gel based

11   separation of fragments?

12   A   Significantly, yes.

13        THE COURT:  Mr. Presant, I'm thinking about taking a

14   break at about 2:30.  Because I would like to go as long this

15   afternoon as we can.  So if you are getting ready to switch

16   topics, or if you want to wrap up a particular topic, now is

17   the time to think about it.

18        MR. PRESANT:  I appreciate that, Your Honor.  I'm

19   happy to have the Court interrupt me whenever the Court is

20   ready for a break.

21        THE COURT:  Okay.

22        MR. PRESANT:  Mr. Nye, so now I would like to ask you

23   about the decision to begin to use probabilistic genotyping in

24   general and to choose STRmix in particular because you were the

25   person who made that decision, correct, for the Michigan State

1    Police.

2            THE WITNESS:  I was, yes.

3    BY MR. PRESANT:

4    Q    And when you looked at where you were kind of in the

5    progression of forensic DNA science over time and you look at

6    the market of options of probabilistic genotyping software,

7    what led you to make the consumer decision that you ended up

8    making?

9    A    Certainly.  So my position as the DNA technical leader was

10   to not only train individuals but seek out new technologies and

11   make sure that we are current on everything we can be with

12   what's available in the community, and certainly probabilistic

13   genotyping offered an opportunity for us to improve our

14   service.  And specifically, the combined probability of

15   inclusion statistic that was available was not, we did not use

16   the entire set of data that was available to us, and it also

17   resulted in a large number of analyses that would end in an

18   inconclusive result because of that inability to use the full

19   gamut of data that was available to us.

20            So there was an interest in furthering it because we

21   knew, as did the community in general, that we weren't using

22   the full amount of data that was available to us.  So

23   probabilistic genotyping would have been an advancement,

24   another tool available to us to use our expertise in an area

25   that we couldn't currently use it within.  So then I started

1    looking at the different opportunities, the different

2    applications that were available, and there were two commercial

3    ones.  So basically the first decision that I looked at was do

4    I use a commercial off the shelf product, or do I use what they

5    would call a free ware system which is basically just a free

6    system, and the question is how much support are you going to

7    get.  Are they going to continue to develop the product, make

8    further advancements with the product, were they going to be

9    able to help train, do all those different things.  And when

10   you're looking at a free software system, those resources are

11   not available to you.

12          So if you make the first decision that you're going to

13   look at a commercial off the shelf system that has those

14   resources available, there is essentially two.  One would be

15   TrueAllele, which is an American company, and the second being

16   the STRmix which is from New Zealand.  So then you start and

17   evaluate the application itself, what type of resources, where

18   the rest of the community is going, the educational

19   opportunities with understanding and learning because it's not

20   enough to just have a piece of software where you can click a

21   button and get an answer out the other side.  You actually as a

22   practitioner need to understand enough of the method to be able

23   to convey that to the jury so that they can make the decisions

24   that they need to make.  And at the end of the day we felt

25   strongly that STRmix was the system that we wanted and that's

1      the process that we went.

2              Now, I want to back up for one second because I

3      skipped over an important part.

4              So the Michigan State Police Forensic Science Division

5      is made up of approximately 90 DNA examiners.  It's a pretty

6      good number.  And with CPI or other more manual interpretations

7      for mixtures, I believe Dr. Buckleton mentioned it, and I'm

8      going to mention it again, is that when you put human

9      intervention into something you're going to get some

10     variability on how mixtures are interpreted.  And going with an

11     additional tool such as STRmix allowed us to standardize that

12     approach a little bit.  There is still some subjectivity, I

13     think it's significantly less than prior to probabilistic

14     genotyping, but from a management perspective it allowed us to

15     standardize the approach and the level of service that we are

16     providing to our customers, if that makes sense.

17             THE COURT:  I think we are going to take our break

18     here, Mr. Presant.  We will come back in about 20 minutes.

19             MR. PRESANT:  Thank you, Your Honor.

20             THE LAW CLERK:  All rise.  Court is in recess.

21             (Recess taken, 2:29 p.m.; Resume Proceedings,

22     2:55 p.m.)

23             THE LAW CLERK:  All rise.  Court is back in session.

24     Please be seated.

25             THE COURT:  Mr. Presant.

1          MR. PRESANT:  Thank you, Your Honor.  Mr. Nye, before

2     the break you had testified about your lab's decision to use

3     STRmix.

4          THE WITNESS:  Yes.

5     BY MR. PRESANT:

6     Q    And my question for you is when did the lab actually start

7     using STRmix?

8     A    In February of 2016.

9     Q    And you testified earlier that only certain analysts were

10    trained to use it?

11    A    Correct.

12    Q    What sort of training program did you develop for the

13    people selected, the forensic scientists selected to use

14    STRmix?

15    A    So we required that they would have received the four-day

16    training from Dr. Buckleton's group, as well as additional

17    literature readings in our laboratory, and then a practice set

18    of samples before we deemed them to have sufficient training.

19    And then before they actually started using STRmix in case work

20    there's a required competency test that I developed that they

21    had to pass, and then once they started using STRmix in case

22    work then they went through our normal proficiency testing

23    program.

24         THE COURT:  Can I ask one question here, Mr. Nye?

25    When you say that a practice set of samples, does that mean a

1    set of samples where the DNA contributor is known and they run

2    it, run the sample to determine if they can agree with what you

3    already know, is that it?

4             THE WITNESS:  Yes, correct.

5             THE COURT:  Okay.

6    BY MR. PRESANT:

7    Q    So what's involved in the ongoing proficiency testing?

8    A    So one of the accreditation standards is that everybody

9    specifically in DNA do external proficiency tests twice per

10   year.  An external proficiency test is a mock case that's

11   administered by a private company which I don't even know the

12   answer to and each person has to complete that mock case

13   proficiency test as though they would a regular case and then

14   report the results to that external organization and they get a

15   response back at some point in the future as to whether they

16   successfully completed the proficiency test or not.

17   Q    The Court has heard testimony today about the importance of

18   internal validation before a forensic laboratory begins to use

19   STRmix.  In addition to training these analysts, did the

20   Michigan State Police undertake an internal validation of

21   STRmix?

22   A    Yes, we did.

23   Q    Prior to the internal validation of STRmix, in addition to

24   the -- or strike that.  Prior to the internal validation of

25   STRmix, had you been involved with the internal validation of

1    other forensic tools?

2    A    Yes.

3    Q    So you were familiar with the process for conducting

4    internal validation?

5    A    Yes, depending on what you're validating the process may be

6    slightly different.  But certainly, yes, that was a major

7    portion of my responsibility as a DNA technical leader was to

8    either complete it myself or to certainly oversee it.

9    Q    And what's the theoretical purpose behind internal

10   validation?

11   A    So in my view there is really two different types of

12   validation that occurs.  There is a developmental validation

13   which is typically done outside of the laboratory sometimes by

14   the researcher, in this case ESR or other entities, commercial

15   entities sometimes.  That's a developmental validation and

16   there is a requirement for an internal validation to make sure

17   that the product or method works as expected in your hands, in

18   your specific situation within your laboratory.  And so we

19   conducted an internal validation of STRmix.

20   Q    Different laboratories have different conditions and

21   instrumentation and procedures and so it's important to make

22   sure the tool works in that particular environment.

23   A    That's correct, yes.

24   Q    Go to Exhibit 10, please.  Do you recognize Exhibit 10?

25   A    I do.

JEFFREY NYE - DIRECT EXAMINATION - MR. PRESANT

1    Q    What is it?

2    A    It is a summary of our validation, our internal validation

3    of STRmix in cooperation with our amplification chemistry which

4    is PowerPlex Fusion that Dr. Buckleton had mentioned this

5    morning.

6    Q    Page 2, please.  That's your signature at the bottom?

7    A    It is.

8    Q    It's dated February 22, 2016?

9    A    It is.

10            MR. PRESANT:  Government moves 10, Your Honor.

11            MS. KLOET:  No objection.

12            THE COURT:  It's entered.

13    BY MR. PRESANT:

14    Q    So on this page 2 there's a paragraph here right underneath

15    the table, is that right?

16    A    Yes.

17    Q    And what's that paragraph basically saying?

18    A    So that paragraph is my declaration that the internal

19    validation was completed and enclosed within the document that

20    follows, meets as my determination as the DNA technical leader

21    that meets the additional guidelines that were published by

22    SWGDAM for validating Probabilistic Genotyping Systems.

23    Q    Page 3, please.  Now, you have some background information

24    in this document, it's what, like a 40 or 50-page document,

25    right?

1    A    It is.

2    Q    So we don't need to go page by page, but I would like to

3    direct your attention to page --  start with page 5.  You

4    discuss the concept of threshold here that's been talked about

5    earlier, is that right?

6    A    Yes.

7    Q    And then on the next page stutter.

8    A    Correct.

9    Q    Page 11, please.  There are drop-in parameters here, right?

10   A    Yes.

11   Q    And then you set the drop-in cap right here is 400, the

12   Court has heard testimony about that earlier today too, right?

13   A    That's correct, yes.

14   Q    The drop-in frequency, there is also testimony about that

15   figure, that was determined by this document during the

16   internal validation?

17   A    It was.

18   Q    You discuss a concept called saturation here, is that

19   right?

20   A    Yes.

21   Q    Let's go to page 20, please.  What's being described here

22   in this table 4, adjudicated cases?

23   A    So the period of time that I was summarizing or completing

24   the validation, the internal validation on STRmix within our

25   system was around about the same time that the Daubert hearing

JEFFREY NYE - DIRECT EXAMINATION - MR. PRESANT

1    was ongoing in Muskegon County.  That was discussed earlier

2    this morning.  And although not required, there was some

3    testimony from a defense expert in that particular hearing that

4    it's very difficult to create samples in the laboratory much

5    like you just explained a moment ago where we know the result

6    because we created the samples, but that's not always the best

7    reflection of a sample type that we would see from a crime

8    scene.  So in other words --

9          THE COURT:  Is that correct?

10         THE WITNESS:  I think it has some merit.  The

11   difficulty is that if you don't create the sample yourself, you

12   really don't know what the ground truth of the sample is.  So I

13   think there is benefit from doing both.  The samples that are

14   created in the laboratory are typically coming from very nice

15   samples, DNA that's extracted from blood, typically from some

16   of your own employees, and we create mixtures of different

17   proportions, different contributor numbers, we have a lot more

18   control over that situation.  But the advantage of looking at

19   actual evidence from crime scenes is that they have gone

20   through a bit more I'll use the word insults.  Maybe they are

21   dirty, they have been degraded, they are on different

22   substrates.  Maybe a cotton swab versus some blue jeans, versus

23   a cigarette butt.  I mean they represent a better range of

24   things.

25         So we did both.  Although not required.  And this

1    table in the exhibit shows a number of cases, and we used

2    adjudicated cases with the understanding that to the best of

3    our ability if the adjudication has been complete that that's

4    the closest we can get to ground truth of whether somebody

5    contributed to a sample or not.  And we ran those adjudicated

6    cases through STRmix and then compared the STRmix results to

7    the adjudication and/or the statistical value that was provided

8    previously to understand whether it's giving us --  it being

9    STRmix -- is giving us information that is supportive of what

10   was developed previously.

11   BY MR. PRESANT:

12   Q    What was the conclusion from that analysis?

13   A    So the overall conclusion is that if we were able to

14   provide a statistical estimate with our standard, whether it be

15   CPI or random match probability, STRmix was able to support

16   that conclusion.  Although it's a different type of statistical

17   approach, it's a likelihood ratio as opposed to a frequency, it

18   was still supportive of the end conclusion.  The other thing

19   that we could conclude out of it was that there was a

20   significant number of samples or cases where we were unable to

21   provide a result, a conclusion, because the statistics and the

22   modeling, it was that manual approach, whereas if we ran it

23   through STRmix we were able to provide some supportive

24   information either through exclusions or inclusions.  It would

25   go both directions.

1   Q    You tested firearms as part of this historical analysis?

2   A    I believe so, yes.

3   Q    So if we look at this one right here, the third entry of

4   swabs from rifle, right?

5   A    That's correct.

6   Q    The original statistical value reported was 1.2 septillion?

7   A    Correct.

8   Q    And what was STRmix's conclusion upon reanalysis of that

9   sample?

10  A    So on that particular sample I just want to point out that

11  was a two-person mixture and the 1.2 septillion represents AA

12  frequency.  So the proper way to word that particular type of

13  statistic is that if you were to go out into the population at

14  random, select people at random, you would expect to find a

15  person that would match a particular donor within that sample 1

16  out of every 1.2 septillion individuals.  So very, very

17  significant.

18          The STRmix results, which again is expressed as a

19  likelihood ratio, gave a value of approximately 4.5 times 10 to

20  the 24th times more likely that an individual is included in

21  that mixture than not included.  So both very strong

22  indications of inclusion, just two different ways to represent

23  the results.

24  Q    Page 22, please.  Zoom in right here.  So this is another

25  example of a firearm right here, a shotgun trigger, right?

1    A    Yes.

2    Q    Would you describe the results of the analysis of this

3    case?

4    A    So this case is a partial mixture, so what that means is

5    that we have DNA from more than one person but we don't have a

6    full complement of all the data for all the genetic markers.

7    We estimated that to be a two-person mixture, and our initial

8    conclusion was that there is nothing applicable, it was

9    inconclusive.  And our result with STRmix was a likelihood

10   ratio that was less than 1, which would support the defense

11   hypothesis that somebody was not included within that.

12   Q    Page 4, please.  These were a number of other firearms you

13   tested it on right here, right?

14   A    Yes, that's correct.

15   Q    Page 25.  More firearms, all those revolvers right there,

16   correct?

17   A    Correct.

18   Q    Let's jump ahead to page 29 now.  Let's zoom in on the

19   chart on just the first few lines of the text below.  Mr. Nye,

20   would you discuss for the Court what was being analyzed in this

21   portion of the validation study?

22   A    Certainly.  So this is a lab created mixture, two

23   individuals in a 1 to 1 ratio.  So equal proportions of each

24   contributor to the mixture.  And then depending on the

25   hypotheses that would be set up within the STRmix software, we

1    would result in different likelihood ratios.  So the

2    significance of the comparison would be predicated upon the

3    hypotheses that you would use.  So as an example, in that first

4    block under number 15, sample 15, if we had a set of hypotheses

5    where the prosecution hypothesis was that it was a two-person

6    mixture, that included item number 15 or person number 15, and

7    some unknown contributor, and then the defense hypothesis would

8    be that it would be two unknown contributors, our likelihood

9    ratios would be essentially ten to the 20th on an order of

10   magnitude.  So significant.

11        If we took that exact same mixture and looked at the

12   other contributor, so our hypotheses would be it's item or

13   person number 17 and an unknown contributor, versus two unknown

14   contributors, our likelihood ratio would again be in the ten to

15   the 20th area.

16        If we change our hypothesis on the prosecution

17   hypothesis, we are going to say that that two-person mixture is

18   made up of individual number 15 and individual number 17, but

19   the defense hypothesis is that it's two unknown individuals,

20   you can see that the significance of the statistic jumps to ten

21   to the 50th power.

22        So the point in this is is that depending on the

23   hypothesis that you use or the hypotheses that you use, it can

24   change the significance of the statistic significantly.

25        And this might be a good point to explain how we come

1    up with our hypotheses that we use in our report, our

2    analytical reports that we issue.

3            So based on information that we are provided when the

4    case is submitted to us from law enforcement, we will use our

5    best judgment as to the hypothesis that we will use in our

6    analytical report.  But we also have a statement in every

7    single report that upon request we will rerun the analysis with

8    another set of hypotheses.

9            So let's say there's a couple scenarios.  Let's say an

10   individual is sexually assaulted and we find out that on a

11   particular orifice swab there's three, it appears that there's

12   three donors to the swab.  We could run that as the victim, the

13   female victim being a contributor in that sample and two

14   unknowns, I'm sorry, with the suspect and an unknown, versus

15   the victim and two unknowns, and then later on if we come to

16   find out that there was a consenting partner that she had sex

17   with around the time of the assault, we can change our

18   hypothesis to say that it was the victim, the suspect, and this

19   elimination individual versus the victim, the elimination, and

20   some unknown person.  So we can change the hypotheses as we go,

21   and it has a bearing on the statistics that's provided.  And of

22   course we open up that opportunity to defense counsel as well;

23   if they want to propose other alternatives, we will certainly

24   run the software with their alternative and issue a report then

25   we can talk about the merits of their hypothesis when trial

JEFFREY NYE - DIRECT EXAMINATION - MR. PRESANT

1    comes.

2    Q    But you can at least do whatever calculation they wanted to

3    do then the parties could debate which set of hypotheses were

4    more reasonable.

5    A    That's correct, yes.

6    Q    All right.  So after this two-person mixture analysis was

7    done, in this text below you start talking about another

8    analysis, a three-person mixture analysis, right?

9    A    Correct.

10   Q    It says here you did it using what ratio of contributors?

11   A    So a 10 to 5 to 1.  So you have a major donor, an

12   intermediate donor, then a minor donor.  So basically trying to

13   run the range of what we would see.  Rather than like the one

14   above which was equal contributions of the DNA to the mixture,

15   we look at a three-person mixture with different contributions

16   from each person.

17   Q    So the minor contributor here, the 1 would represent

18   roughly just under 7 percent of the sample right, 116th, did I

19   do that math right?

20   A    Correct, yes.

21   Q    So can we go to the next page, please?  And let's start

22   with just the chart.  This is the result of that three-person

23   analysis, is that right?

24   A    Correct.  So the layout is similar.  Different hypotheses

25   along the bottom.  And then the likelihood ratio or the log

1    likelihood ratio represented there, so they range anywhere from

2    10 to the 10th power, to as much as high as 10 to the 60th

3    power, depending on the hypothesis that you set up.

4    Q    And because those numbers are also large your conclusion

5    was that?

6    A    It was significant support for inclusion.

7    Q    That STRmix could work on a three-person mixture with these

8    ratios, minor contributor down to just below 7 percent.

9    A    Yes.

10   Q    Let's zoom out and go to the text right here.  You next did

11   validation on a four-person mixture, correct?

12   A    Correct.

13   Q    What were the ratios there?

14   A    A 10 to 5 to 1 to 1, so that would be a major donor,

15   intermediate donor, and two minor donors.

16   Q    The minor donor in that case would be roughly 1 --

17   A    17th.

18   Q    17th, so a little bit smaller than before the minor donor?

19   A    Correct.

20   Q    And if we go to the next page.  You see the chart.  What

21   were your conclusions about this chart?

22   A    That it still models the four-person mixtures in those

23   ratios very well.  You can see that as you become a minor donor

24   in a four-person mixture, that because the software

25   incorporates more combinations in different possibilities that

1    it has an effect on the likelihood ratio.  So as there is more

2    combinations and more possibilities that it considers, the

3    likelihood ratio becomes smaller, which is understandable.

4    Q    Mr. Nye, are there any other portions of this validation

5    study you would like to touch on?

6    A    There was some discussion previously about repeatability,

7    or the variation between one run and another run.  And I did a

8    study related to that.  I forget right now the exact results of

9    that study but I think Dr. Buckleton had mentioned that it

10   could be circle around a ten full plus or minus.  I wouldn't

11   disagree with that.  There is some variation.  That's not

12   unexpected.  The similar variation that we would see with other

13   statistical methods as well.  The random match probability

14   which has been used since, gosh, the early to mid 1990s is not

15   uncommon to explain to a jury that the true value is ten fold

16   higher or ten fold lower from the number that you are

17   presenting.  It's an estimate for a reason.

18           I also looked at partial data, so if you took a single

19   source DNA profile and just continually removed data, so

20   basically mimicking drop-out, that it has an impact on the

21   likelihood ratio.  So the less data that you put into the

22   system, the lower your likelihood ratio can be.

23           So that would mimic something similar to the sample on

24   this case where we have some drop-out or loss of DNA types that

25   could be contributed to the defendant.  That that actually

1    impacts the likelihood ratio to a less significant statistic.

2         I'm sure there was more.  But those are the couple

3    that come to mind.

4    Q    Just one more I would like to touch on.  Can we go to page

5    36, please?  Zoom in right here.  In addition to the charts we

6    reviewed earlier about the various person mixtures and other

7    ratios, you also tested other combinations of two, three and

8    four-person mixtures?

9    A    Yes.

10   Q    And the ratios are contained in this paragraph here?

11   A    Yes.

12   Q    So one of them is 10 to 10 to 5 to 1?

13   A    Correct.

14   Q    So that would mean the minor contributor would be less than

15   four percent?

16   A    Correct.

17   Q    One in 26.  What's your, what was your conclusion about the

18   efficacy of STRmix on those types of mixtures?

19   A    So it still works very well.  As Dr. Buckleton and I agree,

20   four-person and five-person mixtures it works very well.  It's

21   just you get to the point of the computing power and how long

22   each run is.  We set a policy that we will not go over

23   four-person contributors.  I do know other laboratories in the

24   U.S. that will go to five, but I would agree that most are in

25   that four to five-person range.  We did not test five.  But it

JEFFREY NYE - DIRECT EXAMINATION - MR. PRESANT

1  works very, very well at four.  And the more minor, the minor

2  component is, so in that four percent range, because it has

3  more possible combinations that it's looking at, the likelihood

4  ratio is lower.  And that's okay.  That's a fair representation

5  of that particular sample.

6  Q    Turning to another topic.  Is your laboratory accredited

7  and audited?

8  A    It is.

9  Q    And does the use of these Probabilistic Genotyping Systems,

10  STRmix in particular, comply with your accreditation standards?

11  A    It does.  We have not had any findings in that particular

12  arena.

13  Q    Are you aware of state commissions on forensic science that

14  have reviewed probabilistic genotyping in general?

15  A    Yes.

16  Q    And have some of them approved of the use of probabilistic

17  genotyping?

18  A    They have, yes.

19  Q    Let's go to Government's Exhibit 11.  11 isn't found in the

20  book, Your Honor, because it's some 4, 500 pages long.  We

21  provided a copy to the Court but we just printed it once.  Do

22  you recognize 11, Mr. Nye?

23  A    I do.

24  Q    What is 11?

25  A    Our procedure and training manuals for the DNA program.

1    Q    And what sorts of things does this manual cover?

2    A    So it's divided up into two major categories, a training

3    manual, which has some relevancy to this proceeding but it

4    also, the other section is our procedure manual, basically our

5    instructions to our examiners on how they analyze evidence, how

6    they interpret it, how they report it, makeup of chemicals and

7    QC and different things of that nature.

8    Q    Does it cover topics like handling of evidence in a

9    laboratory?

10   A    It does.

11   Q    Are there strict procedures in place to try to minimize the

12   likelihood of cross contamination?

13   A    There are.

14   Q    Does it cover decisions that a particular forensic

15   scientist has to make when analyzing an electropherogram?

16   A    It does.

17   Q    And does it provide guidelines for using STRmix in the

18   Michigan State Police setting?

19   A    Yes, it does.

20          MR. PRESANT:  Your Honor, the government moves to

21   admit 11.

22          THE COURT:  Ms. Kloet.

23          MS. KLOET:  I have no objection.  This is the full

24   policy manual?  I just don't have a copy in my binder.  Is this

25   the whole manual?

1           MR. PRESANT:  It's, can we go to the last page?  I

2      don't know how many pages there are.  That would probably be

3      the best way to get an idea of the scope.

4           THE COURT:  446.

5           MS. KLOET:  If that reflects the whole manual, I'm

6      fine with it.

7           MR. PRESANT:  I believe it does.

8           MS. KLOET:  Okay.

9           THE COURT:  Do you have any objection?

10           MS. KLOET:  No objection, sorry, Your Honor.

11           THE COURT:  It's admitted.

12      BY MR. PRESANT:

13      Q    Now, while we are on the topic of possibility of

14      contamination, is that something you worry about as a

15      supervisor of DNA analysis at the Michigan State Police lab?

16      A    Yes.

17      Q    Why do you worry about it?

18      A    So when I described previously the changes in technology

19      over the 22 years that I've been in the system, the sensitivity

20      of what we do has increased dramatically.  And when I'm

21      referencing sensitivity, what I'm referencing is the ability to

22      detect DNA at smaller and smaller and smaller quantities.  And

23      so one thing that you have to be concerned about is that when

24      your sensitivity increases in your laboratory analysis, that

25      you're actually detecting DNA that's from the crime scene and

1    not cross contaminating with other items or contaminating with

2    DNA from yourself or other exogenous items.  So it's something

3    that we work very closely with.  There are accreditation

4    standards that speak to some of these items such as training

5    and policies and procedures, and facilities, evidence handling,

6    there's a number of accreditation standards that speak to this,

7    and then also we have our own requirements to try and minimize

8    it.

9    Q    Are you confident in the procedures that have been put in

10   place in order to handle DNA evidence at the MSP lab?

11   A    I am.

12   Q    Now, a closely related topic is this idea of touch or

13   transfer DNA.  Are you familiar with that concept?

14   A    I am.  Depending on the terminology that you use, it may

15   mean very different things.  But we will see.

16   Q    What do those mean to you if I say touch DNA or transfer

17   DNA?

18   A    So in my world when I talk about touch DNA, I'm talking

19   about DNA that can be recovered from an item that was handled

20   for a short period of time.  So we could be talking about a

21   doorknob, a pen, I mean a whole host of different things.  That

22   continuum of what people want to consider touch DNA can range

23   quite a bit further than that.  Some people may consider touch

24   DNA a garment that you're wearing.  Or more intimately held

25   items than something that's just touched for a brief period of

JEFFREY NYE - DIRECT EXAMINATION - MR. PRESANT

1    time.  So there is not a lot of consensus on what you consider

2    to be touch DNA, so we have to be somewhat cautious of what we

3    lump into that type of explanation.

4    Q    What about the idea of DNA transfer and the related ideas

5    of primary transfer, secondary transfer, are you familiar with

6    that terminology?

7    A    I am.

8    Q    What does it mean to you?

9    A    Well, when you get into primary and secondary transfer,

10   again, there is some differences of opinion as to what that

11   actually means.  But in a very general sense when we talk about

12   transfer of DNA, just me picking up this cup could be I'm

13   transferring my DNA to the cup.  Now, when you start to get

14   into secondary transfer and tertiary transfer, if you pick this

15   cup up after I have handled it and then go to the door, are you

16   going to transfer my DNA from this cup to another item.  And

17   that's a more extended version of transfer that can be

18   discussed.

19   Q    Are you aware of literature where people have attempted to

20   study those types of DNA transfer?

21   A    You chose your words very well.  Attempted because it's

22   very, very difficult to model that type of situation.  And

23   there have been studies, and they have come up with a variety

24   of different conclusions as to how prevalent or how rare that

25   type of situation is.

1    Q    Can we bring up Exhibit 9, please?  And go to page, well,

2    first on page 1, you recognize this as a laboratory report or

3    the format of a laboratory report produced by Michigan State

4    Police?

5    A    Format, yes.

6    Q    You didn't produce this report?

7    A    I did not.

8    Q    Can we go to the second page, please?  Can we zoom in on

9    that table?  There's been testimony today, Mr. Nye, about how

10   we communicate likelihood ratios to a jury.  What is the

11   significance of the table that I'm showing you here?

12   A    So when we produce a likelihood ratio statistic, it's a

13   numerical form.  In this particular case, 40 or 50 million to

14   1.  And I had previously explained that we have approximately

15   90 DNA scientists just within our one organization, let alone

16   any other experts that might review that material or testify to

17   those findings, and for me 40 or 50 million to 1 may mean

18   something quite different to somebody else.

19           And so we created a policy of a verbal equivalent of a

20   numerical value.  So in other words, to try and standardize or

21   bring some normalization to how we testify with the Michigan

22   State Police.  So if you get a value that's let's say a

23   likelihood ratio of greater than 0 to 99, I think I've

24   mentioned I have testified before to a value that was 10.  What

25   does that 10 actually mean?  A 10 to 1, 10 times more likely

1    than not, to me represents something that's relatively

2    uninformative.  You're very close to 1 which I think

3    Dr. Buckleton had mentioned is uninformative, to me that has

4    less value than a likelihood ratio that's a duodecillion to 1.

5    And so this is our effort to try and bring a verbal equivalent

6    to a numerical value to again assist the jury and assist our

7    scientists to normalize how they respond to how strong or weak

8    the evidence is.

9          THE COURT:  Isn't that to some extent invading the

10   province of the jury?

11         THE WITNESS:  I think what it's doing is, DNA is very

12   good at, DNA analysis is very good at determining whether,

13   whether you have a result that can support an inclusion or

14   exclusion.  I think the significant portion of that is is that

15   DNA testing can't fully explain how the DNA was deposited on

16   that item or how it came to be found there.  I think that was

17   what Dr. Buckleton was trying to explain is that when you have

18   a likelihood ratio, it helps inform a part of it but there's

19   other items and investigative information that fully informs

20   the jury as to the significance of that.

21         So our effort here is not to provide any more

22   information to the jury other than to normalize how we present

23   the data and the significance that we see in it so that we

24   don't have wide variations of what a million to one means

25   versus me versus somebody else.

JEFFREY NYE - DIRECT EXAMINATION - MR. PRESANT

1    BY MR. PRESANT:

2    Q    So you helped develop this verbal equivalency table?

3    A    I did.

4    Q    And the top level is 10,000 or greater, correct?

5    A    It is.

6    Q    So that would be three orders of magnitude or a thousand

7    times lower than the tens of millions of range that we have had

8    testimony about here today like 50 million, right?

9    A    That's correct, yes.

10   Q    The purpose of this equivalency table is to impose

11   uniformity, correct?

12   A    It is.

13   Q    That's part of the purpose of the policy and procedures

14   manual that we just looked at, Exhibit 11?

15   A    It is.

16   Q    That's part of the reason that you testified you chose to

17   adopt PG system such as STRmix in the first place to impose

18   uniformity on the way that DNA mixture analysis is done,

19   correct?

20   A    Certainly one portion of it, yes.

21   Q    And are you aware of the labs in the United States, the

22   forensic laboratories in the United States that are doing

23   probabilistic genotyping analysis, what percentage of them are

24   using STRmix as opposed to some other form of software?

25   A    I don't have access to the same level of information that

1  Dr. Buckleton does.  But when I go to different conferences, go

2  to SWGDAM, also a member of the OSAC through NIST, and have

3  just individual conversations with different laboratories or

4  representatives from those laboratories, there is a significant

5  portion of people that either have purchased it and implemented

6  it, or have purchased it and are going through the validation

7  process right now.  The validation process is extensive.  We

8  talked about the end date of February of 2016.  But it was

9  actually started, the validation formally was started in about

10  July or August of '15.  So it takes quite a period of time.

11  And certainly a year from now there will be significantly more

12  laboratories that will have implemented it because they are

13  undergoing their internal validation right now.

14         MR. PRESANT:  Thank you very much.  Nothing further,

15  Your Honor.

16         THE COURT:  Cross-examination.

17         MS. KLOET:  Thank you, Your Honor.

18                    CROSS-EXAMINATION

19  BY MS. KLOET:

20  Q    Good afternoon.

21  A    Good afternoon.

22  Q    Just to refresh my recollection, when did the MSP or when

23  did you decide to purchase STRmix on behalf of MSP?

24  A    I don't know if I can clarify exactly when I decided to

25  purchase it.  But I can say that in I think it was May of 2015

1    I think it was was when we had our first training event.  So

2    the purchase would have been shortly before that time period.

3    Q    Okay.  Thank you.  During the decision making process I

4    believe you testified that you read developmental studies with

5    respect to STRmix, developmental validation studies?

6    A    I read a number of different literature, citations, spoke

7    with a number of different individuals, received demonstrations

8    of the software application as it existed at that particular

9    time.  I did quite a bit of I guess I'll use the word research

10   before I ultimately made my decision.

11   Q    Of the studies that you read specifically, can you recall

12   how many of them involved complex mixtures of three or more

13   contributors?

14   A    I think many of them do.  That's where STRmix or other

15   probabilistic genotyping applications excel.  And so I'm sure a

16   large portion of them had mixtures that were more than two

17   individuals.

18   Q    You said many.  Do you have any idea how many?

19   A    I don't recall.  It's not something I tracked.

20   Q    Okay.  I believe you testified the date that STRmix went

21   live was approximately February of 2016.

22   A    Correct.

23   Q    Okay.  The time that you purchased STRmix in or before May

24   of 2015, were you aware of any errors in the program?

25   A    Not that I specifically recall.  I mean at that particular

1    point in time -- so let me back up just a second.  So when we

2    implemented in February of 2016, I believe we were laboratory

3    number 9 in the country to actually implement.  I may be wrong

4    on that.  We were a very early adopter.  So if you back up a

5    year from the time that we implemented to the approximate time

6    of when we purchased, there wasn't as much information out

7    there about like coding errors and things of that nature.  I

8    think Dr. Buckleton had mentioned about his personal website

9    and different websites that they are posting a lot of that

10   information, and a lot of those weren't available.  I don't

11   recall if I ever had a discussion with the distributors of the

12   application about whether there was coding errors.  I don't

13   recall whether I did that or not.

14   Q    Okay.  And you just referenced Dr. Buckleton's publishing

15   of a few errors.  And I believe that one of those was admitted

16   as an exhibit or document representing those through the

17   government's direct exam of John Buckleton.

18   A    I believe so, yes.

19   Q    Were you aware of those specific errors?

20   A    I was aware of the specific error as it relates to the one

21   of our version.

22   Q    So is it your testimony today there was only one potential

23   error in your version?

24   A    I think that was Dr. Buckleton's testimony.

25   Q    Okay.  I'm going to help refresh your recollection if we

1    pulled up that document.

2    A    Sure.

3         MS. KLOET:  Your Honor, can I ask the Court to pull up

4    Government's Exhibit 14?

5         THE COURT:  I think we are going to ask the

6    government's tech to do it.

7         MS. KLOET:  Thank you.

8    BY MS. KLOET:

9    Q    So this is the document that was previously admitted with

10   respect to the errors in STRmix.  I would like you to look at

11   these paragraph 3.  This paragraph indicates that there was an

12   issue with the version that MSP employed, correct?

13   A    Yes, if it's version series 2.3 and we use 2.3.07.

14   Q    And were you aware of that particular issue at the time

15   that you purchased STRmix?

16   A    I'm not sure that they were aware of it at that particular

17   time.  I was not aware or if I was aware, because it's such a

18   rare instance on a specific scenario, I'm not sure it would

19   have necessarily impacted my decision to purchase or not

20   purchase it.  I don't recall specifically.

21   Q    So you don't remember if you were aware of this particular

22   error.

23   A    I do not.

24   Q    Okay.  Thank you.  Did you become aware of those errors

25   after the purchase of the program?

1    A    I don't remember if I was aware of it before it so I don't

2    know if it was after or not, I'm sorry.

3    Q    Did you first become aware of it today?

4    A    No.  No.  If that's your question, no, I knew of it before

5    then.

6    Q    That is my question.  Thank you.  I would like to talk a

7    little bit about the training at MSP with respect to STRmix.

8    You came up with the competency test for the analysts with

9    respect to STRmix, correct?

10    A    Yes.

11    Q    And you administered that test to the 90 or so, I guess the

12    portion of the 90 or so analysts that are --

13    A    Correct.

14    Q    Okay.  Thank you.  Now, at the time you did this, had you

15    passed any competency tests yourself before administering it?

16    A    No.  It's sort of a chicken and egg kind of thing.  You

17    can't competency test yourself if you're the one that's

18    administering the competency test.  So as a DNA technical

19    leader there is no requirement that I become competency tested

20    before I administer the competency test to others.  The real

21    test, so to speak, is I make a mixture up that represents the

22    range of testing that we do and I know the answer to it because

23    I made it up myself.  That's the real essence of the test.

24    Q    Okay.  Had you taken and passed any competency test on

25    STRmix?

JEFFREY NYE - CROSS EXAMINATION - MS. KLOET

1   A    No.

2   Q    Thank you.  I would like to talk a little bit about the

3   internal validation MSP completed in this case.  You referenced

4   adjudicated cases earlier.

5   A    Correct.

6   Q    And I believe you suggested that you utilized those because

7   they tended to be more representative of real life samples?

8   A    They can be.

9   Q    And why is that?

10  A    For the reasons I explained previously which was that they

11  are more representative or they can be more representative of

12  evidence types that we get in the laboratory; so they have been

13  subjected to different conditions, there's varying amounts of

14  DNA, varying numbers of contributors, on different substrates.

15  And what I mean by substrates is the surface that they are on,

16  whether it be a fabric of a particular kind or whether it's on

17  a hard surface like a gun, or just a whole host of different

18  conditions that are sometimes a little bit hard to mimic in the

19  laboratory.

20  Q    Thank you.  And you are comparing your results in STRmix to

21  the adjudicated conclusion, correct?

22  A    Correct.  It's the only other source of information that we

23  have because we, we didn't deposit the DNA on the item so we

24  don't actually know whose on the item or in what proportions

25  that they are on the item.  So that's the closest we can get to

1    a comparison.  So my position was it's better to do that

2    comparison knowing that there is some shortcomings of that

3    comparison than to not do the comparison at all.  That there

4    was some value in doing that.

5    Q    So you're comparing it to your conclusion not to ground

6    truth, so to speak, in those cases?

7    A    Right.

8    Q    Thank you.  And I believe you testified that STRmix is

9    validated for up to four potential contributors?

10   A    Yes.

11   Q    So four contributors for purposes of this version of STRmix

12   at MSP is the boundary of acceptable use.

13   A    That is the boundary that I placed on it, yes.

14   Q    Okay.  But isn't it true that the true number of

15   contributors is always unknown?

16   A    It is always unknown, and I would agree with Dr. Buckleton

17   that you can estimate it.  It's better to be conservative than,

18   or correct than to be incorrect.  But I would also clarify that

19   that estimation, I don't know if I'm going to use this term

20   correctly, but it's an informed estimation.  The estimation of

21   the number of contributors is not a trivial matter.  We spend a

22   fair amount of time in our policies and procedures explaining

23   what things to consider when trying to make an estimation as to

24   the number of contributors.  And we train quite a bit around

25   that.  And it comes through training and experience and

1    knowledge and procedures.

2    Q    Did you publish the MSP validation summary, internal

3    validation or study in any peer reviewed journals?

4    A    No.  Our positions as forensic scientists, as practical

5    practitioners isn't really to go out and publish material.

6    Q    Did you -- did any third party duplicate any of the tests

7    that you performed during the validation?

8    A    No.

9    Q    Would you mind pulling up your Exhibit 9?

10        MR. PRESANT:  Exhibit 9 wasn't admitted.

11        MS. KLOET:  It wasn't admitted?

12   BY MS. KLOET:

13   Q    What is this document?  I know you already looked at it but

14   just for clarification.

15   A    It would be a laboratory report reference a specific

16   laboratory number and date and time for an agency.

17   Q    And you previously looked at the second page of this

18   document, right?

19   A    I believe so, yes.

20   Q    And we were talking or you were testifying about the chart

21   that's on this second page.  You are the individual who created

22   these guidelines, right?

23   A    Yes.

24   Q    Okay.  You determine these cutoff values?

25   A    So the cutoff values for the verbal equivalent were derived

1    from a publication which I don't have with me today but I could

2    certainly provide it to the Court if necessary.  It was a

3    journal publication, peer reviewed journal publication not

4    related to DNA but it was related to other forensic evidence.

5    I believe it might have been maybe latent prints, and where

6    they do likelihood ratios and have a verbal equivalent for a

7    likelihood ratio.  I used that as a guide.  This is not

8    verbatim out of that publication.  There were too many

9    different statements, there is too many different categories.

10   I believe that the publication might have had maybe eight or

11   nine different categories.  It's like the equivalent of saying

12   very, very, very strong evidence.  It just how many times can

13   you say the word very.  So I condensed a number of them and

14   then I don't recall if I specifically adjusted the range or the

15   numbers, but that was where it was derived from.

16           And then I will also offer that in the forensic

17   community for those that have adopted probabilistic genotyping,

18   the use of a qualitative equivalent, some laboratories use

19   them, and some not.  And those that do use them they generally

20   are consistent amongst them.  But it's something that is being

21   looked at in the community to see if we can standardize those

22   verbal equivalents.  So my effort to standardize within our

23   laboratory, there is an interest to standardize that across the

24   forensic DNA community as well.

25   Q    So you made your own personal judgment call with respect to

the creation of this qualitative equivalent chart, fair to say?

A    Yes.

Q    You did that based on a study that had nothing to do with DNA.

A    Forensic latent print examination.

Q    Not DNA, fair to say?

A    Correct.

Q    And that was published in a peer review publication.

A    I believe so, yes.

Q    But you changed what was published in the peer review publication for MSP's purposes, true?

A    I certainly condensed the number of categories because I thought it was overly confusing to have that many different categories.  And I don't recall whether I changed the likelihood ratio cutoffs for the verbal equivalent.

Q    Okay.

        MS. KLOET:  Thank you.  I don't have anything further.

        THE COURT:  Thank you.  Any redirect, Mr. Presant?

        MR. PRESANT:  No, Your Honor.

        THE COURT:  Thank you.  You may step down, Mr. Nye.
Thank you for your testimony.  Your next witness is going to take how long?

        MR. PRESANT:  I would have given a different answer this morning but at the pace we are going I would say could be an hour to an hour and a half.

1    THE COURT: Well, let's do this. Let's get started

2    and see how far you get by 4:15.

3    MR. PRESANT: That sounds good to me. Your Honor, may

4    I raise just one legal issue now or be better to wait until the

5    end of the day?

6    THE COURT: Depends on what the issue is.

7    MR. PRESANT: Your Honor just made some comments at

8    the conclusion of Dr. Buckleton's testimony with respect to the

9    Court's role in Daubert, and I'm making sure that, and I may

10   have misinterpreted the Court's comments, that the evidence was

11   handled properly. And I didn't know if we were just talking

12   about in the lab or chain of custody issues as well. The

13   government hasn't prepared witnesses for this hearing that

14   would address chain of custody, and if the Court needs to hear

15   from them I'll understand that. But it's been treated on page

16   19 and 20 in our brief and response. The government's view

17   chain of custody is really an issue for trial about whether the

18   officers did it properly. So we prepared our proofs today with

19   respect to the reliability of the technology.

20   THE COURT: I don't believe the chain of custody or

21   how it was handled has anything to do with what we are about in

22   this hearing. So, no, my answer is no. There is no need for

23   the government to put on any testimony as to that.

24   MR. PRESANT: Thank you, Your Honor. I just wanted to

25   clarify. With that clarification the government calls

AMBER SMITH - DIRECT EXAMINATION - MR. PRESANT

1   Ms. Amber Smith.

2            THE COURT:  Okay.  My purpose in exploring that with

3   Dr. Buckleton was simply to delineate the different areas that

4   are pertinent to the development of this kind of test, of this

5   kind of result, not that we're about examining it here.

6            MR. PRESANT:  That was very well my misunderstanding,

7   Your Honor.  I appreciate the clarification.

8            AMBER SMITH, GOVERNMENT WITNESS, WAS DULY SWORN

9            THE LAW CLERK:  Please be seated.  And state your full

10  name for the record, spell your last name.

11           THE WITNESS:  It's amber, A-M-B-E-R, Smith, S-M-I-T-H.

12                          DIRECT EXAMINATION

13  BY MR. PRESANT:

14  Q    Ms. Smith, where do you work?

15  A    I am a forensic scientist with the Michigan State Police in

16  the Lansing laboratory in the Biology DNA Unit.

17  Q    Can you bring up 3, please?  Do you recognize Government's

18  Exhibit 3?

19  A    I do.

20  Q    What is it?

21  A    This is a copy of my curriculum vitae.

22           MR. PRESANT:  Government moves Exhibit 3, Your Honor.

23           MS. KLOET:  No objection, Your Honor.

24           THE COURT:  It's admitted.

25  BY MR. PRESANT:

AMBER SMITH - DIRECT EXAMINATION - MR. PRESANT

1    Q    Can we start at the top with your education.

2    A    Yes.  I have a master's degree in biology from Southern

3    Illinois University in Edwardsville, Illinois and I have a

4    bachelor's degree in marine science and biology with minors in

5    chemistry and environmental science from the University of

6    Tampa in Tampa, Florida.

7    Q    Can we back out and go to experience.  What has your work

8    experience been, Ms. Smith?

9    A    I was previously employed before I came to Michigan State

10   Police with the St. Louis Metropolitan Police Department.  And

11   the formal title there was I was a criminalist for

12   approximately two years.

13   Q    What type of work did you do in St. Louis?

14   A    I did both body fluid identification analysis as well as

15   DNA analysis.

16   Q    And after you left St. Louis?

17   A    When I left St. Louis in March I moved to Michigan and I

18   became a DNA analyst with the Michigan State Police where I

19   also perform body fluid identification as well as DNA analysis.

20   Q    You've been there more than ten years now?

21   A    Yes.

22   Q    Are you trained in using STRmix?

23   A    I am.

24   Q    What trainings have you gone through in STRmix?

25   A    I was a member of the first group that was put through the

AMBER SMITH - DIRECT EXAMINATION - MR. PRESANT

1    STRmix training in March of 2015 where I underwent the four-day

2    class with Dr. Buckleton.  And then as part of the validation

3    myself and that original group compiled samples for our

4    technical leader at the time, Mr. Nye, and went through those

5    samples and ran a number of samples for practice with STRmix.

6    And then after we ran through the samples and the validation

7    was complete, we went through and did a competency test

8    involving samples that Mr. Nye had created.  And then once that

9    was complete, we then took a written test before we were able

10   to be put online.

11   Q    Page 2, please.  And if we zoom in here.  Is that the

12   STRmix training you just testified about?

13   A    Yes.

14   Q    That's in the middle of a number of other trainings related

15   to DNA analysis and other forensic topics?

16   A    Yes.

17   Q    And the trainings you have undergone continue to the end of

18   your CV as well, right?

19   A    Yes.

20   Q    Approximately how many samples, DNA samples of any kind do

21   you think you've processed in your career as a forensic

22   analyst?

23   A    Thousands.

24   Q    How many STRmix analyses have you conducted?

25   A    Analyses, well over 200 analyses with the cases being

1    around 200 as well.

2    Q    How many times have you testified with respect to any type

3    of forensic DNA science, approximately?

4    A    With testimony, this is my 74th time.

5    Q    And how about testimonies including STRmix?

6    A    With STRmix, I have testified 16 times.

7    Q    Those were all in state court here in Michigan?

8    A    Yes.

9             MR. PRESANT:  Your Honor, the government offers

10   Ms. Smith as an expert in forensic DNA analysis.

11            MS. KLOET:  No objection.

12   BY MR. PRESANT:

13   Q    The Court has already heard Mr. Nye describe the general

14   process for forensic DNA analysis at the Michigan State Police

15   lab.  You were in the courtroom for that testimony, correct?

16   A    Yes.

17   Q    Is there anything you would like to add or supplement that

18   you think the Court should know about the general process from

19   the time the evidence comes into the lab until the time you

20   produce your lab report?

21   A    As it pertains to STRmix?

22   Q    As it pertains to the processing of evidence, or to STRmix,

23   just anything you would like to add about the general process

24   before we talk about what you did in this case.

25   A    At this time, not all of the analysts in my unit or across

1    the state are trained in STRmix.  However, they are trained in

2    DNA analysis and mixture interpretation.  So because they are

3    not trained in producing statistics on their mixtures, a lot of

4    the samples especially at this time in Lansing there were only

5    two of us that were performing STRmix analysis.

6             THE COURT:  Does the Michigan State Police still do

7    DNA analysis under the pre probability genotyping?

8             THE WITNESS:  Yes.  The process is the same and if the

9    analyst that is running their case develops single source

10   samples they will still produce their report that has a random

11   match statistics.  It's only when the statistic becomes too

12   complex for mixtures samples that they are then inserted

13   through the STRmix samples.

14            THE COURT:  How is that determined?

15            THE WITNESS:  So once the analyst runs their sample

16   and they see that they have a mixture sample, they then forward

17   their sample to a qualified STRmix analyst and get approval and

18   clarification for this sample if it will fit the guidelines for

19   STRmix analysis.

20            THE COURT:  So when you say a mixture sample, you mean

21   that it appears that there's more than one donor to the DNA

22   that's being tested?

23            THE WITNESS:  Yes.

24            THE COURT:  Okay.

25            THE WITNESS:  So once, in this case anyway, the

1    analyst developed her profiles and then sent those forward to

2    the two of us at the time to evaluate for potential STRmix

3    analysis.  And that still goes on until all of us in the unit

4    will be qualified.

5    BY MR. PRESANT:

6    Q    So there were in this particular case there are actually

7    three forensic scientists that handled the sample in the lab?

8    A    The actual DNA process there were only two.  There was the

9    person that, the person that -- the way our laboratory works is

10   we do perform our own lab work on our own cases and then

11   generate reports.  However, the analyst that did her lab work

12   and got, she did issue a report but she could not issue the

13   statistic on the report because the sample needed a mixture

14   statistic.  So at that time she issued a report that I believe

15   basically said it's a mixture, a subsequent report will follow

16   with statistics.

17   Q    I missed a question earlier too.  You testified you

18   underwent proficiency testing in STRmix, right, and you

19   continue to undergo it as long as you are a STRmix analyst?

20   A    Yes.

21   Q    Have you ever failed a proficiency test?

22   A    Not to my knowledge.

23   Q    Other general background questions.  What type of genetic

24   analyzer is in use at the Michigan State Police lab?

25   A    Right now we have a 3500 XL, which is a genetic analyzer

AMBER SMITH - DIRECT EXAMINATION - MR. PRESANT

1    that will inject 24 samples at a time, as well as a regular

2    3500 which only injects 8 samples at a time.

3    Q    And what sort of software is used to interpret the

4    electropherogram?

5    A    GeneMapper is the name of the software that is used to

6    generate our electropherograms.

7    Q    Then STRmix is used to interpret it.

8    A    STRmix is the statistical tool used to generate the

9    statistics.

10   Q    All right.  So let's take a look at Government's Exhibits 6

11   and 7.  Can we do a side-by-side?  They will be in the book in

12   front of you if you want to flip back and forth but we will

13   start side-by-side.  And would you describe for the Court what

14   6 and 7 are, if you recognize them?

15   A    6 are the electropherograms that were generated by the

16   original analyst in the case.  Her electropherograms are

17   utilized to help determine number of contributors.  And these

18   electropherograms have filters turned on which are the stutter

19   filters which is an artifact that is generated during the

20   process.  Our laboratory has thresholds for each location that

21   we test that has stutter filters.  So in order for

22   interpretation, if they are below those filters it's

23   automatically filtered out by our GeneMapper software.

24         And for number 7, I actually have to analyze and

25   insert the electropherogram into STRmix with stutter filters

AMBER SMITH - DIRECT EXAMINATION - MR. PRESANT

1    off.  Meaning that all of the artifacts are present on the

2    electropherograms and that is so that STRmix can analyze the

3    sample and determine the probability that this peak is a true

4    artifact or could it possibly be a potential type.

5    BY MR. PRESANT:

6    Q    Those are your initials at the top of 7, ALS?

7    A    Yes.

8    Q    That's how you know it's yours?

9    A    Yes.

10        MR. PRESANT:  Your Honor, the government moves to

11   admit 6 and 7.

12        MS. KLOET:  No objection.

13        THE COURT:  Admitted.

14   BY MR. PRESANT:

15   Q   So would you briefly walk through 6 and 7, the process of

16   interpretation as you understand that was undertaken by

17   Ms. Urka was the original analyst, correct?

18   A    Yes.

19   Q    How it was transferred over to you and then we will look

20   through your notes in Government's Exhibit 7.

21   A    So there are different sets of protocols that different

22   analysts follow.  So non STRmix qualified analysts follow

23   Section 2.10 in the protocols and they had different rules

24   according to those protocols.  And then once the samples come

25   forward to STRmix, I have a different set of protocols I follow

1    which is 2.11.

2             So under 2.10, the analyst looks at their data and

3    make sure it's free of any extraneous artifacts which are

4    generally determined to be off ladders at samples, and those

5    samples can generate off ladders if there's oversaturation

6    observed.  However --

7             THE COURT:  What does that mean, oversaturation?

8             THE WITNESS:  Oversaturation is when there is too much

9    DNA amplified on the first go around, and that it will generate

10   a bunch of noise that is usually detected below the analytical

11   threshold.  So when you have a sample that generates a bunch of

12   excessive plus 4 stutter, or OLs which are called off ladders,

13   means they don't have types, you generally will reinject that

14   sample at a lower time or you will reamplify it with a lesser

15   amount.

16            THE COURT:  Okay.

17            MR. PRESANT:  Can I just interrupt?  Can we go to page

18   5 of Exhibit 7?  No need for side-by-side.  And zoom in right

19   here.  Ms. Smith, would you continue if you would answering the

20   Court's question regarding oversaturation as we look at the D8

21   locus.

22            THE WITNESS:  Yes.  So regarding D8, according to the

23   manual that Ms. Urka followed, there was nothing wrong with the

24   data that was detected in D8.  Because Ms. Urka is not yet

25   trained in the STRmix evaluation of the software, she does not

1    know to look at certain areas more in-depth that I look at when

2    it comes to the analyses.  So being that this 13 type at D8 was

3    very high, it was under the parameters for oversaturation

4    regarding STRmix, which is 25,000 RFU, and this is at 23,821,

5    but however there is a potential plus 4 stutter with the 14

6    present at 910, which I believe was about three and a half

7    percent of the 13 type.  And in addition to that, the 12 peak

8    before 13 was in the stutter position for the 13.

9         And I was unaware if the 11 peak that popped up when

10   the stutter filters were removed could possibly be an N minus 8

11   stutter which could be artifact generated from the height of

12   the 13 peak or if it was a byproduct of the 12 peak which could

13   have been very high stutter.

14        So since the version of software with STRmix that we

15   use at 2.307 does not model plus 4 stutter, or N minus 8

16   stutter, it was my judgment call to remove the locus completely

17   from interpretation as because I could not explain if those

18   were artifacts or if those were real types.  Generally when I

19   run my own data I like my types to be around 20,000.  When I

20   run my own data I like my types to be around 20,000 at the

21   highest just because that generally does not indicate an

22   overexaggerated plus 4 stutter from that highest peak.  And it

23   does not usually generate anything that will go into another

24   color.  So that's just a personal preference.  That I start to

25   see more artifacts once I see that 20,000 peak height.

AMBER SMITH - DIRECT EXAMINATION - MR. PRESANT

BY MR. PRESANT:

Q    Now, you talked about what you prefer for your own types
when you're running the sample, correct?

A    Yes.

Q    And so one question that might come to mind is why not just
rerun the sample in this case?

A    Well, this case was generated under a different protocol
which was 2.10, the original data that was run by Ms. Urka.
Ms. Urka followed her protocol as she was supposed to.  There
is no upper bound or upper threshold when it does come to
following a 2.10 manual.  So when Ms. Urka ran her data it did
undergo a technical review as well as an administrative review
by two other individuals in the laboratory.  Her data was then
approved and reported out in her original report following 210.
So when that data is supplemented over to me, I am taking data
that's already been approved and data that's already been
reviewed and passed through.  So at that point I do not have
the ability to reamplify or rerun or reinject a sample because
that's not my data.  That's someone else's data.  And if on her
review the person that reviewed it thought it should have been
injected or use a lesser injection time, they would have
suggested at that time.  But because it did not technically
violate the protocol that she was following, this data was
acceptable for the purposes of her report.

Q    Let's go back to Exhibit 11 previously admitted.  You

1   recognize 11 as the policy manual for MSP, Ms. Smith?

2   A    Yes.

3   Q    And can we go to page 88 of the document?  Now, we are in

4   part of the 2.10 series you've testified about, right?

5   A    I cannot --  that's actually regarding the analytical

6   threshold.  It says, "All available loci and alleles greater

7   than or equal to the 250 RFU analytical threshold should be

8   analyzed or should be utilized during STR interpretation.  It

9   should be noted that peaks not represented by an allele do not

10  need to be included within the interpretation."

11  Q    Can we back out of that please, Ms. Miller, and go to the

12  bottom here.  What's the significance of this, Section 2.10?

13  A    This basically says that the single donor reference samples

14  must also surpass the 250 RFU analytical threshold and that a

15  known sample that has a single type present at a location must

16  meet the 900 RFU threshold to be utilized in a statistic.

17  Q    Let's jump ahead to page 106.  I'm sorry.  We have to start

18  at the bottom, 105.  And now we are in the 2.11 series of the

19  manual, is that right?

20  A    I'm not sure.

21  Q    We can go to the next page if you want to see the next.

22  A    Yes.

23  Q    What does the 2.11 series govern exactly?

24  A    2.11 is a protocol that if I were running my own data

25  through and following forward through the STRmix procedure,

AMBER SMITH - DIRECT EXAMINATION - MR. PRESANT

1    this was the protocol I would follow, as well as if STRmix is

2    to be utilized in a sample, this is also the protocol you

3    follow.

4    Q    The point is these protocols, dozens of pages in this

5    particular area of this hundreds of pages document limit the

6    judgment calls you can make with respect to what you do in

7    processing the DNA sample and in using STRmix, is that right?

8    A    Yes.  If I did not generate the data, I can only assess how

9    the data is once I receive it.

10   Q    And the policy allows you to disregard a locus that is

11   deemed to be oversaturated?

12   A    Yes.

13   Q    Is that based in part on the detection of the instrument?

14   A    It is as well as my training and the ability to determine

15   artifacts and actually how well or if the software is able to

16   assess the potential artifact present.

17   Q    Let's go to page 3 of Exhibit 7 where we were before.  Zoom

18   in on the note.  This note appears on several pages of the

19   report, is that right, Ms. Smith?

20   A    Yes.

21   Q    Or of the electropherograms, rather?

22   A    Yes.

23   Q    Would you just read the note for us?

24   A    So I'm required as part of my protocol to document my

25   number of contributors as well as how I got to that number of

1    contributors.  So this note is me saying that I interpreted

2    this sample, "assuming that there were three donors present due

3    to more than four peaks that were observed at multiple

4    locations, and since D8 exhibited oversaturation and was the

5    only locus to indicate four potential donors, due to the

6    oversaturation and possible artifact observed, D8 was not used

7    in the analysis."  So this is my evaluation of the profile as a

8    whole and how I deemed the profile to be three donors.

9    Q    How common is it in your experience to observe a profile

10   where you have to ignore a locus because it's oversaturated?

11   A    At this point it's not uncommon.  Again, it's because all

12   of us are not STRmix trained and so I am receiving data that's

13   run by someone else.  And because that someone else follows a

14   different protocol, and meets the standards and guidelines in

15   their protocol, it's not uncommon for me to receive an

16   electropherogram that may have demonstrated oversaturation.

17   There also potentially may be a time where I myself may have a

18   sample that does surpass the 25,000 RFU cutoff, however, if you

19   look further out in the profile as a whole I may be losing

20   minor contributors.  And so it may be more beneficial for me to

21   sacrifice one locus that exceeds the threshold in order to gain

22   more information from additional contributors.

23   Q    Let's say you were wrong about the oversaturation and it's

24   actually a four-person mixture.  Would you be willing to run

25   STRmix again assuming the four-person mixture?

1  A    Yes.  My report does offer and say that I will run a sample

2  again if there are different circumstances that people would

3  like me to consider.  In fact I have on I believe on at least

4  three occasions that I can recall.

5  Q    So if the defense asked you to rerun STRmix assuming four

6  contributors, that is something you would be willing to do?

7  A    Yes.  Although I do feel this is a three contributor

8  sample, I will run it however I am requested to rerun a sample.

9  Q    As you sit on the witness stand today, have you received a

10  request from anyone to rerun STRmix in this case using

11  different assumptions?

12  A    I have not.

13  Q    So let's go to Exhibit 9, please.  Do you recognize

14  Exhibit 9?

15  A    9 is the report that I generated based on my STRmix

16  analysis.

17  Q    It's a minor point, but this Exhibit Number 5 in the bottom

18  right-hand corner, that's not part of your report usually,

19  right?

20  A    Right.

21  Q    I'll represent to you that's just the way it was processed

22  en route to me.  That's why it's on there.

23       But so this is your report, and let's go down to your

24  conclusion section.  Mr. Nye testified about the importance of

25  formulating hypotheses and using that to run STRmix; is that

1  what you've documented here in the report?

2  A    Yes.  The first interpretation under number 1 I am required

3  to state how I interpreted the sample, and so I am saying by

4  looking at the evidence I ran the sample assuming there were

5  three individuals.  Based on our reporting formats, I also have

6  to state my hypotheses which is generally the person of

7  interest and two unrelated, unknown contributors, or did this

8  sample generate from three unrelated, unknown contributors, not

9  the person of interest.

10  Q    And your conclusion was?

11  A    The conclusion is, "Based on the DNA typing results

12  obtained, it is at least 49 Million times more likely if the

13  observed profile from the swabs of the textured areas of

14  GUN-001 originated from Daniel Gissantaner and two unrelated,

15  unknown contributors than if the data originated from three

16  unrelated, unknown individuals."

17          MR. PRESANT:  Your Honor, the government moves

18  Exhibit 9.

19          THE COURT:  Ms. Kloet.

20          MS. KLOET:  No objection, Your Honor.

21          THE COURT:  It's entered.

22          MR. PRESANT:  Let's go to the second page.  We have

23  already heard testimony about the verbal scale table, correct,

24  and you just applied that to the number you reached at the top

25  of the page, is that right?

1          THE WITNESS:  Yes.  As part of our reporting format I

2     am required to insert a verbal equivalent to insert the number

3     in lay terms.  And this number corresponded with the 10,000 and

4     greater part of the equivalent which was very strong support

5     that Daniel Gissantaner is a contributor to the DNA profile

6     developed from the swabs of the textured area of GUN-001.

7     BY MR. PRESANT:

8     Q    In this first paragraph here under remarks is the offer you

9     were talking about earlier where you wrote, if other

10    propositions should be considered you would be able to

11    undertake them if instructed with sufficient time, right?

12    A    Yes.

13    Q    Okay.  Let's go to Exhibit 8, please.  Do you recognize 8,

14    Ms. Smith?

15    A    I do.

16    Q    What is it?

17    A    8 is the Word Pad file of the comparison report that was

18    run against the deconvolution file for this case.  So this is

19    basically an unpretty version of a comparison of the known

20    sample which was 2AX compared to the evidence sample.

21    Q    All right.  And let's look at 25, please.  What's 25?

22    A    25 is the original deconvolution file that I ran as it

23    pertained to the gun evidence.  And this file gives the summary

24    of my parameters that I ran as well as the diagnostic kickouts

25    and the summary of contributors.  It also includes the required

1    parameters that are used in the software as well as the allele

2    calls that were imported into the software and all the genotype

3    contributor possibility breakdowns.

4    Q    Would it be easier if we talked about what led to the 49

5    million to 1 number to use this Exhibit 25 as the prettier

6    version of Exhibit 8 or are they different?

7    A    This is not the prettier version.  The prettier version is

8    27 or 26.

9    Q    I'm sorry.  I appreciate the correction very much.  Let's

10   look at 26 then.  And would you just lay a little bit of

11   foundation beyond the prettier version?

12   A    So 26 is the PDF form of the Word Pad version that we

13   previously looked at, and this basically says the same

14   information, however, it's in table format and it's a lot

15   easier to follow.

16             MR. PRESANT:  Your Honor, the government moves to

17   admit 8, 25 and 26.

18             THE COURT:  Ms. Kloet.

19             MS. KLOET:  No objection, Your Honor.

20             THE COURT:  They are admitted.

21             MR. PRESANT:  Let's start where we are with 26.  And

22   let's go to page 3, please.  Zoom in on this area if we can.

23   So you may recall some testimony from a prior witness where we

24   were looking at these rows where there is no data entered.

25             THE WITNESS:  Yes.

BY MR. PRESANT:

Q    Would you explain why there is no data in those rows?

A    There is no data at DY because we don't use DY as part of the comparison.  Not only with STRmix but with any of our statistics we do not use DY.  There's no data at D8 because I removed that locus from the original deconvolution file so because there was no information there for the known sample to be compared to, is why that's blank.  Because there is no LR that can be generated because there was no data for that to be compared.

Q    Can we back out of that, Ms. Miller?  Briefly go to the top, just the column headers.  Ms. Smith, would you orient the Court to what each of these three major columns are?

A    These columns generate the values that were obtained from the three population data bases that we use, and in Michigan we primarily only report out the African American, Caucasian and Hispanic profiles because those are the races most commonly come across in Michigan.

Q    Can we back out of that, please?  Now, why did you choose to report -- well let's go to the bottom here, the total likelihood ratios.  Let me word it this way.  Is the reason you chose to report out the 49 million to 1 number because you had been given information that the defendant in this case, the known sample is African American?

A    No.  I actually have no idea the race of anyone when I run

AMBER SMITH - DIRECT EXAMINATION - MR. PRESANT

1   the sample.  It's the most conservative number out of the three

2   populations that's generated, so that's the number that's

3   reported out.

4   Q    So if you used the Caucasian data set, the number is even

5   bigger, the likelihood ratio is bigger, right?

6   A    Yes.  In our previous or my previous reports and in the

7   current random match reports, all three numbers for each of the

8   populations are a given.  But because we use STRmix now we just

9   report out the most conservative number.

10  Q    So this E7 means what versus E9 and E8?

11  A    So the E7 is the statistic that was generated or the

12  likelihood ratio that was generated for the African American

13  population, the E to the 9th is for the Caucasian population,

14  and the Hispanic was for E8.

15  Q    That's just a mathematical notation indicating times ten to

16  the power of whatever number is listed?

17  A    Yes.

18  Q    Let me back out, please.  Last on this page, just go to the

19  column.  So this 49 million number, you've actually rounded

20  down to 49 million from what's reported there, right?

21  A    Yes.  We do only report out two significant figures, so

22  that's why it's 49.

23  Q    That's calculated by all these likelihood ratios from the

24  individual loci.

25  A    Yes.

AMBER SMITH - DIRECT EXAMINATION - MR. PRESANT

1    Q   Let's go to the next page, please.  Ms. Kloet asked

2    Dr. Buckleton some questions earlier about these parameters.

3    Let's look at those briefly.  Did you input these settings, the

4    drop-in cap and the drop-in frequency, this 400 number and the

5    .453 number?

6    A   No, these are parameters that were generated during the

7    validation process, and this is what all of the samples run

8    through STRmix are run with.  I actually don't have clearance

9    to alter these samples, or these numbers, and if they were to

10    be altered, they would be in bold to signify that they were not

11    the same as the original parameters.  However, I do not have

12    that ability to do that.

13    Q   And the next page.  Ms. Kloet also highlighted some of

14    these peak heights.  In this column right here that were below

15    400, that drop-in cap, is that right?

16    A   Yes.

17    Q   What's the significance of them being below 400?

18    A   Really there is not much significance that many of them are

19    below 400.  400 just happens to be our drop-in cap.  Meaning

20    that if there is a peak that is detected blow 400, the software

21    does consider it to be potential drop-in.  However, just

22    because it's 400 doesn't mean that it's drop-in.  The software

23    also is considering the possibility that it's stutter of some

24    sort or is it a possible real allele that could be attributed

25    to a contributor in the case.  So it does consider every option

1    and then weighs those options based on the profile as a whole.

2    Q    Is there anything else you would like to highlight for the

3    Court in Exhibit 26 before I turn back to 25?

4    A    Just that 26 also has where on page 7, the last page, is

5    the reference profile from 2AX to show that this is the profile

6    that was compared to the original evidence.  And so this is

7    also checked on review to make sure that the right profile is

8    compared to the evidence.

9    Q    So it's just listing here the specific alleles at each of

10    these loci.

11    A    Yes.  Known samples don't take peak heights into

12    consideration so that's why none of them are listed; they only

13    take the allele types into consideration.

14    Q    Let's go to 25, please.  We have also heard some testimony

15    about 25 today.  This is a document you produced in the course

16    of doing the STRmix analysis in this case?

17    A    Yes.

18    Q    Can we zoom in, Ms. Miller, on that area, please?  Now,

19    there are three contributors listed, based on your

20    determination that there were three, that STRmix should assume

21    three contributors, is that right?

22    A    Yes.  Based on my interpretation of the profile, I believed

23    that these contributor percentages did represent what I was

24    observing in the profile as a whole where there was a more

25    major contributor, as well as a middle contributor, and then

1  again a minor contributor.

2  Q   And you've listed the measured mixture or proportions here,

3  correct, at 68 percent, 25 percent, and 7 percent.

4       THE COURT:  Does the fact that those three numbers add

5  up to 100 percent confirm that there were three contributors or

6  not?

7       THE WITNESS:  That number, if there were four there,

8  the percentages would also add up to 100 percent.  If there

9  were two, the percentages --

10       THE COURT:  Okay.

11       THE WITNESS:  So it's just saying that the percentage

12  of each individual that contributed to the sample.  So the

13  sample as a whole is 100 percent, and this breaks down what

14  each contributor approximately contributed.

15       THE COURT:  Okay.

16       MR. PRESANT:  Do you have an opinion, Ms. Smith, on

17  which of these three contributors is the defendant, assuming

18  that he is in fact in the mixture?

19       THE WITNESS:  When I did the comparison first, so

20  before I actually run it through STRmix, I actually look at the

21  electropherograms not only to determine number of contributors

22  but I do my own comparison to look to see if I could visually

23  exclude someone so I don't have to use STRmix.  Or I also look

24  through to see is there drop-out in how does this known sample

25  look compared to the evidence.  So I make a conclusion just

1    like I always have before I run the sample.  The sample then is

2    entered into STRmix and confirms my conclusion if the person is

3    there or not.  And originally when I looked at the

4    electropherogram, I did associate item 2AX as the most minor

5    contributor, and STRmix then confirmed my conclusion.

6    BY MR. PRESANT:

7    Q    So the sample for comparison, the defendant's sample, you

8    believe to be the 7 percent, correct?

9    A    Yes.

10   Q    What about sex, are you able to make a sex determination

11   with respect to either contributor 1 or contributor 2?

12   A    Generally, again looking at the electropherogram as a

13   whole, I'm able to look at the amelogenin, which is the sex

14   defining chromosome, and generally if the X is larger in the XY

15   combination, that may indicate a potential female contributor

16   is predominantly contributing to this sample, and in this case

17   there was a significant imbalance with the XY.  So based on

18   looking at the profile, in my opinion the predominant donor was

19   a female in this case.  And I knew at least one of contributor

20   2 or 3 had to be a male because there was also a Y present as

21   well as there was a type present at DY, which is also another

22   male indicator chromosome.  So I knew before comparing anything

23   that there was at least one male present out of this mixture.

24   Q    And that male would be the defendant if he is in the

25   mixture, correct?

AMBER SMITH - DIRECT EXAMINATION - MR. PRESANT

1  A    Yes.

2  Q    And your opinion then with respect to contributor 1 is that

3  that's likely a female?

4  A    In my opinion, yes, contributor 1 is predominantly the

5  female.

6  Q    And what contributor 2, can you make a conclusion as for

7  sex for contributor 2?

8  A    I would not make a conclusion on contributor 2.

9  Q    Now, is this 7 percent number acceptable because of the

10  internal validation studies showing STRmix can be used in the

11  Michigan State Police laboratory down to levels where the minor

12  contributor is below 7 percent?

13  A    Yes.

14  Q    There's also been testimony today about this number right

15  here, the Gelman-Rubin conversions diagnostic.  Do you recall

16  hearing that testimony?  You were in the courtroom, right?

17  A    Yes.

18  Q    Why did you settle on a run of STRmix where this diagnostic

19  was 1.41?

20  A    So according to the 2.11 protocol there are diagnostics

21  that you look at.  The primary diagnostic isn't always is the

22  contributor percentages does it appear to make sense as well as

23  the genotype breakdowns.  The secondary diagnostics that are to

24  be considered is the Gelman-Rubin convergence, as well as

25  allele and stutter variance, and the average likelihood or

1    average log likelihood.  Those numbers aren't the end all be

2    all and they are to be considered as a whole, and our manual

3    does say that 1.2 is generally an indicative indication that

4    the chains did converge.  However, being that is slightly above

5    1.2, is not a big deal because the ultimate is does the weight

6    of the breakdown of the evidence make sense, and then once the

7    comparison was run, does the individual likelihoods at each

8    location make sense.

9           So just because one diagnostic is slightly out it

10   doesn't cancel the other 7 or 8 diagnostics that you look at.

11   I have actually had a run where the Gelman-Rubin was at 3.87

12   but the overall breakdown and likelihood ratios made sense and

13   it was because of the other minor donor that slightly elevated

14   it, but overall the run made sense so it was able to be

15   reported out.

16          THE COURT:  When you say made sense, what, is that a

17   subjective determination by the analyst?

18          THE WITNESS:  Yes.  Made sense in a term that it did

19   what I expected it to do.  So if in this run say with the

20   contributor proportions there, it would have said that

21   contributors 2 and 3 both generated around 15 percent, and then

22   contributor 1 generated 7 percent or 70 percent.  That

23   breakdown would not have made sense to me because I can tell by

24   looking at the electropherogram that there is a major, a mid

25   contributor, as well as a minor contributor.  So when I say

1    made sense, it means that it made sense with what I was

2    observing in the electropherogram.  And once I did the

3    comparison, and based on looking at the individual LRs at each

4    individual locus, those numbers weren't anywhere outside of the

5    scope that I would have expected them to be.

6    BY MR. PRESANT:

7    Q    Is there anything else you would like to highlight for the

8    Court in Government's Exhibit 25?

9    A    Just again that the evidence input file does represent the

10   stutter filters off and that all those numbers are checked by a

11   technical reviewer to make sure they were inputted correctly

12   and that there is data present where there should be data

13   present.

14        THE COURT:  And I think we are going to wrap it up

15   there, Mr. Presant.

16        MR. PRESANT:  Your Honor, if I may I may have one or

17   two more questions then I'm done with my direct.

18        THE COURT:  Okay.

19        MR. PRESANT:  Thank you.  Ms. Smith, in your career as

20   a forensic DNA analyst, have you testified of likelihood ratios

21   before?

22        THE WITNESS:  I have.

23   BY MR. PRESANT:

24   Q    How long have you been testifying to likelihood ratios?

25   A    I have been a forensic scientist for 12 plus years, and I

1      used likelihood ratios in St. Louis, so I have been testifying

2      and running them since 2006.

3                MR. PRESANT:  That's all I have, Your Honor.

4                THE COURT:  Thank you.  You may step down right now,

5      Ms. Smith.  We are going to have to invite you back tomorrow

6      for cross-examination.

7                Counsel, what I would like to do before we adjourn is

8      to go through the, to make sure we have the exhibits correctly,

9      which ones have been offered and admitted, and I'm going to ask

10     the clerk to read her list off and once she's finished with

11     that, would you please indicate whether you have anything

12     different from what she has.

13               THE LAW CLERK:  Do you want the ones, just the ones

14     admitted?

15               THE COURT:  Yes.

16               THE LAW CLERK:  Okay.  Those are for the government,

17     1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 18, 19, 23, 25,

18     26, 27, and 28.

19               THE COURT:  Is that what you have, Mr. Presant?

20               MR. PRESANT:  That's what I have, Your Honor.

21               THE COURT:  Thank you.

22               THE LAW CLERK:  And for the defense I have G and CC.

23               MS. KLOET:  Yes, Your Honor.  And just to make the

24     record clear, the Defense Exhibit F that Your Honor hesitated

25     to admit I believe has now been admitted through the

Government's Exhibit 8.  Government's Exhibit 8.  So that issue is resolved.

THE COURT:  Thank you.  Is there anything else we need to cover before we adjourn for the day?

MR. PRESANT:  Not from the government.

MS. KLOET:  Give me one second, Your Honor.  Just give me a second to --  I think we are all set.  Thank you.

THE COURT:  Let's be back here ready to start promptly at 9:00 o'clock tomorrow morning.

THE LAW CLERK:  All rise.  Court is adjourned.

(Proceedings concluded, 4:34 p.m.)

```
 1                              INDEX

 2      Government Witnesses:                    Page

 3      JOHN BUCKLETON

 4      Direct Examination by Mr. Presant        13

 5      Cross-Examination by Ms. Kloet           89

 6      Redirect Examination by Mr. Presant      132

 7

 8      JEFFREY NYE

 9      Direct Examination by Mr. Presant        143

10      Cross-Examination by Ms. Kloet           194

11

12      AMBER SMITH

13      Direct Examination by Mr. Presant        205

14

15

16

17

18

19

20

21

22

23

24

25
```

| | Government Exhibits: | Admitted |
|---|---|---|
| 1 | Buckleton CV | 15 |
| 4 | validation studies | 53 |
| 5 | validation studies | 53 |
| 12 | validation studies | 53 |
| 23 | validation studies | 53 |
| 13 | list of labs using STRmix | 60 |
| 15 | Iyer/Lund paper | 61 |
| 18 | Buckleton paper | 63 |
| 28 | accepted Buckleton response | 63 |
| 17 | Dr. Adams report | 66 |
| 27 | Metropolis-Hastings algorithms | 73 |
| 14 | miscodes on STRmix | 77 |
| 2 | Nye CV | 144 |
| 19 | SWGDAM guidelines | 148 |
| 10 | MSP internal validation | 174 |
| 11 | MSP Procedure & Training Manual | 188 |
| 3 | Amber Smith CV | 206 |
| 6 | electropherograms | 211 |
| 7 | electropherograms | 211 |
| 9 | lab report | 221 |
| 8 | Word Pad file | 223 |
| 25 | deconvolution file | 223 |
| 26 | PDF of file | 223 |

1      Defense Exhibits

2      CC     Access to STRmix files              139

3      G      ScienceDirect article              139

REPORTER'S CERTIFICATE


I, Kathy J. Anderson, Official Court Reporter for the United States District Court for the Western District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a full, true and correct transcript of the proceedings had in the within entitled and numbered cause on the date hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared by me or under my direction.



/s/ Kathy J. Anderson

Kathy J. Anderson, RPR, FCRR

U.S. District Court Reporter

412 Federal Building

Grand Rapids, Michigan  49503